IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | No. 32 EM 2023 |
| | : | |
| | : | On King's Bench petition from the |
| v. | : | order of the Philadelphia County |
| | : | Court of Common Pleas at No. CP- |
| | : | 51-CR-0407441-2004, dated May 5, |
| LAVAR BROWN | : | 2023, granting Brown's petition under |
| | : | the Post Conviction Relief Act and |
| | : | vacating the judgment of sentence |
| PETITION OF: FAMILY MEMBERS OF | : | entered on October 24, 2004, with |
| MURDER VICTIMS MICHAEL | : | the consent of the Commonwealth. |
| RICHARDSON AND ROBERT | : | |
| CRAWFORD | | ARGUED: March 5, 2025 |

**OPINION**

**JUSTICE DOUGHERTY**                                                   **DECIDED: June 16, 2026**

The prosecutor does not decide whether a defendant is entitled to relief under the Post Conviction Relief Act (PCRA).[1]  This is the exclusive province of the PCRA court. Nonetheless, while not dispositive, a prosecutor's concession of relief is undoubtedly influential.  Courts have long been instructed to give such concessions "great weight[.]" *Young v. United States*, 315 U.S. 257, 258 (1942).  But when the prosecutor sides with a defendant, there generally is no adversarial testing of the defendant's entitlement to relief, and the court is left without the benefits of opposing advocacy, including the presentation of counterarguments and exposure of misrepresentations of fact and law.  The PCRA court's review is limited to the record before it.  If relevant evidence is withheld from the court, this pertinent information goes unconsidered.  The court is not permitted to conduct

---

[1] *See* 42 Pa.C.S. §§9541-9546.

its own independent investigation of extra-record materials, and it is not equipped to do so in any case. For these reasons, an unreliable prosecutorial concession substantially risks the erroneous grant of relief by the court. This is not to say a prosecutor should never concede relief. A prosecutor bears the responsibility of a minister of justice and not simply that of an advocate. Hence, a prosecutor is duty-bound to confess error, provided the facts and law call for it. But the proviso is critical. When relief is not dictated by the record and law but merely advocated for personal, political, ideological, policy, or other non-legal reasons, a prosecutor's concession does not minister justice; it facilitates injustice.

Here, in this case reviewed under our King's Bench jurisdiction, the Philadelphia District Attorney's Office (DAO), on behalf of the Commonwealth, conceded that Lavar Brown (Brown), a convicted murderer sentenced to death for a separate murder, was entitled to a new trial based upon a facially untimely claim under the PCRA. Upon careful review, we conclude this concession was not reliable. More specifically, we find the DAO conceded relief although none was warranted based on the existing record, violated its duty of candor to the PCRA court, withheld material evidence from the court, opposed efforts by *amici* to gain access to this evidence, submitted a false stipulation of fact, misstated facts in its pleadings, failed to conduct a reasonable investigation, and opposed a required evidentiary hearing. The predictable result was the erroneous grant of a new trial.

These circumstances, troubling as they are, would not warrant a remedy beyond reversal of the PCRA court's order in this particular case if they were confined to this one case. Unfortunately, they aren't. Since 2018, the DAO has conceded relief well over 100 times, mostly in murder cases like this one. There have been numerous instances of untrustworthy concessions, lack of candor, misrepresentations of fact, lack of adequate

investigation, and avoidance of hearings. And the problems are poised to continue. There are apparently more than 1,000 cases yet to be reviewed by the DAO's Conviction Integrity Unit (CIU), and the DAO vigorously defends its checkered concession program as a necessary corrective to past misdeeds by prior administrations.

The DAO's active, ongoing, and problematic concession program requires broader remedial action to promote just outcomes. Accordingly, in addition to reversing the PCRA court's grant of a new trial here, we also hold that in any PCRA case in which the DAO concedes relief, the PCRA court shall grant the Office of Attorney General (OAG) notice and the right to intervene in the case before ruling on the concession. Regardless of the OAG's position on the concession if it chooses to intervene — it may well agree relief is warranted — its independent assessment and participation will enhance the reliability of the proceedings and the PCRA court's ultimate decision.

## I. Background

In December of 2002, Jamaar Richardson began working at a Rite Aid at the intersection of 12th Street and Girard Avenue in Philadelphia. On January 17, 2003, Jamaar was at his nearby house at 1218 N. 11th Street. He was there with his brother James Richardson, who also lived at the house, as well as Kiana Lyons, who lived directly behind the Richardson house, and Brown. Jamaar explained to James, Lyons, and Brown that he would be responsible for opening the Rite Aid the next morning, that there would be $50,000 in cash in the store's two safes, and that the only other people who would be present at the store would be the manager and a delivery truck driver.

On the morning of January 18, 2003, at approximately 4:00 a.m., Delbert Wech, an assistant manager of the Rite Aid, arrived at the store. Thereafter, Jamaar also arrived at the store and assisted in unloading the delivery truck. After the delivery truck was unloaded, Wech exited the back door of the Rite Aid and put trash in the dumpster. As

Wech returned to the back door, he encountered Brown, who was armed with a rifle or shotgun. Brown motioned for Wech to enter the store. Instead, Wech turned and ran. At that point, he noticed James standing approximately one car's length away. James fired a gunshot at Wech but missed, and Wech continued to flee. Lyons saw Brown, who was still armed, and James run through her backyard and enter the Richardson house.

Later that day, James met with Ronald Vann and Christopher Kennedy. James told the men he and another person had attempted to rob the Rite Aid, and the manager had gotten away.

On January 19, 2003, Brown, Vann, James, Jamaar, Kennedy, and Lyons met at the Richardson house to plan another robbery of the Rite Aid. Their plan called for each of them to perform specific tasks. Specifically, they planned for Lyons to enter the store first and report back about how many people were inside, Vann to close the gates from the inside, Kennedy to take the manager to the safe and shoot him in the leg if he gave him any trouble, James to grab the security guard and prevent him from running out the door, and Brown to get everyone in the store onto the ground and make sure no one moved. In addition, Jamaar advised the group where the alarms were located and how to open the gate at the back of the store.

Following the meeting, Lyons entered the Rite Aid, bought a few items, and reported back that there was one security guard and two cashiers inside. Thereupon, Kennedy entered the Rite Aid while Brown, Vann, and James remained outside. Inside the Rite Aid, Kennedy followed the manager, Michael Richardson,[2] down an aisle. Moments later, a cashier working at the store, Dinlitha Banks, heard a gunshot and heard Michael Richardson cry out, "[b]ut I didn't do anything. I didn't do anything." N.T. Trial, 7/20/04, at 63. Banks ran out of the store to a payphone and called the police. James

---

[2] Michael Richardson was not related to Jamaar and James.

approached a window to the Rite Aid and then ran back to Brown and Vann and said, "Chris did it." N.T. Trial, 7/22/04, at 154. At that point, Brown, James, and Vann ran back to the Richardson house.

The police responded to the scene and saw Kennedy run out of the back door of the Rite Aid with a gun and a trash bag. The police ordered Kennedy to stop but he kept running. They gave chase and eventually apprehended him. The officers recovered Kennedy's gun as well as the trash bag, which contained $2,200 in cash. The police discovered Michael Richardson lying in a pool of blood in his office. He had a bullet hole in the side of his head near his left ear. Although he was still alive, he was gasping for air and could only respond to the police with a gurgling sound. He died a short time later at the hospital.

At approximately 8:45 p.m. that evening, approximately two hours and fifteen minutes after the murder at the Rite Aid, the police arrested Vann and Brown outside of the Richardson house. They were subsequently released.

Vann later gave a series of statements to the police regarding the Rite Aid murder. On January 21, 2003, at approximately 11:15 a.m., he gave a statement to Detective Brian Peters of the Central Detectives Division (CDD)[3] in which he implicated Kennedy and James in the murder. That same day, at approximately 1:55 p.m., he gave a statement to Detective Kevin Judge of the Homicide Division in which he again implicated Kennedy and James. He also noted "a girl" was at the Richardson house before the murder.

Next, on February 20, 2003, Vann gave a statement to Detectives Gregory Santamala and Timothy Brooks of the CDD. In this statement too he implicated Kennedy

---

[3] Detective Peters retired from the Philadelphia Police Department in 2021 and presently works as a Special Agent for the OAG. He is referred to herein as Detective Peters in accordance with his position at the time of the relevant events.

and James.  Additionally, he alleged Jamaar[4] was involved in the murder and told the police he believed Brown was involved in the failed robbery of the Rite Aid the day before the murder.

On March 21, 2003, in a proffer session attended by Assistant District Attorney Bill Fisher (ADA Fisher), Detectives Santamala, Brooks, and Judge, Sergeant Andrew Byard, and Vann's counsel, Vann gave another statement to law enforcement.  This statement is memorialized in a memorandum to the file from ADA Fisher dated March 31, 2003 (March 2003 memorandum), which provides:

> ADA spoke with defendant's counsel alone and gave him a copy of defendant's statements, also informed him that defendant had given an informal (oral) statement to Dets. Brooks and Santamala.  ADA didn't inform the defendant's attorney about specific content of the oral statements, however, counsel was informed that the oral statements were more expansive or conflicted with the written statements.

> Counsel was given an opportunity to speak in private with Vann, prior to our interview.

> Vann was not immediately forthcoming — but eventually [h]e probably told most of the truth — in a patchwork, haltingly painful reluctant manner.

> This is a summary of what he said:

> On the day of the murder, 1/19/03 (about game time[5]) he, James Richardson, Black (Lavar Brown), were in Richardson's kitchen — Black and Richardson talked about the robbery of Rite Aid (1/18/03, 5:00 a.m.) — both admitted to their involvement of [sic] that robbery.  James Richardson may have had a 9mm and Black a rifle.  I think Vann said it was some type of assault weapon (W[e]ch said that the doer had shotgun — he knows is a hunter and knows guns.)

> James Richardson shot at manager.  (A 9mm FCC was found the next day by W[e]ch.)

---

[4] The statement referred to Jamaar as "Jamal."

[5] The Philadelphia Eagles played the Tampa Bay Buccaneers in the National Football Conference Championship Game of the National Football League on January 19, 2003.

At some point Jamaar Richardson and Chris Kennedy were in the kitchen. The robbery the previous night was discussed in Jamaar's presence — it was not clear whether he helped plan this robbery.

Vann seemed to suggest that Black was the "leader" or "motivator"/"initiator" when the discussion turned to the plan for the robbery on 1/19/03. However, Jamaar provided specific information — only camera in front of store didn't work; only panic button near the safe; no money pick-up on Sunday.

The original plan required Kinyana (a young black woman, 17-18 years old) to case the store — she went to the store prior to the robbery — bought a bottle of Nyquil — came back to house — told them the number of people working in the store and how many cars in parking lot.

Subsequently, Vann, Black, Kinyana, Chris and James went back to store — Chris had 40 + cal, Black had an assault rifle, and James had 9mm. Kinyana and Vann were unarmed (according to Vann).

Only Chris and Kinyana went into the store. It is not clear whether they entered together. I interviewed several witnesses — no one mentioned seeing a girl. One witness (store clerk not interviewed by the police) remembers seeing Chris Kennedy but no girl. Keith Quinn recalls seeing Chris Kennedy with short person with hoody (fits description of girl) walking towards the entrance of the store minutes before the robbery.

[Kinyana may live immediately in back of James Richardson.][6]

After speaking with Vann, Sgt. Byard and K. Judge indicated they would follow-up on Kinyana (address-name) and research on Lavar Brown (Black). As of this writing I have not heard anything from either. Further, I have spoken with them about J[a]maar and the planning of the 1/19/03 robbery and the fact that J[a]maar still shows up periodically at Rite-Aid asking questions about the case — the witnesses (employees) are scared to death of J[a]maar.

---

[6] This sentence is bracketed in the original.

March 2003 memorandum at 1-2.[7]  Thus, in Vann's March 21, 2003 statement, in addition to again implicating Kennedy, James, and Jamaar in the murder, he also identified Brown and Lyons as being involved in the killing.[8]

Finally, on July 22, 2003, Vann gave a lengthy and detailed statement to Detectives Baker and Judge, likewise implicating Kennedy, James, Jamaar, Brown, and Lyons in the murder.[9]  None of Vann's statements referenced Kennisha Paige.[10]

On July 15, 2004, Brown's jury trial for the Rite Aid murder began.  He was tried jointly with Kennedy, James, and Jamaar.  The evidence against him at trial included the

---

[7] Neither the DAO nor Brown provided the March 2003 memorandum to the PCRA court below.  Instead, the King's Bench petitioners, the family members of Brown's murder victims Michael Richardson and Robert Crawford (Family Members), obtained the memorandum from a public court filing by co-defendant Kennedy in his own separate PCRA case and have included it in their supplemental appendix in this Court.  *See* Family Members' Brief at ii n.1; OAG's Brief at 53 n.22; Brown's Answer to Allegations of Oral Argument Misstatem[e]nts at 5.

[8] The March 2003 memorandum referred to Lyons as "Kinyana."

[9] The statement referred to Lyons as "Keyanna."

[10] Attached as exhibits to the OAG's reply memorandum in support of Family Members' petition for King's Bench review, which this Court permitted and ordered docketed when we assumed King's Bench jurisdiction, are declarations from Detectives Judge and Peters.  The Judge declaration alleges: "[w]hile I do not have a specific recollection of someone named Kennisha Paige, had she been identified at any point by Vann or anyone else as being involved or being in possession of any information about the homicide, that information would have been documented."  Declaration of Detective Kevin Judge at ¶16 (undated).  Similarly, the declaration of Detective Peters asserts: "[a]t no time during my encounter and interactions with Vann at Central Detectives on January 21, 2003 did Vann ever say to me, or another detective/officer in my presence, that someone named Kennisha Paige was involved in the commission of the Rite Aid robbery/murder on January 19, 2003.  If he did, I would have documented that information."  Declaration of Special Agent Brian Peters, 6/14/23, at ¶13.  In addition, the Peters declaration claims: "[w]hile I do not specifically recall the name Kennisha Paige, I distinctly remember that Vann discussed two girls that lived in the area and hung around these suspects regularly."  *Id.* at ¶14.

testimony of Vann and Lyons.[11]  The questioning of Vann, which included extensive cross-examination by counsel for each of the four co-defendants, elicited considerable information challenging his credibility.  For example, Vann's testimony revealed he had a separate open robbery case; pleaded guilty to selling drugs; had other drug convictions; violated his parole following the Rite Aid murder and served nine months in prison; initially lied to the police about the murder "to keep [himself] out of it"; lied to the police "about three times"; hoped his testimony would help him with his own cases; and was the beneficiary of a testimonial immunity order providing that if he testified about the murder, the Commonwealth would not be able to use his testimony against him in any criminal prosecution.  *See* N.T. Trial, 7/22/24, at 159-161, 171, 361-62.  Ultimately, the jury convicted Brown of second-degree murder, two counts of criminal conspiracy, two counts of robbery, aggravated assault, and possessing an instrument of crime.  The trial court sentenced him to life imprisonment for second-degree murder.[12]  On September 20, 2006,

_____

[11] Jamaar also implicated Brown in the murder in his statement to police on February 10, 2004.  Statement of Jamaar Richardson, 2/10/04, at 3.  This statement was introduced at trial, but the references to Brown therein were redacted.  *See* N.T. Trial, 7/26/04, at 257-281.  In addition, the trial court instructed the jury to consider Jamaar's statement against him only, and to not consider it in any way against any of the other defendants.  *See* N.T. Trial, 7/28/04, at 227-28.

[12] On May 31, 2005, a jury convicted Brown of first-degree murder and related offenses for a second murder, the murder of Crawford, which he committed on December 10, 2003, before he was arrested for the Rite Aid murder.  In that case, Brown and Rahsaan Anderson were standing on Girard Avenue in Philadelphia when Brown saw Crawford crossing the street.  Brown stated, "There go that pussy."  He then approached Crawford from behind and shot him multiple times in the back.  Brown and Anderson began to run.  Two police officers were nearby, one of whom pursued Brown and ordered him to stop.  Brown, however, continued to flee.  Other officers joined the chase, and the police eventually found Brown hiding under a car.  A gun was recovered nearby.  The jury sentenced Brown to death for the first-degree murder of Crawford.  One of the aggravating circumstances supporting the death sentence was Brown's second-degree murder conviction for the Rite Aid murder.

(continued…)

Following the affirmance of his death sentence on direct appeal, Brown filed a petition under the PCRA. The petition was denied, and Brown appealed to this Court, raising thirteen issues. "On September 19, 2017, the Commonwealth filed a lengthy (ninety-eight-page) brief in which it opposed any and all relief on these thirteen issues." *Commonwealth v. Brown*, 196 A.3d 130, 141 (Pa. 2018). Thereafter, however, on January 2, 2018, there was a change in administration at the DAO, and Lawrence S. Krasner became the District Attorney of Philadelphia (DA Krasner). On April 9, 2018, the DAO and Brown filed a joint motion with this Court confessing error with respect to one of Brown's claims: his allegation that trial counsel was ineffective for not developing and presenting mitigating evidence at the penalty phase of the capital trial. The joint motion requested this Court grant relief on the claim, vacate Brown's death sentence, and remand to the trial court for resentencing to life imprisonment. On April 23, 2018, this Court ordered the parties to submit supplemental briefing in support of the joint motion and invited the OAG to participate as *amicus* and file a brief. In its brief in support of the joint motion, the DAO argued "when a district attorney makes a 'reasoned fact and policy-based decision not to defend a particular conviction or sentence,' this Court must immediately remand for imposition of the agreed-upon relief, as this Court may not 'second-guess legitimate exercises of prosecutorial discretion.'" *Id.* at 143, *quoting* DAO's Supplemental Brief at 3. The OAG, on the other hand, contended this Court cannot accept confessions of error by a prosecutor without conducting independent judicial merits review. This Court rejected the DAO's position and agreed with the OAG, holding that "neither the parties, by agreement, nor this Court, absent a finding of legal error, have the power or ability to order that the jury's verdict be commuted to a life sentence without parole." *Id.* at 144. Upon independent judicial review of the penalty phase claim conceded by the DAO, this Court disagreed with the DAO's assessment of its merits, and instead concluded no relief was due on the issue. *See id.* at 149-158. The Court denied the joint motion and affirmed the denial of PCRA relief. On September 9, 2021, Brown filed another PCRA petition, which remains pending in the PCRA court. He also has a pending petition for a writ of habeas corpus in federal court challenging his judgment of sentence in his capital case, which he filed on July 19, 2019. Among other claims, Brown's federal habeas petition raises the claim of ineffective assistance of counsel in the penalty phase rejected by this Court in 2018. On May 28, 2021, the DAO and Brown filed in federal court a joint motion for sentencing relief based on this claim. The joint motion alleged this Court's denial of the claim "was based on an unreasonable application of clearly established federal law and an unreasonable determination of the facts." *Brown v. Wetzel*, 10-5553, ECF No. 33, 5/28/21, at ¶13. The joint motion also argued that while the DAO's concession to relief on the mitigation ineffectiveness claim was "not binding" on the district court, it was nonetheless "entitled to substantial deference." *Id.* at ¶14. After oral argument was held in this matter, however, the DAO filed a motion for leave to withdraw the joint motion for sentencing relief. The DAO explained the joint motion did not align with "the DAO's current practice . . . to file a fulsome merits response in every case," which "applies both when the DAO opposes relief and when the DAO agrees that some form of relief is due." *Brown v. Wetzel*, 10-5553, ECF No. 62, 10/6/25, at 3. The DAO's motion to withdraw was granted on April 21, 2026.

the Superior Court affirmed Brown's judgment of sentence, and this Court denied allowance of appeal on May 15, 2007.

On July 24, 2007, Brown filed a timely *pro se* petition under the PCRA. Lloyd Long, Esq., was appointed to represent him and filed an amended petition on his behalf.[13] Attorney Long subsequently withdrew from the case and Brown's current counsel, the Federal Community Defender Office for the Eastern District of Pennsylvania, entered their appearance and filed a supplemental amended petition. The Commonwealth opposed relief. The PCRA court conducted an evidentiary hearing at which James Funt, Esq., counsel for Lyons, testified.[14] The PCRA court dismissed the petition, and the Superior Court affirmed.

On June 23, 2020, Brown filed a second PCRA petition. Thereafter, on June 28, 2021, he filed a Supplement and Amendment to Successor Petition for Writ of Habeas Corpus and for Collateral Relief from Criminal Conviction (Amended Second PCRA Petition). In the latter filing, Brown pertinently claimed the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963)[15] when it "withheld [from Brown prior to trial] evidence that [Vann] falsely accused an individual named Kennisha Paige of being involved in the January 19, 2003 Rite Aid robbery/murder." Amended Second PCRA Petition, 6/28/21, at ¶63. Specifically, he faulted the Commonwealth for failing to disclose four documents, which he attached as exhibits to the appendix to his Amended Second PCRA Petition.

---

[13] Attorney Long was subsequently the law partner of DA Krasner, from January 2012 to June 2017. *See* DAO Response to Claim of Conflict of Interest, 12/10/21, at ¶12.

[14] Attorney Funt is a partner in the law firm of Greenblatt, Pierce, Funt & Flores LLC. DA Krasner was associated with this firm from June 2017 to January 2018. *See id.* at ¶7.

[15] "Under *Brady*, the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Commonwealth v. (Christopher Lynn) Johnson*, 335 A.3d 685, 703 n.4 (Pa. 2025), *quoting Smith v. Cain*, 565 U.S. 73, 75 (2012).

First, he claimed the Commonwealth failed to disclose a memorandum from Detective

Baker[16] to Detective Judge dated July 14, 2003, which provided:

> Monday the 14th of July 2003
> M03-14[17]
> Det. K. Judge
>
> Kevin I called Kennisha Paige at about 6:30 p.m. and she said she would come down for an interview, she didn't show. I called her back at about 7:30 p.m. and she said she was getting dressed, she never showed. She did however say that she was incarcerated until 6/03.
>
> I called and spoke to her mother, seemed nice, she said she couldn't control her daughter and that her daughter was living with a lady Marzetta (NFI) 1216 Stiles St.[]
>
> I called Gannondale (School for girls) and they said she would get weekend passed [sic] but they could not tell when she was home, we would have to call tomorrow (7/15/[03]) and talk to Specialist Nancy Sabol at 814-899-7659.
>
> I located a Marzetta in public housing, but Mom will have to ID.
>
> I will attempt to get her tomorrow, after we talk to Gannondale. I would hate to drag her in and then find out that she was truly incarcerated and Vann was lying. After all he is the only one that mentioned her.
>
> Envelope in my box[.]

Amended Second PCRA Petition, 6/28/21, at Appendix, Exh. 20.

Second, Brown alleged the Commonwealth withheld another memorandum from

Detective Baker to Detective Judge dated July 15, 2003, which provided:

> Tuesday the 15th of July 2003

---

[16] Although Detective Baker's memoranda to Detective Judge on July 14 and 15, 2003 are not signed, it is clear he wrote them. They are written in the first person and refer to Detective Baker receiving a fax from the Gannondale Residential Center for Girls on July 15, 2003. A copy of the fax confirms he received a fax from Gannondale on that date. Moreover, the parties agree Detective Baker authored these documents. *See* Family Members' Brief at 38; OAG's Brief at 52; DAO's Brief at 19.

[17] This was the case number for the Rite Aid murder. *See* Joint Stipulations of Fact, 11/8/22, at ¶18.

M03-014
Det. K. Judge 8062

On Monday the 14th of July at about 6:30 p.m. I called [redacted[18]] and spoke to Roslyn Paige, the mother of Kennisha Paige, who indicated that she was unable to control her daughter that when she turned eighteen she began staying with an older lady Marzetta who lived at 1216 Stiles Street. Also that Kennisha was incarcerated until Father's day 2003. Ms. Paige then put Kennisha on the phone and Kennisha told me that she didn't know anything about a murder but was willing to come to Homicide for an interview, that she was incarcerated.

At about 7:30 p.m. I called Kennisha and inquired if she was indeed coming in for an interview, she indicated that she was getting dressed and would be in. She never showed.

I contacted Gannondale residential center for girls (814-899-7659) and was informed that Kenneshia [sic] had been a client from 9/16/02 until 6/03 but did not get home passes. I was told that for more detail I would have to contact Nancy S[abol] during working hours.

On Tuesday the 15th of July 2003 at about 2:35 p.m. I spoke to Nancy Sabol and she affirmed that Kennisha was a client and not away from the Center during the time of the homicide. I requested and received a fax copy of the "Night log chart" which showed Kennisha in residence during the time of the homicide.

Gannondale i[s] located in Erie Pennsylvania.

Amended Second PCRA Petition, 6/28/21, at Appendix, Exh. 21.

Third, Brown accused the Commonwealth of failing to disclose a fax from Gannondale to Detective Baker on July 15, 2003. The fax included the night log chart indicating Paige[19] was at Gannondale on January 19, 2003, the day of the Rite Aid murder.

---

[18] This content is blacked out in the document.

[19] The night log chart referred to Paige as "Kinneshia."

Fourth, Brown claimed the Commonwealth withheld an undated memorandum titled "23rd Dist, 'A' Sector Robberies" (23rd District memorandum)[20] which provided:

23rd Dist, "A" Sector Robberies

On 1/21/03, defendant Ronald Vann PPN/867801 was arrested by CDD SIU for the robbery, point of handgun of a pizza delivery person, [redacted] (DC#03-23-00618)

Vann then co-operated with CDD SIU, providing in[f]ormation into the robbery of the Rite Aid, 1301 Girard Ave, on 1-18-03, and the homicide at the Rite Aid the following day, 1-19-03. Based on Vann's co-operation, defendants Christopher Kennedy 22/B/M, PPN/840063 and James Richardson 22/B/M, PPN/858783 have been arrested and charged with robbery & homicide. (DC#03-23-001770 and 03-23-001914)

Vann is continuing to co-operate with CDD SIU regarding robberies being committed in the 23rd dist area of Broad and Girard Ave, providing confidential information concerning the following:

Robbery/Homicide: Jama[a]r Richardson 21/B/M, 1218 N 11th St (no record), Kennisha Paige 17/B/F, 1116 Stiles St

Robberies:   William Green 19/B/M, PPN/885936, [redacted]
Anthony Frames 20/B/M, PPN/836622, aka "Spanky"
Lavar Brown, 25/B/M, PPN/807547, 1222 N 11th, aka "Black"
Stephen Kennedy 19/B/M, PPN/823690, [redacted]
James Montgomery, 20/B/M, PPN/885941, [redacted]
Naheem Johnson 20/B/M, PPN/851060, [redacted]

Amended Second PCRA Petition, 6/28/21, at Appendix, Exh. 12.[21]

_____

[20] The Commonwealth provided a redacted version of the 23rd District memorandum to Brown in 2010 in connection with the litigation of his first PCRA petition. *See* Amended Second PCRA Petition, 6/28/21, at ¶60.

[21] Although the 23rd District memorandum is not dated, it references the arrest of James, which occurred on February 4, 2003. *See* N.T. Trial, 7/26/04, at 110, 134. The memorandum also states Jamaar has "no record[,]" indicating it was written before his arrest on February 10, 2004. *See id.* at 250. Hence, it appears the memorandum was drafted at some point between February 4, 2003, and February 10, 2004. Detective Peters described this document as follows:
(continued…)

Brown argued "[t]he suppression of the paperwork about Kennisha Paige deprived the defense of evidence that could have been used at trial to show police knew Mr. Vann had provided untrue information and was capable of falsely implicating an innocent person **in this crime** simply to save himself." Amended Second PCRA Petition, 6/28/21, at ¶68 (emphasis in original). "This is particularly important," he contended, "because based on this false accusation, the jury could have surmised that Mr. Vann was also lying when he implicated Mr. Brown — given Mr. Vann made no mention of Mr. Brown being involved in this crime until later." *Id.* According to Brown, "[t]he defense could have used the suppressed paperwork to discredit not only Mr. Vann's testimony implicating Mr. Brown, but also the investigation resulting in [Brown's] conviction." *Id.* Brown filed the Amended Second PCRA Petition under seal.

On August 18, 2021, Brown and the Commonwealth, represented by the DAO, filed a joint motion to unseal the Amended Second PCRA Petition. Additionally, Brown moved, without opposition by the DAO, to amend his Amended Second PCRA Petition to assert that the allegations therein were based on "newly discovered evidence . . . obtained from review of homicide detectives' files (H-files) and Philadelphia District Attorney's Office files in the Philadelphia District Attorney's Office . . . conducted in late 2020 and

---

I recognize this document generally as a summary prepared for a "CompStat" meeting. This is a monthly administrative meeting wherein each Captain and supervising officer provides a general briefing to Police Command about ongoing investigations and other matters of interest in their respective areas of command. Detectives do not attend these meetings. This document was not prepared by me or by any other detective in CDD. Generally, these CompStat summaries were prepared by one of two officers assigned to administrative duties that worked at CDD during this time. It is my belief, based on my knowledge of how and why these documents were prepared, that this document was generated by one of these administrative officers at CDD, and possibly based on handwritten notations taken by me or another Detective during my encounter with Vann.

Declaration of Special Agent Brian Peters, 6/14/23, at ¶16.

early 2021 and concluded when the Commonwealth provided [Brown's] counsel with redacted copies of all documents flagged for copying on April 13, 2021." Joint Motion to Unseal and Unopposed Motion to Amend Supplement and Amendment to Successor Petition and Appendix, 8/18/21, at ¶3. Brown claimed "[t]he [Amended Second PCRA Petition] is timely filed pursuant 42 Pa.C.S. §9545(b)(1)(i) (government interference) and 42 Pa.C.S. §9545(b)(1)(ii) (newly discovered evidence)." *Id.*

On November 1, 2021, the DAO filed a response to Brown's PCRA petition. Therein, the DAO asserted that following a "thorough, independent review of the records in this case[,]" it "now agree[d]" with Brown that he was "entitled to a new trial." DAO's Response to Petition for Collateral Relief, 11/1/21, at ¶¶8,10. In particular, the DAO agreed with Brown that the Commonwealth violated *Brady* by failing to disclose evidence that Vann implicated Paige. *See id.* at ¶¶105-08. The DAO insisted the PCRA court was "in a position to do what the prior PCRA court could not — review Brown's claims in light of a complete record." *Id.* at ¶129. "Given the record as a whole," the DAO "believe[d] Brown was likely involved in the robbery and homicide, but his trial and subsequent proceedings were infected by serious misconduct." *Id.* at ¶138. The DAO emphasized "[t]he misconduct in this case is particularly troubling as Brown's conviction served as an aggravator in a separate capital case." *Id.* at ¶139 (footnote omitted). The DAO also accused the prior prosecutors in the case, both at trial and in the first PCRA proceeding, of exhibiting a "win at all costs mentality" and engaging in "misconduct [that] falls short of prosecutors' legal, ethical, and constitutional obligations[.]" *Id.* at 59. In the DAO's view, "this case [was] a stark example of what can go wrong when prosecutors cut corners and

shirk their ethical and constitutional duties in order to obtain and defend convictions of defendants they believe are guilty." *Id.* at 4.[22]

On January 24, 2022, Family Members filed a motion to intervene in Brown's pending PCRA case "to litigate the disqualifying conflict of interest of the [DAO], and in the alternative to provide th[e PCRA court] with a balanced account of the merits of [Brown's] current postconviction claims[.]"  Motion for Intervention by Victims' Families, 1/24/22, at 1.  Family Members alleged the DAO had a disqualifying conflict of interest based, *inter alia*, on DA Krasner's prior professional relationships with Attorneys Long and Funt, and the DAO's apparent effort to "circumvent" this Court's decision in *Brown* by conceding relief in his non-capital case which served as an aggravator for his death sentence.  *Id.* at 9.  Alternatively, Family Members argued that "[e]ven if the [DAO] were not disqualified, . . . intervention would still be essential to vindicate the interests of the victims' families by permitting [them] the opportunity to review the full, lengthy file and prepare a thorough response to [Brown's] claims.  This Court cannot make a proper decision without hearing both sides of these factually and legally complicated issues." *Id.* at 10.  The DAO opposed intervention.

On July 8, 2022, the PCRA court issued an order denying Family Members' request to disqualify the DAO.  Additionally, in a separate order the same day, the court granted in part and denied in part Family Members' motion to intervene.  The court granted intervention solely for the purpose of litigating the conflict-of-interest issue, which it had decided in the DAO's favor, but denied intervention for the purpose of litigating the

---

[22] In a footnote, the DAO referenced Vann's March 21, 2003 statement.  *See id.* at ¶74 n.8 ("The first formal statement implicating Brown in this crime was taken in July 2003, and there is no record of Vann discussing Brown informally prior to March 2003.").

merits of Brown's PCRA petition. The court ordered Family Members could be heard on the merits of the pending PCRA petition as *amici curiae*.[23]

Regarding future proceedings, the PCRA court noted the existing record was insufficient to determine Vann in fact implicated Paige and to grant relief, and that an evidentiary hearing was required:

> I will also state that I am not going to grant the petition based on the existing record. I'm going to require an evidentiary hearing. I'm going to require that all of the prosecutors who participated in this case and whose conduct is at issue be subpoenaed to testify.
>
> I also — I agree with the [Family Members] on the insufficiency of the record; and in particular, I do want to see more evidence on the statement that Ronald Vann allegedly made implicating Kennisha Page [sic]. I agree with [Family Members'] argument that on the face of the documents that were submitted to me, I can't tell that that, in fact, happened. And I also want to hear the perspective of all of the district attorneys who worked on this case and whose conduct is at issue and hear what they believe happened and find out — get to the bottom of it.
>
> But on the existing record, it's my considered view — and I've spent a lot of time on this — that there is not enough information in the paperwork for me to grant the petition notwithstanding the fact that both parties are of the opinion that it should be granted.

N.T. PCRA Hearing, 7/8/22, at 6-7; *see also id.* at 10 (court noting that if there is no appeal by Family Members it will "schedule an evidentiary hearing"); *id.* at 11 (same).

On August 11, 2022, the PCRA court reiterated that Brown was not entitled to relief on the existing record and an evidentiary hearing was necessary. Responding to defense counsel's argument "a hearing is not needed[,]" the court noted, "Well, that train has left the station. We're having a hearing. I've already ruled on that at the last listing." N.T. Hearing, 8/11/22, at 13. The court elaborated: "I'm interested in actually what happened, and I don't think that's clear just from the submissions that I received." *Id.* The court

---

[23] Family Members did not appeal these orders.

ordered briefing regarding the witnesses to be presented at the evidentiary hearing, the scope of the hearing, and the role of Family Members at the hearing. *See id.* at 16.

In their opening brief, Family Members argued Brown's second PCRA petition was "untimely[.]" Opening Brief of *Amicus Curiae* Victims' Family to Dismiss Brown's Untimely and Meritless PCRA Claims, 9/9/22, at 10. In addition, Family Members' brief included extensive discussion of the merits of Brown's claims. They argued an evidentiary hearing was not warranted because it was clear Brown was not entitled to relief. *See id.* at 61-62 ("Rule 907 of the Pennsylvania Rules of Criminal Procedure provides that the PCRA court can deny a petition without a hearing when it determines 'that there are no genuine issues concerning any material fact and that petitioner is not entitled to post-conviction collateral relief and no purpose would be served by any further proceedings . . . .' Pa.R.Crim.P. 907. That is the case here."). Alternatively, Family Members insisted that if the court ordered an evidentiary hearing, their participation therein was "essential . . . to protect the sanctity and integrity of the criminal justice system in this case[.]" *Id.* at 62. Relatedly, they requested "access to the complete file in this case[,]" arguing this "would be the only way to make certain th[e PCRA court] was presented with all the relevant documentation in the case before making its determination — and not just those documents that the parties believe support their mission to vacate the conviction." *Id.* at 67 (emphasis omitted).

The briefs of Brown and the DAO similarly argued an evidentiary hearing was unnecessary because Brown was entitled to PCRA relief as a matter of law. *See* Brown's Memorandum on the Scope of the PCRA Hearing and Role of *Amicus Curiae* (Brown's Pre-Hearing Brief), 9/9/22, at 2 ("[T]here is no need for an evidentiary hearing because the pleadings and proffered evidence establish that there are no genuine issues of material fact and Mr. Brown is entitled to relief as a matter of law[.]"); DAO's Pre-Hearing

Brief, 9/9/22, at 4 n.3 ("[N]o additional evidence is necessary to resolve the claim[.]").

Moreover, Brown and the DAO maintained Family Members' participation as *amici* should be limited to filing briefs, and they should not be allowed to review the DAO's files, obtain discovery from the DAO, or present or question witnesses. *See* Brown's Pre-Hearing Brief, 9/9/22, at 20 ("Here, the *amici* should not have any role other than filing briefs on the merits."); DAO's Pre-Hearing Brief, 9/9/22, at 8 ("*Amici*'s formal participation should be limited to the traditional role of *amicus curiae* — providing briefing to assist the Court in its resolution of the issues before it."). In particular, the DAO alleged Family Members' review of the prosecution's records was "unnecessary" because "the DAO is the Commonwealth's representative in this case and has already reviewed the prosecution file to ensure that any relevant evidence is provided for the [c]ourt's review." *Id.* at 9-10.

On October 7, 2022, the PCRA court continued the case for Brown to consider whether he wanted to request an evidentiary hearing. The court expressed skepticism as to why Brown was seeking a ruling without further factual development, as it was dubious the paperwork submitted by Brown, *i.e.*, the exhibits included in the appendix to his Amended Second PCRA Petition, alone established Vann falsely implicated Paige:

> It's troubling. I mean, I raised this the first day we got this case. And [counsel for Family Members] has raised it and has argued it, and he makes some excellent points there. So I don't know why you would want to submit it in this posture, but if you do, that's up to you. Of course, if I were to rule against you on this, then I would have to reach the materiality issue that would be right [sic] for a decision. But this is a preliminary matter. First of all, did this happen? . . .
>
> If it didn't happen then I don't have to figure out if it's material or not; right? I don't have an answer, I have to look at it more closely. But I'm still not understanding how everybody thinks that paperwork establishes that. I'm a little thick about this but, seriously, I just don't get it. . . . I don't know how you look at that paperwork and reach that decision. But I'm not going to make a decision now.

N.T. Hearing, 10/7/22, at 12-13. In addition, the court observed "the briefs that [counsel for Family Members] filed show that there are reasoned arguments to be made in support of maintaining the judgments of the conviction[,]" and these arguments "haven't been made by the prosecution." *Id.* at 23-24.

On November 8, 2022, the DAO and Brown filed joint stipulations of fact with the PCRA court. The joint stipulations alleged, among other things, that "[o]n Tuesday, July 22, 2003, Ronald Vann provided a third statement to homicide investigators. That statement was the first in which he implicated [Brown] or Kiana Lyons in the Rite Aid robbery/homicide." Joint Stipulations of Fact, 11/8/22, at ¶41.

The next day, at a status hearing before the PCRA court, the DAO explained the joint stipulations of fact were submitted "to clarify why there's no need for" an evidentiary hearing. N.T. Hearing, 11/9/22, at 16. The court raised the concern that the factual stipulations could be affected by the common position of the DAO and Brown in support of PCRA relief:

> I could also see that in a situation where you had a commonality of view and a commonality of purpose to illuminate what otherwise would be real — I'm not saying this is happening. But believe me, just purely speaking theoretically, you can enter into stipulations on matters that could actually have them litigated as a matter of fact but for which you both have a common view since you both have a common position on the legal issues and therefore foreclose any further review.

*Id.* at 13. The court also repeated its view there were "arguments that can reasonably be made to support the conviction . . . that haven't been made to support the conviction." *Id.* Thereafter, Family Members formally objected to the stipulations. *See* Reply Brief of *Amicus Curiae* Victims' Family to Petitioner's Joint Stipulations of Fact, 11/22/22, at 1 ("The *amicus curiae* objects to ¶¶'s 1 – 42 (including all subparagraphs) of Petitioner's November 8, 2022, Joint Stipulations of Fact, as: (1) conclusions of law to which no further

response is required; (2) the docket/documents/writings speak for themselves; and/or (3) otherwise, denied as stated.").

On December 1, 2022, the PCRA court accepted the joint stipulations of fact submitted by the DAO and Brown. However, the court noted "the record in front of me including the stipulation does not resolve the factual question of whether Mr. Vann actually identified Kennisha Paige as a participant in the Rite-Aid conspiracy." N.T. Hearing, 12/1/22, at 8; *see also id.* at 10 ("It seems to me there's evidence on both sides, and I don't know how anybody could conclude conclusively that Vann actually identified Paige as being one of the participants in the homicide based on this record. I don't know how you know that."); *id.* at 13-14 ("I'm pointing out that a key factual issue in my mind is not resolved on this existing record."). The court observed the July 14 and 15 memoranda "were certainly circumstantial evidence that Mr. Vann did that." *Id.* at 8. Yet, the court continued, the 23rd District memorandum "certainly doesn't make it clear that Vann identified Paige for the Rite-Aid homicide" and "[a]ctually" presents "circumstantial evidence that he did not[.]" *Id.* at 9. The court reasoned the paragraph of the memorandum discussing the Rite Aid murder does not reference Paige, and Paige is only referenced in a separate, subsequent section of the memorandum discussing other robberies. *See id.* at 8-9. If Vann had implicated Paige in the Rite Aid murder, the court explained, "[i]t certainly would've made sense to put that up in the paragraph where they're talking about the Rite-Aid robbery." *Id.* at 11. In addition, the court emphasized "the reports of interview[s] with Mr. Vann never mentioned Ms. Paige." *Id.* at 9. It argued "if Vann had actually identified Paige, . . . [t]here's no detective who wouldn't put that in following the ordinary course of business." *Id.* at 12-13.[24] Notwithstanding the PCRA

_____

[24] Brown argued the absence of Paige from Vann's police statements could be explained by the fact the police "checked it out[,]" *i.e.*, investigated Paige's possible involvement in the Rite Aid murder, "and it didn't check out." *Id.* at 13. The court responded this would (continued…)

court's clear and repeated determinations that it was confronted with a material issue of fact, *i.e.*, whether Vann in fact implicated Paige in the Rite Aid murder, the court nonetheless concluded it was "not going to have a hearing if everybody connected with the case thinks I shouldn't." *Id.* at 10.

In February of 2023, Brown and the DAO submitted additional briefing in the PCRA court again arguing Brown was entitled to a new trial because the Commonwealth violated *Brady* by not disclosing Vann's purported false incrimination of Paige. Consistent with their joint stipulations of fact, they each represented to the PCRA court that Vann's July 22, 2003 statement to the police was his first police statement in which he implicated Brown and Lyons in the Rite Aid murder. *See* Brown's Response to *Amicus*'s Opening Brief (and Other Filings) and in Support of Successor Petition for Writ of Habeas Corpus and for Collateral Relief, 2/6/23, at 31 ("[I]n statements made prior to his final July 22, 2003 statement, Vann . . . did not mention Kiana Lyons or [Brown] as being involved in the January 19 robbery/homicide."); DAO's Consolidated Response to Briefing by *Amici* and Petitioner, 2/21/23, at 15 ("They were first mentioned in Vann's July 21 and 22, 2003, statements[.]"); *id.* ("[T]he statement [Vann] provided on July 22 . . . implicated [Brown] and Lyons for the first time."). Similarly, the DAO contended Vann's identifications of Brown and Lyons came "**after** investigators determined that Vann had lied about Paige's involvement in the Rite Aid robbery/homicide." *Id.* at 15 (emphasis in original); *see also id.* ("Had the defense been apprised that Vann had told investigators that a demonstrably innocent person had been involved in the crime and only implicated [Brown] after being caught in the lie, their attacks on his credibility would have been more convincing to the jury.").

---

not explain Paige's omission from statements predating the police's mid-July-2003 determination that Paige had an alibi for the Rite Aid murder. *See id.*

On March 20, 2023, Family Members filed a reply brief asserting, *inter alia*, that "[a]ll of [Brown's] claims are untimely and to overcome the time-bar, [Brown] had to plead and prove an exception." Reply Brief of *Amicus Curiae* Victims' Family, 3/20/23, at 45 n.14.

On May 5, 2023, the PCRA court issued an order granting Brown's PCRA petition and vacating his judgment of sentence for the Rite Aid murder. *See Commonwealth v. Lavar Brown*, CP-51-CR-0407441-2004, Order, 5/5/23 ("AND NOW, this 5th day of May, 2023, it is hereby ORDERED, with the consent of the Commonwealth, that defendant's petition pursuant to the Post Conviction Relief Act, 42 Pa.C.S. §9541, *et seq.*, is GRANTED. The judgment of sentence entered by the Court on October 24, 2004, is hereby VACATED."). The court granted relief based on Brown's claim that the Commonwealth violated *Brady* by failing to disclose to Brown prior to trial that Vann falsely incriminated Paige:

> I'm going to find that the record establishes that the assigned detective in this case learned through investigation that witness, Ronald Vann, had falsely identified Kennisha Paige as being a participant in the January 19th, 2003 robbery and murder here at issue, and that this false identification was not disclosed to the defense; that a critical witness had made a demonstrably false identification of someone as being a participant in the same criminal events; however, the subject of the charges against [Brown] was, in my view, impeachment evidence of a different character than the impeachment material used at trial and I find that the suppressed evidence satisfies the standard for materiality under *Brady* and its progeny.

N.T. Hearing, 5/5/23, at 4. The court did not address whether this claim was timely under the PCRA's jurisdictional, one-year filing deadline. *See* 42 Pa.C.S. §9545(b)(1).

On May 26, 2023, Family Members filed a petition requesting this Court to exercise King's Bench jurisdiction over the case.[25] On April 3, 2024, this Court granted Family

---

[25] On March 4, 2024, Brown filed a supplement to his pending PCRA petition in his capital case claiming that in light of the PCRA court's May 5, 2023 order vacating his conviction for the Rite Aid murder, his death sentence for the Crawford murder should be vacated (continued…)

Members' King's Bench petition and exercised King's Bench jurisdiction to review the

PCRA court's order vacating Brown's judgment of sentence.[26] The Court directed the

---

as well. *See* Second Supplement to Petition for Writ of Habeas Corpus and for Collateral Relief, 3/4/24, at ¶41 ("[The PCRA court's] May 5, 2023 findings and order vacating Mr. Brown's second-degree murder conviction establishes that this aggravating circumstance was based on a constitutionally infirm conviction. Because the prosecution's use of this constitutionally invalid conviction influenced the jury's deliberations in reaching a verdict of death, Mr. Brown was denied due process, a reliable sentencing proceeding, and effective assistance of counsel."). On April 9, 2024, the DAO filed an answer to Brown's PCRA petition, alleging that "[d]uring the initial interrogation of cooperating witness Vann [as part of the Rite Aid murder investigation], Vann told the police that a woman named Keneisha [sic] Paige (rather than Kiana Lyons) was involved in the planning and execution of the Rite Aid robbery." DAO's Response to PCRA Petition, 4/9/24, at 20. In addition, although the DAO had conceded penalty phase relief in Brown's capital case in federal court in May 2021 via a joint motion for sentencing relief, *see supra* n.12 (explaining that DAO subsequently moved to withdraw joint motion), it opposed penalty phase relief in state court. The DAO explained there were two factors supporting death penalty relief:

> First, a PCRA court has awarded a new trial with respect to [Brown's] other murder case. . . . As a result, one of the aggravating circumstances found by his sentencing jury may no longer be applicable. Second, based on evidence assembled during [Brown's] first PCRA proceeding, there is a serious concern that [his] sentencing jury received incorrect information regarding a recognized mitigating factor — organic brain damage.

*Id.* at 34. However, the DAO maintained relief was nonetheless precluded for two reasons:

> First, the law of the case [this Court's decision in *Brown* in 2018] precludes relief (or an evidentiary hearing) on the grounds that the jury received misinformation regarding [Brown's] organic brain damage. Second, the (possibly misinformed) jury found no mitigators and one aggravator in addition to [Brown's] prior murder. . . . "Where there are no mitigating factors found and there is a finding of at least one aggravating circumstance, the sentencing court has no discretion but to impose the death penalty."

*Id.* at 40, 42, *quoting Commonwealth v. Saranchak*, 675 A.2d 268, 278 (Pa. 1996).

[26] At the time this Court granted King's Bench review, no Justice even wished to note their dissent to the Court's *per curiam* order. Now, however, Justice Wecht argues at length that the Court should reverse itself and deny King's Bench jurisdiction. *See* Dissenting Opinion at 4-19 (Wecht, J.). Specifically, Justice Wecht insists we are reviewing a (continued…)

parties to brief the issue of "[w]hether, and via what procedure, a common pleas court judge may grant PCRA relief based upon concessions of the parties." *Commonwealth v. Brown*, 32 EM 2023 (Pa. filed Apr. 3, 2024) (*per curiam*).[27]  The Court also invited the OAG to participate as *amicus* and to participate in oral argument.

---

"routine" and "average" PCRA case.  *Id*. at 7 & n.26.  This is hardly a run-of-the-mill PCRA matter — at least we certainly hope not.  As detailed below, in the present PCRA litigation, the DAO unreliably conceded relief to a convicted two-time murderer after having its concession in his other murder case rejected by this Court, violated its duty of candor to the PCRA court, withheld material evidence, submitted a false stipulation of fact, misstated facts in its pleadings, failed to reasonably investigate the matter, and opposed a mandatory evidentiary hearing.  Moreover, this matter raises very serious concerns regarding the fairness and integrity of the criminal judicial process in Philadelphia County, Pennsylvania's largest county with its busiest criminal docket.  Our King's Bench review is amply justified here and accords with how we have treated similar matters for decades. *See, e.g.*, *In re Office of Philadelphia District Attorney*, 125 EM 2019, Order, 2/24/20 (exercising King's Bench jurisdiction to review claims of conflict of interest by DAO in murder case of Mumia Abu-Jamal); *Commonwealth v. Chimenti*, 507 A.2d 79 (Pa. 1986) (exercising King's Bench jurisdiction where DAO and Chimenti submitted plea agreement to single Superior Court judge on appeal from Chimenti's conviction of first-degree murder, and appellate judge ordered trial court to accept plea agreement on remand). Justice Wecht argues the Abu-Jamal matter is distinguishable because it only involved "a single case."  Dissenting Opinion at 7 n.26 (Wecht, J.).  But we think the fact the present matter implicates many cases, not just one, argues **for** the exercise of our King's Bench authority, not against it.  When the reliability of many proceedings is at stake, as opposed to the result of a single matter, the justification for our involvement is enhanced, not diminished.  In addition, Justice Wecht submits "the remedy ordered by the *Chimenti* Court . . . was limited to that which was necessary to resolve the case."  *Id.*  This is a non sequitur.  The ultimate remedy to be ordered is an entirely separate question from whether to exercise King's Bench review in the first place.  No less than in *Chimenti*, we are here confronted with "problematic" and "anom[a]lous" proceedings below fully justifying our review.  *Chimenti*, 507 A.2d at 83.  Finally, changing course now would be deeply unfair to the litigants.  The parties and *amici* have clearly devoted considerable time and effort to this matter.  There has been exhaustive briefing and extensive oral argument, as well as numerous ancillary filings.  This substantial outlay of energy and resources deserves our substantive consideration.  For all these reasons, we decline to reverse ourselves and proceed to merits review.

[27] Justice Wecht argues the question we ordered the parties to brief was "clearly" "answered" in *Brown*, and "[t]here is no reason for this Court to invoke our extraordinary King's Bench authority just to repeat ourselves."  Dissenting Opinion at 10 (Wecht, J.). While the distinguished dissenting Justice may now have come around to the view *Brown* (continued…)

## II. King's Bench Jurisdiction and Powers

"In addition to general powers of adjudication, supervision, and administration, this Court also has 'the power generally to minister justice to all persons and to exercise the powers of the court, as fully and amply, to all intents and purposes, as the justices of the Court of King's Bench, Common Pleas and Exchequer, at Westminster, or any of them, could or might do on May 22, 1722.'" *In re Domitrovich*, 257 A.3d 702, 714-15 (Pa. 2021), *quoting* 42 Pa.C.S. §502. The Court's King's Bench powers are "very high and transcendent." *In re Bruno*, 101 A.3d 635, 669 (Pa. 2014), *quoting Chimenti*, 507 A.2d at 81. Our standard of review is *de novo* and our scope of review is plenary. *See Ball v. Chapman*, 289 A.3d 1, 18 (Pa. 2023); *In re November 3, 2020 General Election*, 240 A.3d 591, 605 (Pa. 2020); *Commonwealth v. Williams*, 129 A.3d 1199, 1213 (Pa. 2015). Moreover, "[t]he exercise of King's Bench authority is not limited by prescribed forms of procedure or to action upon writs of a particular nature; rather, the Court may employ any type of process necessary for the circumstances." *Williams*, 129 A.3d at 1206. The Court

---

clearly resolved this issue, he raised uncertainty in this regard in his concurring opinion in *Brown*. There, he argued the circumstance of "the Commonwealth confess[ing] error directly to the PCRA court itself" — as opposed to a concession to relief for the first time on appeal, which is what occurred in *Brown* — was "a hypothetical scenario not presented" by the facts of that case. *Brown*, 196 A.3d at 196 (Wecht, J., concurring) (emphasis omitted). He maintained the majority opinion in *Brown* included only a "suggestion[,]" *i.e.,* not a binding holding, "that a confession of error can have no impact on a trial court's review of the issues before it." *Id.* He insisted "we must remain open to the possibility that it may be appropriate for a PCRA court to accept a future confession of error and defer to the prosecutor's judgment that justice has not been served by the conviction under the circumstances there presented." *Id.* at 197. This concurrence clouded the question of whether a Commonwealth concession is sufficient to support a PCRA court's grant of relief. We herein clarify that the answer is no. *Brown*'s pronouncement that a confession of error by the Commonwealth is insufficient for any grant of relief under the PCRA applies to the same extent when the concession occurs in the PCRA court as it does when the concession comes for the first time on appeal. *See infra* p. 50. Moreover, we did not, of course, exercise King's Bench jurisdiction "just" to address this issue. Dissenting Opinion at 10 (Wecht, J.). Again, in addition to the *Brown* question, this case implicates important and troubling issues regarding the fair and just administration of criminal justice in Philadelphia County.

may exercise King's Bench jurisdiction "*sua sponte*" and "may assume plenary jurisdiction over a matter even where no dispute is pending in a lower court." *In re Bruno*, 101 A.3d at 669.[28] Similarly, the remedial measures ordered under our King's Bench powers need "not derive from any existing rules, statutes, or procedures." *Id.* at 672. The only limits on the Court's maximal powers at King's Bench are those set forth in the Pennsylvania and United States Constitutions. *See id.* at 676 ("[T]he Supreme Court is neither divested of its King's Bench powers, nor is the supreme and general nature of these inherent powers limited, unless the divestiture or limitation is clearly expressed or necessarily implied in the Constitution."). "In exercising King's Bench authority, our principal obligations are to conscientiously guard the fairness and probity of the judicial process and the dignity, integrity, and authority of the judicial system, all for the protection of the citizens of this Commonwealth." *Williams*, 129 A.3d at 1206 (quotation marks and citations omitted).

---

[28] Justice Wecht insists our King's Bench jurisdiction "cannot be invoked" because Family Members could have appealed the PCRA court's July 2022 order granting in part and denying in part their motion to intervene but "chose not to do so." Dissenting Opinion at 14 (Wecht, J.). On the contrary, as noted, this Court may exercise King's Bench jurisdiction where there is no case at all and our review has not even been requested. *See In re Bruno*, 101 A.3d at 669 (providing Court may assume King's Bench jurisdiction "where no dispute is pending in a lower court" and may do so "*sua sponte*"). Family Members' decision not to pursue an interlocutory appeal to the Superior Court did not deprive this Court of jurisdiction. *See, e.g., In re Office of Philadelphia District Attorney*, 125 EM 2019 (granting King's Bench jurisdiction to consider claim raised by victim's family member even though she failed to first appeal Superior Court's denial of her request to intervene). Moreover, we are not providing Family Members with "a mechanism to revive forfeited rights[.]" Dissenting Opinion at 15 n.52 (Wecht, J.). As Justice Wecht recognizes, the intervention of Family Members would require the "expansion of third-party rights." *Id.* at 14. Because the right to intervene never existed in the first place, Family Members never "forfeited" it, and it would be impossible for this Court to "revive" it. In any case, we do not grant intervention to Family Members. Rather, we reverse the grant of PCRA relief and order that the OAG be provided notice and an opportunity to intervene in concession cases.

### III. Arguments

#### a. Family Members

Family Members argue the PCRA court's grant of relief in this case was based on four factual inferences: (1) that Vann expressly implicated Paige in the Rite Aid murder; (2) that Vann maintained this identification through mid-July 2003; (3) that sometime after July 15, 2003, the police told Vann that Paige was incarcerated at the time of the murder; and (4) that Vann thereafter implicated Lyons in the murder for the first time on July 22, 2003. Family Members insist the March 2003 memorandum recounting Vann's March 21, 2003 statement implicating Brown and Lyons, which was in the DAO's files but was not provided to the PCRA court, refutes this sequence of events. Moreover, according to Family Members, Vann's March 21, 2003 statement contradicts the stipulation of facts submitted by Brown and the DAO alleging Vann's July 22, 2003 statement was the first in which he implicated Brown and Lyons. As such, they submit the PCRA court erred in awarding a new trial to Brown, and the court's order should be reversed.

To safeguard against such an error occurring again, Family Members urge this Court to establish procedures for cases in which the Commonwealth concedes relief. Specifically, they assert a PCRA court should be permitted to grant relief following a Commonwealth concession of error if the concession is based on "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." Family Members' Brief at 53, *quoting Schlup v. Delo*, 513 U.S. 298, 324 (1995) (identifying type of evidence federal habeas petitioner must present to satisfy actual innocence gateway to merits review of procedurally barred claim of constitutional error). They claim the evidence discussed in *Schlup* can be objectively tested, verified, and made available to a reviewing court. In Family Members' view, "[n]othing remotely close to that exists here." *Id.* at 54.

On the other hand, Family Members contend that if a concession is premised on evidence subject to multiple reasonable interpretations, and/or there are reasonable arguments in support of the judgment of sentence that the Commonwealth refuses to make, the PCRA court should be permitted to order *in camera* review or appoint an intervenor. The intervenor, they emphasize, should be on equal footing with the Commonwealth and the defendant in terms of document access. They also stress that the circumstances of this case, in which the DAO did not interview a single police officer or former prosecutor and ignored inculpatory evidence in its own files, demonstrate why the option of appointing an intervenor is critical.

In addition, Family Members support requiring a specific prosecutor to attest under oath that the Commonwealth has provided the court with all relevant evidence related to the concession. They argue this procedure will incentivize the Commonwealth to ensure the record has been appropriately vetted and will avoid later claims of bureaucratic confusion or attempts to shift blame between various individual prosecutors or their leadership teams.

Finally, Family Members posit that if the Commonwealth's concession involves agreeing that police, prosecutors, or others engaged in unconstitutional or illegal conduct, those individuals must have an opportunity to be heard, if they choose, before having a court find misconduct. They insist such an opportunity to be heard is mandated by our Commonwealth's Constitution, which places reputational interests on the highest plane and extends the protection of these interests to state actors functioning in their official capacity.

### b. The OAG

The OAG argues multiple recent concessions of relief by the DAO, once examined under the adversary process, have proven unreliable. In particular, the OAG cites the

federal habeas proceedings of Philadelphia murder defendants Robert Wharton, Javiar Artache, Kevin Johnson, and Rasean Malone,[29] as well as Brown's unsuccessful appeal to this Court from the denial of PCRA relief in his separate Crawford murder case. In addition to these matters, the OAG alleges that since January of 2018, when DA Krasner took office, the DAO has conceded error, and relief has been granted, in 115 cases in which there was no adversarial testing. *See* OAG's Brief at 15-30 (listing cases).

The OAG contends several concerning patterns emerge from these cases. Specifically, the OAG maintains that while virtually all the cases have involved disputable factual issues, almost none of them have been resolved through evidentiary hearings but rather either naked concessions by the prosecution or joint stipulations. It avers that many of the cases on its list have been repeatedly shuttled back and forth between state and federal court, as opportunities to concede receded or advanced in each forum. It submits this juggling between state and federal forums even resulted in the public censure of a prosecutor in one case, *Martinez v. Delbalso*, 2021 WL 510276 (E.D. Pa. 2021). It argues the DAO's many concessions in federal court are especially questionable because claims adjudicated on the merits in state court are subject to an extremely demanding standard of review on federal habeas review, whereby relief is warranted only if the state court judgment was so lacking in justification as to be beyond any possibility for fair-minded disagreement. The OAG claims that in all but one of the 115 concessions, the DAO has not retried the defendant but instead has either dismissed the charges or negotiated a plea, often a plea of *nolo contendere*, to reduced charges. The OAG insists

---

[29] *See Wharton v. Vaughn*, 2022 WL 1488038 (E.D. Pa. 2022); *Wharton v. Vaughn*, 2022 WL 4133291 (E.D. Pa. 2022); *Wharton v. Superintendent Graterford SCI*, 95 F.4th 140 (3rd Cir. 2024); *Wharton v. Superintendent Graterford SCI*, 95 F.4th 113 (3rd Cir. 2024); *Artache v. Superintendent SCI Forest*, 2023 WL 8468613 (3rd Cir. 2023); *Johnson v. Kerestes*, 683 F. Supp. 3d 452 (E.D. Pa. 2023); *Malone v. Smith*, 2023 WL 2351694 (E.D. Pa. 2023).

that none of the DAO's concessions has ever resulted in the arrest and prosecution of a new perpetrator.

In light of the DAO's problematic pattern of concessions, the OAG proposes the implementation of procedures to ensure more reliable results. It recommends that when the DAO confesses error, the trial court should appoint the OAG or the Pennsylvania District Attorneys Association (PDAA), or private counsel if the OAG and PDAA are unable to fill the role, to participate as a third party and investigate the claims and present arguments in support of the judgment. The OAG submits the court should order the prosecution to make available to the third party everything in the police and prosecution files that it makes available to the defense. In the OAG's view, the court should require an evidentiary hearing before granting relief premised on claims of fact, with full participation by the appointed third party. It urges that the third party should be designated by the court as a formal intervenor, entitled to appeal as of right.

Turning to the specifics of this case, the OAG argues this matter bears the hallmarks of many of the DAO's other questionable concessions of error. It contends that despite the PCRA court's repeated requests for actual evidence demonstrating that Vann implicated Paige, Brown and the DAO presented only a joint stipulation. It asserts Vann's undisclosed March 21, 2003 statement belies the allegation Vann actually identified Paige as a participant. The OAG notes Detectives Judge and Peters have provided declarations alleging Vann never identified Paige to them. It faults Brown and the DAO for never attempting to interview Detective Baker, who died in July 2022, or Vann, who died in December 2018. Finally, the OAG submits that even assuming Vann incriminated Paige, this fact would not have been material in light of the other circumstances impeaching his credibility and the evidence, including Lyons's testimony, corroborating Vann's account of the murder.

### c. Brown

Brown responds this Court should affirm the PCRA court's grant of relief. He insists there is no question the evidence Vann falsely incriminated Paige was impeaching and undisclosed and thus the case turns on the issue of prejudice. In his view, the suppression of Vann's false identification was prejudicial because Vann was a critical witness against him, no physical evidence linked him to the crime, and no other witness besides Lyons identified him as being involved. Additionally, Brown seconds the PCRA court's conclusion that the misidentification of Paige would have provided impeachment evidence different in character from the impeachment evidence the jury heard because it would have shown Vann's willingness to falsely accuse an acquaintance of being involved in the murder. Brown rejects the possibility that Vann may have identified Paige in a different murder, noting the undisclosed documents appeared in the files for this case, and the 23rd District Memorandum referred to co-defendant Jamaar. Also, he notes the July 2003 memoranda focused on Paige's whereabouts on the day of the murder, were marked with the case number for this murder, and were addressed to Detective Judge, the assigned detective for this case.

Brown maintains Vann's March 21, 2003 statement implicating Lyons is entirely consistent with, and does nothing to counter the impeachment value of, Vann's false accusation of Paige. A cooperating accomplice's demonstrably false accusation, says Brown, is damning impeachment evidence whether or not it coincided or alternated with other, possibly truthful accusations. He likewise submits the March 21, 2003 statement, which the Commonwealth did not disclose to Brown prior to trial, does not contradict the parties' factual stipulation in the PCRA court that Vann's statement on July 22, 2003 was the first in which Vann implicated him and Lyons. According to Brown, when viewed in context, the stipulation correctly provided that the July 22, 2003 statement was the first of

Vann's three statements to homicide investigators disclosed pre-trial in which he implicated Brown and Lyons.

Alternatively, Brown forwards two other grounds for affirming the PCRA court's grant of relief. First, he accuses the Commonwealth of suppressing an untruthful statement by Lyons in December 2003. Second, he alleges the Commonwealth suppressed other contradictory statements by Vann, as well as Vann's cooperation in other cases and the benefits he received from the Commonwealth.

Expanding his focus to PCRA concession cases generally, Brown argues current law, as set forth in the PCRA and the Pennsylvania Rules of Criminal Procedure, is adequate to ensure reliable dispositions. Moreover, although not expressly permitted by the PCRA or criminal procedural rules, Brown submits PCRA courts have the inherent authority to order the participation of *amicus curiae* where the court seeks, or non-parties voice, arguments and perspectives beyond those provided by the parties. However, Brown opposes the additional procedures proposed by the Family Members and the OAG in cases where the DAO concedes relief. Broadly, Brown insists the extra procedures are clearly intended to apply only in Philadelphia and only during the tenure of DA Krasner. As such, Brown contends, they exceed this Court's constitutional authority "to prescribe **general** rules governing practice, procedure and the conduct of **all courts**." Brown's Brief at 67, *quoting* PA. CONST. art. V, §10(c) (emphasis added in brief). He also claims limiting the procedures to Philadelphia, where racial minorities account for a majority of the population, will have a starkly disproportionate racial impact: PCRA relief will be delayed predominantly for people of color.

More precisely, Brown contends the proposal for intervention by a third party such as the DAO, the PDAA, or private counsel, contravenes the constitutional prohibition against this Court "adopting rules that 'abridge, enlarge [or] modify the substantive rights

of any litigant.'" *Id.* at 68, *quoting* PA. CONST. art. V, §10(c) (brackets added in brief). Additionally, the proposed intervenor rule, in Brown's estimation, conflicts with the Commonwealth Attorneys Act (CAA),[30] which authorizes intervention by the OAG in criminal cases only in limited circumstances, none of which are implicated here, and precludes altogether intervention by the PDAA or private attorneys. Brown believes the proposals to provide the intervenor full discovery, to mandate evidentiary hearings when there are disputed claims of fact, and to guarantee those accused of misconduct an opportunity to be heard, like the intervenor proposal, are substantive in nature and thus beyond this Court's authority under Article V, Section 10 of the Pennsylvania Constitution. He alleges too that the discovery proposal would conflict with Pa.R.Crim.P. 902(E)(1), the evidentiary hearing proposal would conflict with 42 Pa.C.S. §9545(d)(1) and Pa.R.Crim.P. 907, and the opportunity-to-be-heard proposal would conflict with 42 Pa.C.S. §9546(a).[31]

---

[30] *See* 71 P.S. §§732-101-732-506.

[31] Rule 902(E)(1) provides that except on a first counseled petition in a death penalty case, "no discovery shall be permitted at any stage of the [PCRA] proceedings, except upon leave of court after a showing of exceptional circumstances." Pa.R.Crim.P. 902(E)(1). Section 9545(d)(1) provides: "(i) Where a petitioner requests an evidentiary hearing, the petition shall include a certification signed by each intended witness stating the witness's name, address, date of birth and substance of testimony and shall include any documents material to that witness's testimony. (ii) If a petitioner is unable to obtain the signature of a witness under subparagraph (i), the petitioner shall include a certification, signed by the petitioner or counsel, stating the witness's name, address, date of birth and substance of testimony. In lieu of including the witness's name and address in the certification under this subparagraph, counsel may provide the witness's name and address directly to the Commonwealth. The certification under this subparagraph shall include any documents material to the witness's testimony and specify the basis of the petitioner's information regarding the witness and the petitioner's efforts to obtain the witness's signature. Nothing in this subparagraph shall be construed to contravene any applicable attorney-client privilege between the petitioner and postconviction counsel. (iii) Failure to substantially comply with the requirements of this paragraph shall render the proposed witness's testimony inadmissible." 42 Pa.C.S. §9545(d)(1). Under Rule 907, the PCRA court may dismiss a petition without a hearing "if . . . there are no genuine issues concerning any material fact[,] . . . the defendants is not entitled to post-conviction collateral relief, and no purpose would be served by any further proceedings[.]" (continued…)

Lastly, regarding Family Members' proposal for prosecutorial affirmations that all relevant evidence has been produced, Brown asserts such a requirement should apply to all criminal proceedings, not just cases involving the DAO or concessions of relief.

### d. The DAO

The DAO argues the short answer to the question this Court identified for briefing is that PCRA courts cannot grant relief based upon the concessions of the parties, as this Court already ruled in Brown's separate capital appeal. It insists, however, this is not what occurred here; rather, the PCRA court treated this case like any other and granted relief based on its independent judicial assessment of the facts and the law, not because the DAO conceded error. The DAO maintains the result below would not have been different if Family Members had been permitted to intervene, as the court welcomed their input as *amici*, and Family Members vociferously opposed an evidentiary hearing.

According to the DAO, the PCRA court's award of a new trial based on the nondisclosure of Vann's identification of Paige was fully supported by the record. It contends the documentary evidence gives rise to the "inescapable" conclusions Vann implicated Paige in this crime, this accusation was determined by investigators to be false, and this impeachment evidence of Vann was not disclosed to the defense. DAO's Brief at 45. The DAO concurs with the PCRA court's judgment this impeachment evidence would have provided a new and fertile avenue for the defense to undermine Vann's credibility and would have created a reasonable probability of a different outcome at trial.

---

Pa.R.Crim.P. 907(1). Alternatively, "[a] petition for post-conviction collateral relief may be granted without a hearing when the petition and answer show that there is no genuine issue concerning any material fact and that the defendant is entitled to relief as a matter of law." Pa.R.Crim.P. 907(2). Section 9546(a) provides: "[i]f the court rules in favor of the petitioner, it shall order appropriate relief and issue supplementary orders as to rearraignment, retrial, custody, bail, discharge, correction of sentence or other matters that are necessary and proper." 42 Pa.C.S. §9546(a).

The DAO disputes Family Members' arguments in support of reversal. Regarding Family Members' claim that Vann's March 21, 2003 statement implicating Lyons refutes the theory Vann first implicated Paige and then switched to Lyons after the police confirmed Paige's alibi, the DAO insists the parties never raised this switch theory, and the PCRA court did not rely on it in granting relief. Indeed, the DAO emphasizes it "noted in its answer to the [PCRA] petition below that Vann had informally implicated Brown in March 2003[.]" *Id.* at 47, *citing* DAO's Response to Petition for Collateral Relief, 11/1/21, at ¶74 n.8. Like Brown, the DAO argues the factual stipulation providing that Vann's July 22, 2003 statement was the first in which he named Brown or Lyons did not mislead the PCRA court because it was apparent the stipulation referred to disclosed statements. "While the stipulations could have been more clearly drafted to refer explicitly to 'disclosed' statements," the DAO maintains, "they would not have confused anyone acquainted with this case and did not confuse the PCRA court." *Id.* at 52. As for the DAO's failure to provide the March 2003 memorandum to the PCRA court, it explains:

> the Commonwealth did not include this document in its pleadings because it was irrelevant to any of Brown's claims. The Commonwealth's file in this case fills approximately twenty bankers' boxes. It was not reasonable to include every document. As it was, [the PCRA court] was already presented with thousands of pages of transcripts, appendices, and briefs; including unnecessary documents would only have hindered his decision.

*Id.*

The DAO submits the OAG's list of 115 instances in which the DAO has successfully conceded relief does not reflect any impropriety on its part. On the contrary, the DAO contends it is ethically obliged to agree to relief in appropriate cases, and its confessions of error represent a "painful but necessary course correction" from the practices of prior administrations, which had "a culture of non-disclosure and a win-at-all-costs approach to post-conviction litigation." *Id.* at 57, 61. The 115 number, the DAO argues, represents only approximately 1.2% of the approximately 7,600 cases the DAO's

Law Division has briefed on post-conviction review since January 2018, and as such the frequency with which it agrees to relief is not particularly high or unusual. The DAO justifies its determination to either enter a plea deal or withdraw charges in effectively all of these conceded cases by noting the vast majority of criminal matters are resolved via plea, and it violates a prosecutor's duty to pursue charges when a *prima facie* case cannot be established through available and admissible evidence.

Echoing arguments raised by Brown, the DAO contends the current rules of procedure are adequate to protect the integrity of confessions of error in Philadelphia. It claims the designation of private parties as intervenors in uncontested PCRA petitions would be contrary to law and could wrest control of criminal proceedings from the Commonwealth's duly elected representatives. It likewise claims the designation of the OAG as an intervenor would be unlawful, as the OAG may intervene only in accordance with the provisions of the CAA, and nothing in the CAA authorizes the OAG to intervene in this context. The DAO submits that because the right to intervene is substantive rather than procedural in nature, under Article V, §10(c) of the Pennsylvania Constitution this Court's rulemaking authority does not extend to designating non-parties such as Family Members or the OAG as intervenors. The DAO contends PCRA courts have the inherent authority to appoint *amicus curiae*. It emphasizes, however, that in the ordinary case, *amicus*'s role should be limited to briefing the merits of issues, and it should not be permitted to raise new issues or submit extra-record evidence. Moreover, it suggests that ordinarily the role of *amicus* would be best filled by the OAG because it is governed by the same ethical rules and legal restrictions applicable to the DAO.

### e. Family Members' Reply

In their reply brief, Family Members find it "astonishing" the DAO now claims the March 2003 memorandum was irrelevant to the PCRA court's disposition of Brown's

petition yet, by its own admission, the DAO itself proffered selective facts from this document in its response to the petition. Family Members' Reply Brief at 7. Contrary to the DAO, Family Members insist Vann's March 2003 account documented in the memorandum directly addresses the claims made by the parties below and was critically relevant. They submit Vann's March 21, 2003 statement would have been especially relevant to *Brady*'s materiality standard in two ways: first, it would have been evidence of a consistent statement provided before Detective Baker's July 2003 investigation established Paige had an alibi for the murder; and second, this statement would have weakened the causal relationship between Detective Baker's investigation and Vann's subsequent account. Family Members accuse the DAO and Brown of performing "linguistic gymnastics" to defend the accuracy of their factual stipulation regarding Vann's July 22, 2003 statement, and insist these efforts only prove Family Members' point that the stipulation was incomplete and confusing. *Id.* at 23. They claim the misrepresentation that Vann first identified Brown and Lyons in July of 2003 was repeated in the DAO's and Brown's briefing to the PCRA court. Family Members raise the possibility Detective Baker's July 2003 memoranda reflect his own misunderstanding that Paige was involved in the Rite Aid murder, rather than an actual identification of Paige by Vann.

### f. The OAG's Reply

In the OAG's reply brief, it asserts the DAO's claim of a prior culture of *Brady* violations at the DAO, which must be remedied via concession, is largely circular since it relies on the DAO's own untested multitude of prior concessions. In any event, the OAG maintains every *Brady* claim is intensively fact-specific and must be evaluated individually; intoning "culture" cannot substitute for judicial review of actual evidence in individual cases. The OAG insists the DAO uses the wrong denominator in arguing it concedes only a small percentage of cases. According to the OAG, the DAO has focused

its concession program on capital and life sentences, and it has been highly effective in reducing many of these sentences. The OAG reports that when DA Krasner took office, there were 47 Philadelphia defendants on death row, and the DAO has since conceded 35 of these sentences — a concession rate of 75%. The OAG also notes it has identified five more concessions in addition to the 115 enumerated in its initial brief. The OAG argues if, as the DAO contends, the March 2003 memorandum was so irrelevant that it would have just hindered the PCRA court to provide the court with the document, "it shouldn't take seven pages and 2,000 words (and another seven pages and 1,700 words from the defendant) to explain why. Far simpler: just give the court the full facts and let it do its job." OAG Reply Brief at 23. Disagreeing with the DAO that intervention is a substantive right which only the General Assembly can grant, the OAG counters intervention is often a matter of procedure, as evidenced by the multitude of court procedural rules governing it, including Pa.R.Civ.P. 2327, Pa.R.A.P. 1531, Pa.R.A.P. 3775, and Pa.R.J.C.P. 1133. In particular, the OAG notes Pa.R.A.P. 521(b) acknowledges the ability of the OAG to intervene in limited circumstances, and this Court is free to expand those circumstances, and to enact a similar provision in the rules of criminal procedure.

### g. *Amici*

In addition to the invited *amicus* participation of the OAG, numerous *amici* have filed briefs in support of Brown and the DAO: the Conviction Integrity Units of several different prosecutors' offices in the United States; nearly one dozen legal ethics scholars; former prosecutors and judges; the Pennsylvania Innocence Project and the Innocence Network; defense counsel in Philadelphia; professors of criminal law and procedure; forty-one current and former elected prosecutors and Attorneys General, and former United States Attorneys and federal officials; and the Quattrone Center for the Fair

Administration of Justice at the University of Pennsylvania Carey Law School. These *amici* argue existing procedures are adequate to ensure the reliability of DAO concessions and urge us to reject the additional procedural safeguards proposed by Family Members and the OAG. *See* Conviction Integrity Units *Amici* Brief at 16 ("[T]he specific additional procedures [Family Members] and the [O]AG would impose on postconviction proceedings are unprecedented and unworkable."); Ethics Scholars *Amici* Brief at 13-14 ("This Court should decline to use King's Bench jurisdiction to impose new limits on Commonwealth prosecutors' concessions of relief when warranted."); Former Prosecutors and Judges *Amici* Brief at 21 ("Because the system already offers the appropriate flexibility and incentives to properly vet all PCRA petitions, even in the face of prosecutorial concessions, [*a*]*mici* urge the Court not to introduce unnecessary and harmful additional hurdles to the process."); Pennsylvania Innocence Project and Innocence Network *Amici* Brief at 21 ("[F]urther procedural requirements are unnecessary and potentially harmful."); Philadelphia Defense Counsel *Amici* Brief at 30 ("The OAG's desire to retry cases or to defend the prior actions or inactions of its current staff are not compelling reasons for this Court to appoint it as a mandatory intervenor."); Professors of Criminal Law and Procedure *Amici* Brief at 23 ("[T]he decision below should be affirmed."); Current and Former Elected Prosecutors and Attorneys General *et al. Amici* Brief at 3 ("Sufficient guardrails are already in place to ensure that the admission of error is based on the facts of the case and consistent with the law. Mandating additional procedures in post-conviction cases where prosecutors admit error would be unwise and unnecessary."); Quattrone Center *Amicus* Brief at 15 ("The integrity of the PCRA process is best ensured by the proper investigation and review by the prosecutor and the fully independent review and judgment of the PCRA court. In this process, the trial court may

exercise its discretion to appoint *amicus curiae* should the judge feel a need for additional viewpoints. These guardrails are sufficient to ensure an outcome worthy of public trust.").

### h. Ancillary Filings

Beyond the extensive briefing of the parties and *amici*, also pending before the Court are six ancillary petitions.[32] In the interest of maximizing the information and arguments available to us in resolving this highly important King's Bench matter, we grant these petitions and consider these filings and their attachments in deciding this case.[33]

First, Brown has filed an application to notify this Court of the United States Supreme Court's recent decision in *Glossip v. Oklahoma*, 604 U.S. 226 (2025). Brown insists *Glossip*, where the Supreme Court vacated the conviction, is "quite similar" to this case because in both cases "the defendant was charged as a conspirator, not as the actual killer . . . , evidence that was first disclosed in successive postconviction proceedings established violations of" *Brady* and *Napue v. Illinois*, 360 U.S. 264 (1959),[34] "the suppressed evidence undermined the credibility of cooperating co-conspirators whose testimony was central to the prosecution's case . . . , [and] the State confessed

---

[32] Two other ancillary petitions have already been decided. In particular, the OAG filed an emergency petition to stay a joint PCRA evidentiary hearing in the cases of Brown's co-defendants Kennedy, James, and Jamaar pending this Court's decision in this case. In addition, the co-defendants filed a motion for leave to file an *amicus* brief responding to the OAG's emergency petition. By *per curiam* order dated December 12, 2025, this Court denied the OAG's emergency petition and granted the co-defendants' motion.

[33] As noted, our King's Bench authority is not limited by prescribed forms of procedure, and we "may employ any type of process or procedure necessary for the circumstances." *Bruno*, 101 A.3d at 669; *see id.* at 671 ("We have often undertaken flexible measures deriving from our broad power at King's Bench."). We offer no opinion as to whether such ancillary applications would be appropriately granted in a case not involving the exercise of our King's Bench jurisdiction.

[34] The High Court in *Napue* "held that a conviction knowingly 'obtained through use of false evidence' violates the Fourteenth Amendment's Due Process Clause." *Glossip*, 604 U.S. at 246, *quoting Napue*, 360 U.S. at 269.

error, but the victims' families opposed relief as *amici curiae*." Brown's Pre-Submission Application to Notify the Court of Recent Authority, 3/3/25, at ¶10.

In response, the OAG has filed its own ancillary petition seeking leave to answer Brown's application, which it criticizes for providing more than "merely 'notice' of a new decision," but instead "present[ing] four pages of new legal argument." OAG's Request for Leave to File Answer, 3/11/25, at 1. In its attached proposed answer, the OAG submits that "[b]ecause *Glossip* makes no new federal law and has no relevance to this Court's supervisory powers at issue in this King's Bench proceeding, [Brown's] application should be denied." Answer of OAG, 3/11/25, at 1.

In addition, Family Members have filed an application to notify this Court of testimony presented at a hearing on February 21, 2025 in the Philadelphia Court of Common Pleas in the case of *In re Appeal of Bochetto & Lentz, P.C.*, July Term 2021, No. 02373. *Bochetto* involves an appeal from the DAO's denial of a request under the Right-to-Know Law (RTKL)[35] for records pertaining to the DAO's filing of a motion for a *nolle prosequi* in *Commonwealth v. Patterson*, CP-51-CR-0012287-2007.[36] Family Members claim the testimony, which they attach to their application, "sheds light on the policies, practices, and procedures [of] the [DAO] under its current administration when agreeing to relief[,]" and "highlights yet another instance of the [DAO] proffering aversions of fact to support claims of egregious misconduct that were not appropriately investigated, vetted, or confirmed." Family Members' Pre-Submission Application to Notify the Court of Recent Court Proceedings, 3/3/25, at ¶¶15-16. The DAO responds that the application should be denied "[b]ecause the testimony proffered in *Bochetto* relates to the DAO's decision to withdraw criminal charges," and thus "has little bearing on the question

---

[35] *See* 65 P.S. §§67.101-67.3104.

[36] *Patterson* involves one of the 120 DAO concessions noted by the OAG. *See* OAG's Brief at 15.

presented in this King's Bench litigation." DAO's Letter in Lieu of Formal Objections, 3/4/25, at 1. Moreover, the DAO insists it is inappropriate to litigate open cases via these King's Bench proceedings, especially considering this Court may be asked to resolve *Bochetto* in the future. Also, the DAO maintains "[c]ritical witnesses in *Bochetto*, including the District Attorney himself, remain subject to sequestration orders[,]" and "it would be untenable for the [DAO] to address before this Court the factual issues presented by *Bochetto* when counsel is unable to meaningfully consult the District Attorney regarding the factual and legal positions that would entail." *Id.* at 2.[37]

Next, the OAG has filed an application for leave to file a post-submission communication addressing alleged misstatements by the DAO and Brown at oral argument before this Court. In its proposed filing, the OAG alleges Brown and the DAO misstated at argument that Family Members were allowed the same open file review as Brown. In addition, it claims Brown erroneously stated the March 2003 memorandum

---

[37] Subsequent to Family Members' application and the DAO's response, on March 17, 2025, the trial court in *Bochetto* granted the requester's appeal and ordered the DAO to provide all requested records in redacted form. In addition, the court found "DAO members have acted in bad faith throughout the instant RTKL and related proceedings in a manner that has prejudiced the [r]equester and the public at large." Order, *In re Appeal of Bochetto & Lentz, P.C.*, July Term 2021, No. 02373, 3/17/25, at 2. Accordingly, the court imposed the following sanctions on the DAO: reimbursement of all reasonable counsel fees and court costs expended by the requester; payments of $10,000 each to former Assistant District Attorneys Elizabeth McCaffrey and Richard Sax, who were "unfairly maligned" by the DAO; payment of $100,000 to the First Judicial District purgeable upon compliance with the other terms and conditions of the court's order; twelve hours of mandatory ethics training focused on the Pennsylvania Rules of Professional Conduct for each member of the DAO paid for by the DAO and completed within nine months of the court's order; preservation of all records that have been the subject of the RTKL request or are related to Patterson; a thorough audit/inventory of all DAO records related to cases referenced in a report on prosecutorial misconduct in the DAO produced by the Peter L. Zimroth Center on the Administration of Criminal Law at New York University School of Law, to be provided to the court for *in camera* review; and preparation of a standard procedural manual for the DAO addressing the safeguarding of records. *See id.* at 3-6. On March 24, 2025, the DAO appealed this order to the Commonwealth Court, where the appeal is docketed at 297, 396, 418, 457-459 & 464 CD 2025.

was not withheld but was in fact available to the PCRA court "on record." OAG's Post-Submission Communication to Address Oral Argument Misstatements, 3/11/25, at ¶4. Further, the OAG accuses the DAO of misrepresenting the record when it alleged at argument that it never resisted an evidentiary hearing, that Family Members would have been permitted to participate fully in an evidentiary hearing had one been held, and that Vann told Detective Peters two girls were involved in the Rite Aid murder. Brown and the DAO have filed answers arguing the alleged misstatements did not occur and the OAG's application should be denied.

As well, the DAO has filed an application for leave to file a post-submission communication to clarify a footnote in its brief. In its proposed filing, the DAO explains that its brief presently provides:

> Brown was later convicted of another murder for which he was sentenced to death. *Commonwealth v. Brown*, CP-51-CR-0208091-2004. The Commonwealth does not believe that the disposition of this case affects the judgment in that matter and has opposed both guilt and penalty phase relief in those ongoing post-conviction proceedings.

DAO's Proposed Clarification of Incomplete Statement, 4/9/25, at 1, *quoting* DAO's Brief at 8 n.2. However, the DAO now notes, Brown "has an action pending in federal court challenging his conviction and sentence in his capital case[,]" and in that ongoing post-conviction proceeding, "[i]n 2021, the [DAO] agreed that Brown's sentence should be vacated because Brown's sentencing counsel was ineffective for failing to present evidence of Brown's organic brain damage at sentencing." *Id.* at 1-2. The DAO submits "[a] more complete footnote providing this context would" provide:

> Brown was later convicted of another murder for which he was sentenced to death. *Commonwealth v. Brown*, CP-51-CR-0208091-2004. The Commonwealth does not believe that the disposition of this case affects the judgment in that matter and has opposed both guilt and penalty phase relief in those ongoing state post-conviction proceedings. However, Brown has a pending petition for a writ of habeas corpus challenging that conviction and sentence. *Brown v. Wetzel*, E.D. Pa. Civ. No. 10-5553. Consistent

with its position before this Court, the Commonwealth has conceded that Brown is entitled to a new sentence based on the ineffective assistance of his sentencing counsel, though it has specified that that concession is not binding on the District Court. *Id.*, ECF No. 33 (filed May 28, 2021).

*Id.* at 2.[38] The DAO "apologizes for any confusion that may have been caused, which was unintentional." *Id.* Family Members have filed an answer taking no position on the DAO's request but emphasizing that the DAO's concession to relief in federal court on the mitigation ineffectiveness claim involved the allegation that this Court's rejection of the same claim in *Brown* was not merely wrong but an unreasonable application of clearly established federal law and an unreasonable application of the facts.

Finally, the DAO has filed an application for leave to file a post-submission communication concerning the case of *Hicks v. City of Philadelphia*, E.D. Pa. Civ. No. 2:22-cv-00977. A Philadelphia jury convicted Termaine Hicks of rape. The DAO, however, subsequently agreed to PCRA relief and *nolle prossed* the charges against him. Thereafter, Hicks filed a federal civil rights lawsuit against the City of Philadelphia and police officers involved in his case. The DAO's proposed post-submission filing advises that the jury in Hicks's federal case found in his favor. Specifically, the federal civil jury concluded by a preponderance of the evidence that Hicks's constitutional rights were violated, and he did not commit the rape. The jury awarded him $3 million in compensatory damages.

## IV. Analysis

### a. Timeliness

"This Court has consistently held that the PCRA's time restrictions are jurisdictional in nature and that a PCRA court must, before considering the merits of [a] claim[] asserted in a PCRA petition, first make a threshold determination whether [the] claim was timely

---

[38] As noted, *see supra* note 12, following the May 28, 2021 joint motion by the DAO and Brown in federal court for sentencing relief in Brown's capital case, the DAO, on October 6, 2025, filed a motion to withdraw the joint motion, which was granted on April 21, 2026.

filed." *Commonwealth v. Tedford*, 228 A.3d 891, 904 (Pa. 2020) (collecting cases). Generally, a PCRA petitioner must raise a claim within one year of the date his judgment became final. *See* 42 Pa.C.S. §9545(b)(1). "[A] judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and [this Court], or at the expiration of time for seeking the review." 42 Pa.C.S. §9545(b)(3). A claim may be raised beyond the one-year deadline only if "the petition alleges and the petitioner proves" one of three exceptions: "[(1)] the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States; [(2)] the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or [(3)] the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or [this Court] after the time period provided in this section and has been held by that court to apply retroactively." 42 Pa.C.S. §9545(b)(1). A petitioner purporting to invoke one of these exceptions must raise his claim "within one year of the date the claim could have been presented." 42 Pa.C.S. §9545(b)(2). The exceptions to the PCRA time bar, as well as the one-year filing requirement of Section 9545(b)(2), "are claim specific, not petition based." *Commonwealth v. Rivera*, 324 A.3d 452, 468 (Pa. 2024); *see also id.* at 469 n.19. "In other words, if one of several claims in a PCRA petition meets [an] exception and Section 9545(b)(2), that does not mean that a PCRA court has jurisdiction to entertain the other claims raised in that petition." *Id.* at 469.

Here, following the Superior Court's affirmance of Brown's judgment of sentence, this Court denied allowance of appeal on May 15, 2007. Brown did not seek a writ of *certiorari* to the United States Supreme Court. Accordingly, his judgment became final

for purposes of the PCRA on August 13, 2007, upon expiration of the ninety-day period for seeking certiorari.  *See* U.S. Sup. Ct. R. 13.1.

Brown first raised the claim upon which the PCRA court granted relief — that the Commonwealth violated *Brady* by withholding Vann's purported false identification of Paige — over thirteen years later, in his Amended Second PCRA Petition filed on June 28, 2021.  This claim was thus facially untimely under the PCRA.  The PCRA court had jurisdiction to consider the claim only if Brown successfully pleaded and proved an exception to the time bar.

Mistakenly treating the time bar as petition-based rather than claim-specific, Brown broadly alleged his Amended Second PCRA Petition satisfied the governmental interference and unknown facts exceptions to the time bar.  *See* Joint Motion to Unseal and Unopposed Motion to Amend Supplement and Amendment to Successor Petition and Appendix, 8/18/21, at ¶3.  Although the DAO conceded Brown was entitled to a new trial based on the Vann *Brady* claim, and thus implicitly agreed this claim was timely raised, *amici* Family Members argued all of Brown's claims were untimely.  *See* Opening Brief of *Amicus Curiae* Victims' Family to Dismiss Brown's Untimely and Meritless PCRA Claims, 9/9/22, at 10; Reply Brief of *Amicus Curiae* Victims' Family, 3/20/23, at 45 n.14.  The PCRA court, however, apparently did not even consider the requisite threshold issue of timeliness.  Neither the court's order granting relief nor its findings in support thereof address the time bar in any way.  *See* N.T. Hearing, 5/5/23, at 4.  It appears the court simply presumed it had jurisdiction to consider the merits of Brown's *Brady* claim based on the DAO's agreement with Brown that relief was due.  On the contrary, as this Court recently and unanimously held in *Rivera*, "[t]he agreement of the parties . . . does not suffice to vest a court with jurisdiction; rather, a court must conduct an independent analysis of jurisdictional issues."  *Rivera*, 324 A.3d at 467.  On remand, the PCRA court,

before addressing the merits of any of Brown's claims, should first conduct an independent assessment of whether it has jurisdiction to consider the issue in the first place. Substantive review should be limited to those claims, if any, satisfying a time bar exception and Section 9545(b)(2).

### b. Merits

"The petitioner bears the burden to prove, by a preponderance of the evidence, that he or she is eligible for PCRA relief." *Commonwealth v. Murchison*, 328 A.3d 5, 17 (Pa. 2024); *see* 42 Pa.C.S. §9543(a). "[A] preponderance of the evidence . . . is 'tantamount to a "more likely than not" inquiry[.]'" *Cent. Dauphin Sch. Dist. v. Hawkins*, 286 A.3d 726, 741 (Pa. 2022), *quoting Popowsky v. Pa. Pub. Util. Comm'n*, 937 A.2d 1040, 1055 n.18 (Pa. 2007). "It is not possible for evidence that is inconclusive to be sufficient to meet the preponderance of the evidence standard." *Povacz v. Pa. Pub. Util. Comm'n*, 280 A.3d 975, 1006 (Pa. 2022). Similarly, "evidence of a mere possibility . . . is never sufficient to meet a preponderance of the evidence standard." *Id.* at 1007.

To establish a *Brady* violation, a defendant must prove three elements: first, that the evidence at issue is favorable to the defendant, either because it is exculpatory or because it is impeaching; second, that the prosecution suppressed the evidence, either willfully or inadvertently; and third, that the evidence is material. *See Commonwealth v. Thomas*, 323 A.3d 611, 639 (Pa. 2024). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Commonwealth v. Birdsong*, 24 A.3d 319, 327 (Pa. 2011), *quoting Commonwealth v. Chambers*, 807 A.2d 872, 887-88 (Pa. 2002). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." *Id.*, *quoting Chambers*, 807 A.2d at 887.

"[T]he PCRA requires judicial merits review favorable to the petitioner before any relief may be granted." *Brown*, 196 A.3d at 145 (emphasis omitted). "A confession of error by the Commonwealth does not constitute a judicial ruling in [the petitioner's] favor, and thus is insufficient for any grant of relief under the PCRA." *Id.* In conducting its independent judicial review, the PCRA court may dismiss a PCRA petition without a hearing if the court "is satisfied . . . that there are no genuine issues concerning any material fact and that the defendant is not entitled to post-conviction collateral relief, and no purpose would be served by any further proceedings[.]" Pa.R.Crim.P. 907(1). Similarly, "[a] petition for post-conviction collateral relief may be granted without a hearing when the petition and answer show that there is no genuine issue concerning any material fact and that the defendant is entitled to relief as a matter of law." Pa.R.Crim.P. 907(2). On the other hand, "the judge shall order a hearing . . . when the petition for post-conviction relief or the Commonwealth's answer, if any, raises material issues of fact." Pa.R.Crim.P. 908(A)(2). That is, "an evidentiary PCRA hearing is required when there is an outstanding issue of material fact." *Commonwealth v. Hutchinson*, 25 A.3d 277, 321 (Pa. 2011).

Here, the PCRA court granted relief based on Brown's claim the Commonwealth violated *Brady* by withholding Vann's purported false identification of Paige. *See* N.T. Hearing, 5/5/23, at 4 ("I'm going to find that . . . this false identification was not disclosed to the defense[.]"). This was error. Brown did not carry his burden to prove by a preponderance of the evidence that Vann in fact incriminated Paige in the first place. Obviously, the existence of this fact is a *sine qua non* of the claim. In the absence of the alleged misidentification of Paige by Vann, there can be no viable *Brady* claim. The Commonwealth, of course, cannot suppress evidence which does not exist, nor can a nonexistent identification be impeaching, favorable, or material. *See (Christopher Lynn)*

*Johnson*, 335 A.3d at 718 ("[T]he Commonwealth could not have withheld an agreement that never existed in the first place.").

In support of his *Brady* claim, Brown proffered four documents: the 23rd District memorandum, Detective Baker's July 14 and 15 memoranda, and the Gannondale fax. These documents do not render it more likely than not Vann incriminated Paige.

Beginning with the 23rd District memorandum, this document discusses the Rite Aid murder in the following paragraph:

> Vann then co-operated with CDD SIU, providing in[f]ormation into the robbery of the Rite Aid, 1301 Girard Ave, on 1-18-03, and the homicide at the Rite Aid the following day, 1-19-03. Based on Vann's co-operation, defendants Christopher Kennedy 22/B/M, PPN/840063 and James Richardson 22/B/M, PPN/858783 have been arrested and charged with robbery & homicide. (DC#03-23-001770 and 03-23-001914)

Amended Second PCRA Petition, 6/28/21, at Appendix, Exh. 12. Thereafter, the memorandum provides:

> Vann is continuing to co-operate with CDD SIU regarding robberies being committed in the 23rd dist area of Broad and Girard Ave, providing confidential information concerning the following:
>
> Robbery/Homicide: Jamar Richardson 21/B/M, 1218 N 11th St (no record), **Kennisha Paige** 17/B/F, 1116 Stiles St
>
> Robberies:   William Green 19/B/M, PPN/885936, [redacted]
>               Anthony Frames 20/B/M, PPN/836622, aka "Spanky"
>               Lavar Brown, 25/B/M, PPN/807547, 1222 N 11th, aka "Black"
>               Stephen Kennedy 19/B/M, PPN/823690, [redacted]
>               James Montgomery, 20/B/M, PPN/885941, [redacted]
>               Naheem Johnson 20/B/M, PPN/851060, [redacted]

*Id.* (emphasis added).

Thus, the paragraph regarding the Rite Aid murder does not include any reference whatsoever to Paige. This passage refers to Kennedy and James by name, but not Paige. If Vann had identified Paige in this crime, one would expect to find this fact included in this paragraph of the memorandum. As the PCRA court put it, "[i]t certainly would've

made sense to put that . . . in the paragraph where they're talking about the Rite-Aid robbery." N.T. Hearing, 12/1/22, at 11. But it is not there. Rather, the memorandum's sole reference to Paige appears in the subsequent discussion of Vann's assistance in the investigation of **other crimes**. What's more, the memorandum simply notes Paige's name, age, race, sex, and address in connection with an unspecified "robbery/homicide." It does not specify Vann identified Paige. Plus, the memorandum was apparently written by an administrative officer for use at a CompStat meeting, not by an officer with firsthand knowledge of and involvement in the case. *See* Declaration of Special Agent Brian Peters, 6/14/23, at ¶16. In light of its opaque structure, vague phrasing, and clerical origins, the 23rd District memorandum is far from conclusive proof Vann incriminated Paige, as the PCRA court duly recognized. In the apt words of the PCRA court, the memorandum "certainly doesn't make it clear that Vann identified Paige for the Rite-Aid homicide[,]" and "[i]t's actually . . . some circumstantial evidence that he did not[.]" N.T. Hearing, 12/1/22, at 9.

Detective Baker's July 2003 memoranda and the fax he received from Gannondale likewise fail to provide any level of certainty on this score. For the most part, these documents merely indicate the detective investigated Paige in connection with the Rite Aid murder, not that Vann identified her as participating in the crime. The slim information arguably supporting Vann's identification of Paige consists of a single line in Detective Baker's July 14 memorandum in which he vaguely notes Vann "mentioned her." Amended Second PCRA Petition, 6/28/21, at Appendix, Exh. 20. There is ample cause to question whether this thin reed supports the conclusion Vann in fact identified Paige. The memorandum does not specify Vann "mentioned" Paige as a **participant** in the murder, as opposed to merely a witness or associate of the suspects with potentially relevant information. Nor does it specify Vann "mentioned" Paige **to Detective Baker**.

That is, it is not clear from the memorandum that the detective was writing from firsthand knowledge as opposed to relying on secondhand information. On the contrary, it appears the detective first met with Vann over one week later, on July 22, 2003, when he and Detective Judge took Vann's final statement. *See* N.T. Trial, 7/26/04, at 50.

Moreover, as of the time of his July 14, 2003 memorandum, Detective Baker's involvement in and knowledge of the investigation of the Rite Aid murder was limited.[39] Detective Baker was not the detective assigned to the case; Detective Judge was. *See id.* at 72. In fact, the detectives worked in entirely different squads in the Homicide Unit. *See* Declaration of Detective Kevin Judge at ¶13 (undated) ("Detective Baker worked in another squad in the Homicide Unit[.]"). Detective Baker assisted with the case only informally. *See id.* As such, the detective was not familiar with all the statements in the case and did not attend any supervisor meetings where the investigation was discussed. *See* N.T. Trial, 7/26/04, at 87 (Detective Baker testifying "I wouldn't read every statement on every job. The assigned would."); Declaration of Detective Kevin Judge at ¶15 (undated) ("As he was in another squad, Det. Baker . . . would not have attended any meeting with my supervisors where this investigation was discussed."). He likewise was not present when Vann gave his statements to the police on January 21, February 20, and March 21, 2003. Detective Baker's lack of experience and familiarity with the case could well have led him to conflate Lyons and Paige. The possibility of confusion on the part of Detective Baker was particularly pronounced given the salient similarities between Lyons and Paige. Both were teenage black females with similarly sounding first names beginning with "K" who lived in close proximity to the Richardson house where the Rite Aid murder was planned.

---

[39] Subsequently, Detective Baker, *inter alia*, participated in taking a statement from Vann on July 22, 2003, as well as a statement from Lyons on January 15, 2004.

The conclusion Vann incriminated Paige is also undermined by the fact this purported identification is not recorded in any of the statements he gave to law enforcement. It is certainly reasonable to presume that if Vann had actually identified Paige, this identification would have been memorialized. The PCRA court itself made this point emphatically. *See* N.T. Hearing, 12/1/22, at 13 ("There's no detective who wouldn't put that in following the ordinary course of business."). Likewise, Detective Judge, who took Vann's second statement on January 21, 2003 and his final statement on July 22, 2003, and who was also present at the March 21, 2003 proffer session where Vann identified Lyons but not Paige, has confirmed in his declaration: "had [Paige] been identified at any point by Vann or anyone else as being involved or being in possession of any information about the homicide, that information would have been documented." Declaration of Detective Kevin Judge at ¶16 (undated). Detective Peters has similarly declared: "[a]t no time during my encounter and interactions with Vann at Central Detectives on January 21, 2003 did Vann ever say to me, or another detective/officer in my presence, that someone named Kennisha Paige was involved in the commission of the Rite Aid robbery/murder on January 19, 2003. If he did, I would have documented that information." Declaration of Special Agent Brian Peters, 6/14/23, at ¶13. But Vann's multiple statements include no reference whatsoever to Paige.

The conspicuous absence of Paige's name cannot be explained by police manipulation, as Brown argued below. Brown contended Vann may have implicated Paige, but the police kept his identification out of his statements because their investigation established she had an alibi. *See* N.T. Hearing, 12/1/22, at 13 ("There's an explanation. They checked it out and it didn't check out."). This theory is refuted by the timing of Detective Baker's investigation of Paige. Based on his memoranda, Detective Baker did not confirm Paige had an alibi until July 2003, by which point Vann had already

given four statements to the police — two on January 21, 2003, one on February 20, 2003, and one on March 21, 2003. When the police took these statements, they had not yet investigated Paige and had no reason to omit her name if she had in fact been mentioned by Vann.

In short, the inconclusive and disputable documents submitted by Brown did not carry his burden to prove it was more likely than not Vann actually inculpated Paige. And the joint stipulations of fact did not make up for his evidentiary shortfall, as they did not include a stipulation Vann implicated Paige. The PCRA court repeatedly recognized Brown fell short in sustaining his burden of proof. *See* N.T. Hearing, 7/8/22, at 6 ("I agree with the families on the insufficiency of the record; and in particular, I do want to see more evidence on the statement that Ronald Vann allegedly made implicating Kennisha Page [sic]."); *id.* ("I agree with [Family Members'] argument that on the face of the documents that were submitted to me, I can't tell that that, in fact, happened."); *id.* at 6-7 ("But on the existing record, it's my considered view . . . that there is not enough information in the paperwork for me to grant the petition notwithstanding the fact that both parties are of the opinion that it should be granted."); N.T. Hearing, 8/11/22, at 13 ("I'm interested in actually what happened, and I don't think that's clear just from the submissions that I received."); N.T. Hearing, 10/7/22, at 13 ("I'm still not understanding how everybody thinks that paperwork establishes that. . . . I just don't get it."); N.T. Hearing, 12/1/22, at 8 ("[T]he record in front of me including the stipulation does not resolve the factual question of whether Mr. Vann actually identified Kennisha Paige as a participant in the Rite-Aid conspiracy."); *id.* at 10 ("It seems to me there's evidence on both sides, and I don't know how anybody could conclude conclusively that Vann actually identified Paige as being one of the participants in the homicide based on this record."); *id.* at 13-14 ("I'm pointing out that a key factual issue in my mind is not resolved on this existing record.").

Nonetheless, without any further supplementation of the record, or explanation for its sudden about-face, the court granted post-conviction relief. This was error.[40]

Relatedly, it was erroneous for the PCRA court to grant relief without holding an evidentiary hearing. As discussed, there was clearly an unresolved issue of material fact regarding Brown's *Brady* claim: whether Vann in fact incriminated Paige. Accordingly, pursuant to our Rules of Criminal Procedure and case law, the PCRA court was required to hold an evidentiary hearing. *See* Pa.R.Crim.P. 908(A)(2); *Hutchinson*, 25 A.3d at 321. The lower court seemingly recognized as much, at least initially. *See* N.T. Hearing, 7/8/22, at 6 ("I'm going to require an evidentiary hearing."); *id.* at 10 ("And if not, the next thing that will happen is I will schedule an evidentiary hearing."); *id.* at 11 ("So if there's no appeal, we will schedule an evidentiary hearing at that time."); N.T. Hearing, 8/11/22, at 13 ("We're having a hearing. I've already ruled on that at the last listing."). However, the PCRA court ultimately ruled: "I'm not going to have a hearing if everybody connected with the case thinks I shouldn't." N.T. Hearing, 12/1/22, at 10. While Family Members argued Brown's petition should be **denied** without a hearing, they did not concede relief could be **granted** without one. *See* Opening Brief of *Amicus Curiae* Victims' Family to Dismiss Brown's Untimely and Meritless PCRA Claims, 9/9/22, at 61-62 ("Rule 907 of the Pennsylvania Rules of Criminal Procedure provides that the PCRA court can deny a petition without a hearing when it determines 'that there are no genuine issues concerning any material fact and that petitioner is not entitled to post-conviction collateral relief and

---

[40] Again, the claim upon which the PCRA court erroneously granted relief was that the Commonwealth violated *Brady* by failing to disclose Vann's false identification of Paige. *See* N.T. Hearing, 5/5/23, at 4. The claim that the Commonwealth violated *Brady* by not disclosing Detective Baker's July 2003 memoranda, the 23rd District memorandum, and the Gannondale fax does not warrant relief on the present record for similar reasons. As detailed above, these documents alone do not establish by a preponderance of the evidence Vann incriminated Paige. As such, it cannot be concluded this paperwork was favorable and material as required by *Brady*.

no purpose would be served by any further proceedings . . . ' Pa.R.Crim.P. 907. That is the case here.").

In any event, the standard for ordering an evidentiary hearing under the PCRA is not whether the parties want one. A hearing is required when there is a material issue of fact, as there is in this case. The PCRA court is thus instructed on remand to conduct a hearing, after which it shall determine whether Brown has proven by a preponderance of the evidence that Vann in fact incriminated Paige in the first place.[41] If so, the court is directed to reassess whether this evidence is material under *Brady*, *i.e.*, whether "there is a reasonable probability that, had the evidence been disclosed to" Brown before trial, "the result of the proceeding would have been different." *Birdsong*, 24 A.3d at 327, *quoting Commonwealth v. Chambers*, 807 A.2d 872, 887-88 (Pa. 2002).[42]

---

[41] In light of our remand for an evidentiary hearing, Justice Donohue finds it "curious and suspect that [we] engage[] in an extensive evaluation of the probative value of the evidence." Concurring and Dissenting Opinion at 4 (Donohue, J.). But how could we properly determine whether the evidence leaves an unresolved factual issue as to whether Vann in fact incriminated Paige, thereby necessitating an evidentiary hearing, without first evaluating that evidence? Obviously, we cannot simply assume the record is inconclusive as to this critical issue. In our view, it would be "curious" and "suspect" if we did **not** engage in a thorough analysis of the existing proof purportedly supporting a *Brady* violation, and instead summarily remanded for further proceedings.

[42] We have explained that "[i]n evaluating whether a reasonable probability of a different outcome has been demonstrated, the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *(Christopher Lynn) Johnson*, 335 A.3d at 717, *quoting Commonwealth v. Natividad*, 200 A.3d 11, 26 (Pa. 2019); *see id.* (to obtain *Brady* relief a defendant must "show that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict"). The "whole case" here includes the other trial evidence impeaching Vann that did not dissuade the jury from convicting Brown, including that he had a separate open robbery case, pleaded guilty to selling drugs, had other drug convictions, violated his parole following the murder, served nine months in prison, initially lied to the police about the murder to exonerate himself, lied to the police three different times, hoped his testimony would help him with his own cases, and was the beneficiary of a testimonial immunity order providing that if he testified about the murder the Commonwealth would not be able to use his testimony against him (continued…)

## c. The DAO's Conduct in this Case

We cannot ignore the reality that the PCRA court's erroneous grant of relief in this case was abetted by the DAO's lack of candor and failure to conduct a reasonable investigation.[43] Our rules of professional conduct impose on lawyers a duty of candor

---

in any criminal prosecution. In addition, we observe Vann's testimony against Brown was corroborated by Lyons.

[43] Justice Wecht forwards the novel argument that identifying the DAO's ethical violations in this case "exceeds" the "boundaries of our King's Bench power" because there has been no "complaint to the Office of Disciplinary Counsel" and "adjudicat[ion] before the Court's Disciplinary Board[.]" Dissenting Opinion at 15 (Wecht, J.). Not so. Indeed, in cases not involving our "very high and transcendent" King's Bench authority, *In re Bruno*, 101 A.3d at 669, *quoting Chimenti*, 507 A.2d at 81, this Court has repeatedly indicated it may independently find an attorney to have behaved unethically without first referring counsel for disciplinary proceedings. *See, e.g.*, *Cnty. of Fulton v. Sec'y of Commonwealth*, 292 A.3d 974, 1018 (Pa. 2023) (finding attorney "guilty of relentlessly dilatory, obdurate, vexatious, and bad-faith conduct before this Court and the Special Master" and "refer[ring] [him] to the Pennsylvania Attorney Disciplinary Board for further examination of his conduct"); *Commonwealth v. Vandivner*, 983 A.2d 1199, 1202-03 (Pa. 2009) ("[T]he only derogation of duty here involves counsel's present misrepresentation of the record to this Court. The blatant, multiple material misrepresentations of the record that undergird the instant Application are beyond distressing. . . . Counsel should be mindful of her ethical duties, including her duty of candor toward the tribunal, which prohibits an attorney from knowingly making a false statement of material fact."); *Commonwealth v. D'Amato*, 526 A.2d 300, 314 (Pa. 1987) ("We will not hesitate, in appropriate cases, to refer matters of improper trial conduct of either the defense attorney or the prosecutor to the disciplinary board where the record suggests that the Code of Professional Responsibility may have been transgressed.") (emphasis omitted); *Commonwealth v. Stoyko*, 475 A.2d 714, 724 n.7 (Pa. 1984) ("[T]his Court will scrutinize the record for bogus 'ineffectiveness' tactics and should not hesitate, if the facts and inferences so warrant, to refer the matter to the disciplinary board."). This is certainly no less true in the King's Bench context, where our powers are at their maximum. *See, e.g.*, *In re Bruno*, 101 A.3d at 686-87 ("The Supreme Court's exercise of its supervisory authority does not intrude upon the CJD's [Court of Judicial Discipline's] constitutional authority to mete out disciplinary sanctions upon jurists, nor does it preclude the CJD from imposing disciplinary sanctions upon a later Board-filed complaint. . . . Properly understood, any such supervisory action is not punishment, but instead represents action undertaken to preserve the integrity of the judiciary."). Justice Wecht's apparent view that it is somehow procedurally improper for this Court to identify attorney ethical lapses in cases pending before it unless the violations have first been "litigated before the (continued…)

toward the tribunal. *See* Pa.R.P.C. 3.3. Lawyers are "officers of the court" who are duty bound "to avoid conduct that undermines the integrity of the adjudicative process." Pa.R.P.C. 3.3 exp. cmt. [2]. A lawyer's lack of candor to the court does just that. The duty of candor applies with special force to prosecutors, who are not mere advocates but also ministers of justice. *See* Pa.R.P.C. 3.8 exp. cmt. [1]. Moreover, as the United States Court of Appeals for the Third Circuit recently explained in another concession case involving the DAO, "[c]andor is especially critical when proceedings are non-adversarial." *Wharton v. Superintendent Graterford SCI*, 95 F.4th 140, 149 (3d Cir. 2024).[44] "The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective" of justice. *United States v. Cronic*, 466 U.S. 648, 655 (1984), *quoting Herring v. New York*, 422 U.S. 853, 862 (1975). When only one side is presented to the court because the parties agree, for whatever reason, then "the court is entitled to expect an even greater degree of thoroughness and candor." *Wharton*, 95 F.4th at 149, *quoting Me. Audubon Soc'y v. Purslow*, 907 F.2d 265, 268 (1st Cir. 1990).

Under the duty of candor, "[a] lawyer shall not knowingly . . . make a false statement of material fact . . . to a tribunal[.]" Pa.R.P.C. 3.3(a)(1). "Candor means more than just not lying[; i]t also means not saying things 'that are literally true but actually

---

Disciplinary Board" runs headlong into, and is directly contradicted by, a litany of precedent doing just that. Dissenting Opinion at 15 n.53 (Wecht, J.).

[44] Much like this Court is "not obligated to follow the decisions of the Third Circuit on issues of federal law[,]" *Hall v. Pa. Bd. of Prob. & Parole*, 851 A.2d 859, 865 (Pa. 2004), neither are we bound to follow its interpretations of our Rules of Professional Conduct and Rules of Disciplinary Enforcement, which govern the conduct and discipline of attorneys in this Commonwealth. *See, e.g.*, *Beyers v. Richmond*, 937 A.2d 1082, 1090-91 (Pa. 2007) ("this Court's exclusive authority in this area is founded on the separation of powers" and derives from the "constitutional authority to regulate the practice of law" found in Article V, §§10(a) and (c) of our state charter). Still, where appropriate, we may consider such decisions for their persuasive value. We find *Wharton*'s discussion of the duty of candor to be particularly persuasive and adopt it as noted.

misleading.'" *Wharton*, 95 F.4th at 148, *quoting In re Taylor*, 655 F.3d 274, 283 (3d Cir. 2011). The duty of candor also requires that "[i]n an *ex parte* proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse." Pa.R.P.C. 3.3(d). A non-adversarial proceeding in which both sides agree to relief is equivalent to an *ex parte* proceeding because in both situations the court is denied the benefit of adversarial advocacy. *See Wharton*, 95 F.4th at 149 ("At *ex parte* hearings, . . . the customary checks and balances do not pertain[.] . . . The same is true of proceedings that risk being collusive, like class-action settlements or guilty-plea colloquies.") (quotation marks and citation omitted).

Here, the DAO, bearing the prosecutor's responsibility of a minister of justice, confessed error in a non-adversarial proceeding. The conceded case could hardly be more serious: a murder conviction potentially implicating Brown's death sentence for a second murder. As this Court emphasized in *Brown*, "[t]he community . . . has an interest in the[se] verdict[s], which may . . . be disrupted only if a court finds legal error." *Brown*, 196 A.3d at 146. Under these circumstances, the DAO's fidelity to its duty of candor should have been at its zenith. Regrettably, it was anything but.

For one, the DAO did not disclose the March 2003 memorandum to the PCRA court, which recounted Vann's March 21, 2003 statement to police in which he identified Lyons and Brown by name as being involved in the Rite Aid murder.[45] The DAO does not dispute it withheld this memorandum from the PCRA court, but rather insists it "did not include this document in its pleadings because it was irrelevant to any of Brown's claims." DAO's Brief at 52. According to the DAO, the PCRA court "was already presented with thousands of pages of transcripts, appendices, and briefs" and "including

---

[45] Brown also did not provide this document to the PCRA court.

[this] unnecessary document[] would only have hindered [its] decision." *Id.* We find this rationale entirely unconvincing. The DAO itself referred to the March 2003 memorandum in the PCRA court. In its response to Brown's PCRA petition, in which it conceded he was entitled to a new trial, the DAO asserted "there is no record of Vann discussing Brown informally prior to March 2003." DAO's Response to Petition for Collateral Relief, 11/1/21, at ¶74 n.8. This assertion was incorrect. Vann discussed Brown in his unsigned February 20, 2003 statement to Detectives Santamala and Brooks. *See* Interview of Vann by Detectives Santamala and Brooks, 2/20/03, at 1 ("Vann believes that the male with Richardson [during the failed robbery of the Rite Aid the day before the murder] may have been Lavare [sic] Brown, but is not sure."). But more to the present point, as the DAO acknowledges, its allegation about Vann accusing Brown in March 2003 "referenc[ed] the Fisher memorandum[.]" DAO's Brief at 47. Having specifically relied on the March 2003 memorandum in its briefing to the PCRA court below, the DAO's present contention this document was actually wholly irrelevant to the court's decision rings hollow and smacks of *post hoc* rationalization.

Indeed, the March 2003 memorandum was unquestionably relevant to the proceedings below. "Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence[,] and . . . the fact is of consequence in determining the action." Pa.R.E. 401. Again, the March 2003 memorandum reflected Vann identified Lyons (not Paige) in March of 2003. Thus, this evidence tended to support the fact Vann did not identify Paige, which, if true, would of course foreclose Brown's claim that the Commonwealth violated *Brady* by suppressing this alleged identification. The fact Vann identified Lyons in March of 2003, in addition to identifying her in his July 2003 statement and at trial, supported the inference he had consistently identified Lyons and had never implicated Paige. His repeated positive identifications indicated

consistency over time. To be sure, the March 2003 memorandum was not **dispositive** of Vann's failure to identify Paige. It is possible that, notwithstanding this second pretrial identification of Lyons, Vann nonetheless also accused Paige at some other unspecified time, to some unspecified member of law enforcement, who inexplicably failed to record the identification. But the notion that the March 2003 memorandum was not even **relevant** to this question — that it had no tendency whatsoever to make it any less probable that Vann identified Paige — is simply not tenable.[46]

The March 2003 memorandum was also pertinent to the materiality prong of Brown's *Brady* claim, *i.e.*, whether, assuming Vann identified Paige, the introduction of this evidence would have created a reasonable probability of acquittal. The DAO argued below that "[i]f the Paige accusation had been disclosed, it would have proved fertile ground for cross-examination" of Vann. DAO's Consolidated Response to Briefing by *Amici* and Petitioner, 2/21/23, at 14. Specifically, the DAO claimed Vann "first mentioned" Lyons and Brown "**after** investigators determined that Vann had lied about Paige's involvement in the Rite Aid robbery/homicide. . . . Had the defense been apprised that Vann had told investigators that a demonstrably innocent person had been involved in the crime and only implicated [Brown] after being caught in the lie, their attacks on his credibility would have been more convincing to the jury." *Id.* at 15 (emphasis in original).

The March 2003 memorandum flatly belied these arguments. It showed Vann in fact identified Lyons and Brown on March 21, 2003, months **before** Detective Baker confirmed in July of 2003 that Paige had an alibi for the Rite Aid murder. That is, the 2003 memorandum refuted the DAO theory "Vann's July 22, 2003, statement was

---

[46] Whether the plainly relevant March 2003 memorandum is a "smoking gun" is of no moment. Concurring and Dissenting Opinion at 11 (Donohue, J.). The DAO's duty of candor obliged it to disclose all relevant documents to the PCRA court, not just smoking guns. The ultimate evidentiary weight to be given to the memorandum was for the PCRA court to decide, but it never got the chance because the DAO kept it to itself.

sanitized by the police in that it omitted the aspects of his earlier account that detectives had recently confirmed were false." DAO's Brief at 50. Rather, as Family Members note, the memorandum showed that "in both March and July 2003, Vann identified all five participants in both the aborted robbery on January 18, 2003 and the subsequent robbery-murder the following day, January 19 — both those who had been 'checked out' and those who had not — stated their respective roles, and never on[c]e mentioned Kennisha Paige." Family Members' Reply Brief at 16. The memorandum would have poured salt on the "fertile ground" for impeachment envisioned by the DAO.

The DAO did not merely withhold from the PCRA court the clearly relevant March 2003 memorandum; it also actively opposed Family Members' efforts to gain access to this document and share it with the court. As the DAO recounts, after Brown filed his second PCRA petition in 2020, "in accordance with the DAO's open-file discovery policy, the [DAO] allowed Brown's counsel access to the entirety of its file in this case, as well as the Philadelphia Police Department's homicide investigation file[.]" DAO's Brief at 17. Subsequently, Family Members repeatedly requested the same open-file access in the PCRA court. Initially, in their motion to intervene, Family Members argued they should be permitted "the opportunity to review the full, lengthy file[.]" Motion for Intervention by Victims' Families, 1/24/22, at 10. Likewise, in their opening brief below, Family Members argued "the most meaningful and effective participation by the *amicus curiae* would be best served by access to the complete file in this case (the trial prosecution file and the police homicide file)." Opening Brief of *Amicus Curiae* Victims' Family to Dismiss Brown's Untimely and Meritless PCRA Claims, 9/9/22, at 67. Seemingly anticipating the DAO's suppression of the March 2003 memorandum, Family Members contended granting them open-file discovery "would be the only way to make certain th[e PCRA court] was presented with **all** the relevant documentation in the case before making its determination

— and not just those documents that the parties believe support their mission to vacate the conviction." *Id.* at 67 (emphasis in original).

The DAO steadfastly opposed these requests, insisting Family Members were not entitled to the same access it had readily accorded the murderer of their loved ones. *See* DAO's Response to Motion for Intervention by Victim's [sic] Families, 4/5/22, at 4 ("This cannot be permitted."); DAO's Pre-Hearing Brief, 9/9/22, at 9 ("*Amici* have again requested to review the prosecution's records. They are not entitled to do so and identified no statutory authority in support of their request.").[47] The DAO assured the PCRA court that allowing Family Members to review its files was "unnecessary" because "the DAO is the Commonwealth's representative in this case and has already reviewed the prosecution file to ensure that any relevant evidence is provided for the [c]ourt's review." *Id.* at 9-10. However, as is now clear based on the diligent efforts of Family Members following the PCRA court's grant of relief, the DAO did not live up to this representation. The DAO did not provide the PCRA court with the plainly relevant March 2003 memorandum, in breach of its duty of candor.

The joint stipulations of fact submitted by the DAO and Brown likewise lacked candor to the court. Specifically, the stipulations alleged: "[o]n Tuesday, July 22, 2003, Ronald Vann provided a third statement to homicide investigators. That statement was the first in which he implicated [Brown] or Kiana Lyons in the Rite Aid robbery/homicide." Joint Stipulations of Fact, 11/8/22, at ¶41. This joint stipulation was false in multiple respects. Vann provided more than three statements to the police about the Rite Aid murder. He gave at least five statements about the murder: two on January 21, 2003, and one each on February 20, 2003, March 21, 2003, and July 22, 2003. Moreover, his

---

[47] The DAO acknowledges it "opposed" Family Members' discovery requests but notes it would have "view[ed] the discovery matter differently if the OAG were asking to review the file," and that it offered two former prosecutors who had worked on Brown's case "an opportunity to review the entire file." DAO's Brief at 41-42.

July 22, 2003 statement was not the first in which he implicated Brown and Lyons. Per the March 2003 memorandum suppressed by the DAO in the underlying post-conviction proceedings, Vann incriminated Brown and Lyons months before his July 22, 2003 statement, at the proffer session on March 21, 2003.

The DAO concedes the joint stipulation at issue, stipulation 41, "could have been more clearly drafted" but nonetheless insists it "would not have confused anyone acquainted with this case" because it "plainly referred" only to Vann's "disclosed" statements. DAO's Brief at 51-52. On the contrary, prior to this stipulation regarding Vann's third statement, the joint stipulations described Vann's first and second statements as follows:

> 28. Ronald Vann surrendered to the police on January 21, 2003. He was charged with the January 6, 2003 robberies of pizza delivery drivers Hector Toledo and Mohammad Lalhhab at MC103/01-5386 and MC103/01-5387, respectively.
>
> 29. The same day, Vann provided a statement regarding the November 25, 2002, shooting of Kareem Ali, Def. Ex. 10, and the January 19, 2003, Rite Aid robbery/homicide, Def. Ex. 15.
>
> 30. On February 20, 2003, Vann provided a second statement to the police regarding the Rite Aid robbery/homicide. Def. Ex. 9.

Joint Stipulations of Fact, 11/8/22, at ¶¶28-30. The citation to "Def. Ex. 15" in stipulation 29 refers to exhibit 15 in the appendix to Brown's amended second PCRA petition. *See id.* at 1 n.2 ("Unless otherwise stated, all Exhibit numbers correspond to Exhibits in Petitioner's Appendix to [his Amended Second PCRA Petition] filed on June 2[8], 2021."). The statement included as exhibit 15 in Brown's appendix was Vann's statement on January 21, 2003 at 11:15 a.m. *See* Amended Second PCRA Petition, 6/28/21, at Appendix, Exh. 15. In light of this context, this same statement — *i.e.*, the one Vann provided on January 21, 2003 at 11:15 a.m. — was the first of the three statements by Vann referenced in stipulation 41. This statement was **not** disclosed to Brown's trial

counsel, as the joint stipulations themselves alleged. *See* Joint Stipulations of Fact, 11/8/22, at ¶24a ("The following documents are contained in the Philadelphia Police Department's H-File for M03-14 and were not produced to trial counsel or to [Brown's] PCRA counsel during the initial PCRA proceedings: a. January 21, 2003, 11:15 a.m., statement of Ronald Vann with two different versions of page 4, Def. Ex. 15[.]"); *see also* Brown's Response to Amicus' Opening Brief, 2/6/23, at 36 ("The Commonwealth failed to reveal one of two statements Vann gave on January 21, 2003, this one in the morning at 11:15 a.m. Pet. Ex. 15, Stip ¶24.a."); Brown's Brief at 7 ("The DAO did not disclose this statement pre-trial or in initial PCRA proceedings."). Thus, stipulation 41 did not refer only to "disclosed" statements, "plainly" or otherwise. DAO's Brief at 51-52. The DAO's belated gloss on this false stipulation is itself false.[48]

The DAO's pleadings in the PCRA court also included misrepresentations of fact. The DAO repeatedly represented to the PCRA court that the court had been provided with all relevant information necessary for it to make an informed decision. *See* DAO's Response to Petition for Collateral Relief, 11/1/21, at ¶129 ("This Court is in a position to do what the prior PCRA court could not — review Brown's claims in light of a complete record."); DAO's Pre-Hearing Brief, 9/9/22, at 9-10 ("[T]he DAO is the Commonwealth's representative in this case and has already reviewed the prosecution file to ensure that any relevant evidence is provided for the [c]ourt's review."). In fact, the court did not have the decidedly relevant March 2003 memorandum. The DAO represented to the PCRA court that Vann's statement on July 22, 2003 was the first in which he inculpated Lyons and Brown. *See* DAO's Consolidated Response to Briefing by *Amici* and Petitioner, 2/21/23, at 15 ("They were first mentioned in Vann's July 21 and 22, 2003, statements[.]");

---

[48] In any event, the stipulation, which in no way specified it was confined to "disclosed" statements, was, at a minimum, misleading. *See Wharton*, 95 F.4th at 148 ("Candor means . . . not saying things that are . . . actually misleading.") (quotation marks and citation omitted).

*id.* ("[T]he statement he provided on July 22 . . . implicated [Brown] and Lyons for the first time."). The suppressed March 2003 memorandum proves this is not so; the memorandum reflects that Vann identified Brown and Lyons on March 21, 2003, months before his July statement. The DAO claimed Vann did not discuss Brown informally prior to March 2003. *See* DAO's Response to Petition for Collateral Relief, 11/1/21, at ¶74 n.8 ("[T]here is no record of Vann discussing Brown informally prior to March 2003."). Actually, Vann discussed Brown in his unsigned February 20, 2003 statement. *See* Interview of Vann by Detectives Santamala and Brooks, 2/20/03, at 1 ("Vann believes that the male with Richardson [during the failed robbery of the Rite Aid the day before the murder] may have been Lavare [sic] Brown, but is not sure."). The DAO alleged below that Vann identified Brown and Lyons only "**after** investigators determined that Vann had lied about Paige's involvement in the Rite Aid robbery/homicide." DAO's Consolidated Response to Briefing by *Amici* and Petitioner, 2/21/23 at 15 (emphasis in original). To the contrary, Vann incriminated them on March 21, 2003, long before Detective Baker confirmed Paige's alibi in July of 2003.

A concomitant to the lawyer's duty of candor is the obligation to conduct a reasonable investigation before making representations to a court. As the Third Circuit has put it: "[a]s officers of the court, lawyers must not mislead courts. So before they state facts, they must investigate reasonably." *Wharton*, 95 F.4th at 151. In particular, given the special ethical responsibilities of a prosecutor and the community interests at stake, a prosecutor's concession to relief in a criminal case should only follow a reasonable investigation, as *amicus* supporting the DAO confirm. *See, e.g.*, Quattrone Center *Amicus* Brief at 6 ("To be sure, factual stipulations and agreement to relief by prosecutors should only be made based on an independent investigation. This position

is consistent with the prosecutorial function, prosecutorial ethics, and community interests of justice.").

Presently, the DAO's response agreeing to PCRA relief alleged it was doing so "[a]fter reviewing Brown's current pleadings," and "a thorough, independent review **of the records in this case**." DAO's Response to Petition for Collateral Relief, 11/1/21, at ¶8 (emphasis added). In other words, the DAO limited its review to Brown's pleadings and the documents in the prosecution and police files. Its "investigation" did not go beyond a cold review of the inconclusive paperwork in its own records. It never interviewed a single witness. There were a number of individuals who could have potentially provided relevant information regarding the central issue of whether Vann in fact identified Paige, including Detectives Baker, Judge, and Peters, and ADA Fisher.[49] Indeed, Detectives Judge and Peters subsequently provided pertinent declarations when they were contacted by the OAG. However, the DAO never bothered to contact any of these people who could have brought needed clarity to the critical factual question before the PCRA court. This investigative omission was obvious and inexplicable, so much so that the court commented on it directly. *See* N.T. Hearing, 12/1/22, at 10 ("I don't know why it's so hard to ask one of the many people who would actually have personal knowledge as to whether or not this happened[.]").

*Amicus* assures us:

In our experience and studies, a post-conviction review by a prosecutor's conviction review unit involves an exhaustive investigation of the case that may take years to complete. Witnesses are identified, located, and interviewed; forensic evidence is tested or retested with more modern techniques; experts are consulted.

---

[49] Detective Baker died on July 20, 2022, over eight months **after** the DAO filed its response conceding relief on November 1, 2021. *See* Family Members' Brief at 56 & n.12. Vann himself died in December 2018, prior to the filing of Brown's second PCRA petition in this case, but after the DAO had confessed error in his separate capital case. The DAO did not attempt to interview Vann either.

Quattrone Center *Amicus* Brief at 12; *see also* Conviction Integrity Units' *Amicus* Brief at 10 n.3 (arguing this Court "can rest assured" that review procedures of conviction integrity units "are generally viewed as incredibly thorough and effective"). But none of this happened here, leaving us not at all "assured" of the reliability of the DAO's confession of error. Instead, four months after Brown raised his *Brady* claim, the DAO, following a selective, papers-only review, confessed error and agreed to a new trial. What's more, the DAO confidently declared this case to be "a stark example of what can go wrong when prosecutors cut corners and shirk their ethical and constitutional duties in order to obtain and defend convictions of defendants they believe are guilty." DAO's Response to Petition for Collateral Relief, 11/1/21, at 4. Yet the DAO itself cut corners and shirked its duties in conducting its post-conviction "investigation." Although the paperwork alone did not come close to presenting a clear basis for relief, the DAO nonetheless restricted its review to the inscrutable documentary evidence. This was neither reasonable nor adequate to ensure the PCRA court was not misled.

### d. The DAO's Conduct in Other Concession Cases

Unfortunately, the DAO's problematic concession in this case may not be dismissed as a troubling one-off. Since January of 2018, the DAO has made at least 120 concessions of relief. *See* OAG's Brief at 5-30; OAG's Reply Brief at 10 n.3.[50] Importantly, the DAO's concession program is not an exoneration program. The DAO

---

[50] Justice Wecht criticizes us for "[t]aking the OAG's word for it" when it comes to the number of conceded cases. Dissenting Opinion at 16 (Wecht, J.). But so does the DAO. The DAO, which is obviously in a position to know the tally, and would not hesitate to correct the OAG if it were mistaken, does not dispute the general accuracy of the OAG's calculation. Rather, the DAO merely quibbles that the OAG's count is "maximalist" because "it combines both the work of all of the DAO's post-conviction units, including its [CIU] and law division; it includes claims challenging sentences . . . and claims challenging convictions; it counts a failure to object to or appeal from an unfavorable judicial decision as a 'concession;' and it double-counts cases in which a petitioner won relief on numerous grounds, and considers co-defendants who won relief on the same claim(s) as individual concessions." DAO's Brief at 67.

does not concede relief only in cases in which it believes the defendant is actually innocent. As in this case, the DAO also concedes relief when it is convinced the defendant is guilty. *See* DAO's Response to Petition for Collateral Relief, 11/1/21, at ¶138 ("Given the record as a whole, the Commonwealth believes Brown was likely involved in the robbery and homicide[.]"); *see also* DAO CONVICTION INTEGRITY UNIT REPORT, OVERTURNING CONVICTIONS — AND AN ERA (CIU Report), 6/15/21, at 26 ("Although these cases did not warrant exonerations, they involved excessive and unjust punishments. In each of these instances, the CIU was able to seek justice only because it identified unrelated errors that gave the CIU an avenue to ensure they were resentenced to a fair and appropriate term of imprisonment.").[51] Consequently, as a matter of both fact and law, every concession by the DAO leading to relief is not an "exoneration." The DAO apparently "views a person as exonerated when new evidence, or newly discovered evidence, results in the dismissal of all charges against them." CIU Report, 6/15/21, at 19. On the contrary, the common meaning of exoneration is "[t]he clearing of someone's name after that person has been accused of blameworthy conduct or wrongdoing; vindication." *Exoneration*, Black's Law Dictionary (12th ed. 2024). The dismissal of charges does not vindicate an individual's actual innocence. *See Commonwealth v. Wright*, 14 A.3d 798, 819 (Pa. 2011) (Castille, C.J., concurring) ("A grant of a new trial, like a subsequent prosecutorial determination not to reprosecute, does not necessarily represent a determination of actual innocence.").[52]

---

[51] Available at *tinyurl.com/CIUreport* (last visited June 12, 2026).

[52] The point here is not to suggest prosecutors have a "duty to defend a conviction against any legal challenge, regardless of merit, unless there is clear evidence of actual innocence." Dissenting Opinion at 17 (Wecht, J.). They don't. As we state repeatedly throughout this opinion, their duty runs in the opposite direction: prosecutors are duty-bound to concede relief when the record and law call for a confession of error. Rather, (continued…)

While the DAO does not confine its concessions to cases of actual innocence, it does, for the most part, limit its concessions to the most serious cases. Overwhelmingly, the DAO's concessions have been in murder cases. Of the 120 concessions identified, 110 were in murder cases. There has been a particular focus on capital cases. The OAG reports that in January of 2018, "there were 47 Philadelphia defendants serving capital sentences[,]" and the DAO has "conceded 35 of those sentences[,]" a "concession rate" of "75%." OAG's Reply Brief at 10-11. Most of the DAO's concessions have led to convictions being overturned. *See* DAO's Brief at 67 n.36 ("Of the 115 cases [listed in the OAG's principal brief], 29 were concessions of penalty relief due to ineffective capital representation.").[53] The DAO has retried only one of these cases. *See* OAG's Brief at 44 n.19. In 45 of these cases, the DAO has subsequently had the charges *nolle prossed*, and in numerous others the defendant has pleaded guilty to lesser charges, often with a plea of *nolo contendere*. *See id.* at 15-30, 39-42; OAG's Reply Brief at 10 n.3. Some defendants awarded relief under the DAO's concession program have gone on to receive

---

the point here is to refute the false impression fostered by the DAO and others that its concession program is somehow an exoneration program; it is not.

[53] We do not emphasize the DAO's concentration on death and life sentences because it has "led to convictions being overturned." Dissenting Opinion at 18 (Wecht, J.). Nor do we "insinuat[e] that prosecutors' responsibilities to justice and due process depend upon the nature of the crime." Concurring and Dissenting Opinion at 21 n.16 (Donohue, J.). The significance of the DAO's focus on only the most serious sentences is that it suggests "the tail may be wagging the dog[,]" OAG's Reply Brief at 11 — that the concessions in these cases have been motivated by a policy-based opposition to the severe penalties imposed rather than legal considerations.

significant, multi-million-dollar payments from the City of Philadelphia in settlement of civil lawsuits.[54] At least one has gone on to become a suspect in new violent crimes.[55]

In addition to the present case, the DAO's concession program targeting murder cases has involved numerous other instances in which the DAO has conceded relief where none was warranted and engaged in other unreliable conduct. The following cases illustrate the gravity and extent of the problem.

### i. Robert Wharton

Robert Wharton and a friend forced their way into the home of Bradley and Ferne Hart at knifepoint, murdered the couple, and turned off the heat in the house. The murdered couple had a seven-month-old daughter, Lisa Hart, who was left in the house to freeze but ultimately survived. A jury convicted Wharton of first-degree murder and sentenced him to death. Wharton filed a federal habeas petition, which the district court denied. The Third Circuit vacated on the issue of whether trial counsel was ineffective for not investigating and presenting evidence of Wharton's positive adjustment to prison as mitigating evidence at the penalty phase. The Third Circuit ordered an evidentiary hearing on this issue and specified it should cover not only the mitigation evidence that went unpresented, but also the anti-mitigation evidence that the Commonwealth would have presented in rebuttal.

On remand, the DAO, which had steadfastly defended the death penalty against Wharton for decades, abruptly reversed course and conceded Wharton's habeas claim. The DAO represented to the district court that it had decided to concede relief following communications with the victims' family and careful review of the facts and the law. The

---

[54] *See* https://www.phila.gov/2020-12-31-city-and-chester-hollman-announce-settlement -of-wrongful-conviction (last visited June 12, 2026).

[55] *See* https://www.inquirer.com/crime/arkel-garcia-murder-charges-philip-nordo-202601 06.html (last visited June 12, 2026) (reporting that Arkel Garcia is suspected of committing two new murders and shooting a third victim following his release from prison).

district court did not accept the concession and appointed the OAG as *amicus*. The OAG disclosed to the district court information about Wharton's adjustment to prison the DAO had not, specifically that Wharton had attempted to escape from custody and been shot twice, and that he accumulated six prison misconducts. The OAG also provided the court with evidence that the DAO's communication with the victims' family had been minimal.

Following a multiday evidentiary hearing, in which the OAG participated, the district court held, contrary to the DAO's concession, that Wharton was not entitled to relief because he had not shown prejudice. In addition, the district court ruled the DAO violated its duty of candor to the court in two respects. First, the court held, the DAO's claim that it had carefully reviewed the facts and law lacked candor in light of its failure to investigate and disclose Wharton's attempted escape and prison infractions. Second, the court determined the DAO's representation that it had contacted the victims' family was misleading because the DAO had only contacted Bradley's brother and had not contacted Lisa or any other family members. Moreover, in its minimal contact with the brother, the DAO had not explained the situation clearly. The district court sanctioned the DAO by ordering DA Krasner to apologize in writing to four of the victims' family members, and by ordering the DAO to provide a full and balanced explanation of the facts when it seeks to concede federal habeas relief before the court in the future. The district court also referred the matter for disciplinary proceedings.[56]

On appeal, the Third Circuit likewise concluded the DAO displayed a lack of candor to the district court. In this regard, the Third Circuit pointedly noted: "Courts rely on lawyers' honesty; lawyers may not mislead them. But the Philadelphia District Attorney's Office did just that." *Wharton*, 95 F.4th at 143. The court also held the DAO "failed to

---

[56] A prosecutor in the DAO involved in *Wharton* was subsequently ordered disbarred from the bar of the United States District Court for the Eastern District of Pennsylvania based on his conduct in the case. His appeal of this order is pending in the Third Circuit. *See* Third Circuit, Dkt. No. 25-3264.

investigate reasonably to ensure that the claim [it conceded] was well-grounded in law and fact[.]" *Id.* at 150 (quotation marks and citation omitted). Accordingly, the federal Court of Appeals affirmed the imposition of sanctions. Separately, the Third Circuit affirmed the denial of habeas relief because it found "Wharton cannot show that he suffered prejudice from his counsel's failure to offer his prison records as mitigating evidence at sentencing." *Wharton*, 95 F.4th at 127.

### ii. Kevin Johnson

Kevin Johnson and an accomplice shot and killed a drug dealer. The jury convicted him of first-degree murder, and he was sentenced to life imprisonment. The DAO and Johnson filed in federal court a compromise and settlement agreement for habeas relief. Among other things, the agreement asserted the three eyewitnesses who testified against Johnson at trial — James Smith, Opal Nickson, and Elisha Bennett — were not credible because they "were high on cocaine and marijuana[,]" "[l]ighting conditions were poor[,]" and "[i]t was nighttime." *Johnson v. Kerestes*, 13-3197, ECF No. 77, Settlement Agreement, 10/14/21, at ¶41. The parties claimed that "[a]ccording to what the science has taught us about eyewitness identifications, the facts surrounding the identifications in this case (*i.e.* the time and circumstances of the offense) suggest there is a significant risk of mistaken identifications." *Id.* at ¶44. The DAO and Johnson did not advise the district court that the eyewitnesses were previously acquainted with Johnson, and one (Nickson) had actually seen him earlier that same day. *See Johnson v. Mahanoy*, 144 F.4th 178, 182 (3d Cir. 2025) ("Smith, Nickson, and Bennett had all seen Johnson before[.]"); *id.* at 195 ("Nickson . . . testified that she knew it was Johnson because she 'remembered his face real good' from the neighborhood and had seen him earlier that

day.") (citation omitted).[57]  Additionally, per the agreement, the DAO agreed to waive all non-jurisdictional defenses, including exhaustion and procedural default,[58] and also agreed that Johnson was entitled to habeas relief.

The district court declined to automatically grant relief.  Instead, it ordered briefing and, "because the proceeding was no longer adversarial," invited the OAG to participate as *amicus*.  *Id.* at 184 (quotation marks and citation to record omitted).  The OAG "objected that the waivers amount[ed] to forum-shopping — an effort to force the federal court to address claims that should have been resolved in state court in a bid to lower a sentence that a new DA disliked" — and "thus argued that the federal [d]istrict [c]ourt had discretion to reject those waivers."  *Id.* (quotation marks and citation to record omitted).  The OAG also contended Johnson did not deserve habeas relief on the merits.  Importantly, the OAG provided the district court with evidence and information the DAO had not, including that each of the three eyewitnesses was previously acquainted with Johnson before they witnessed him murder the victim.  *See* OAG's Brief at 9 n.1.  The district court agreed with the OAG that the court had the discretion to decline the waivers, rejected the procedural-default waiver, and denied the habeas petition.

The Third Circuit affirmed.  In rejecting Johnson's argument that the district court had no discretion to reject the DAO's knowing and intentional waiver of the procedural-default bar, the Third Circuit explained:

> This case does not involve a normal confession of error.  The DA[O]'s office did not just confess error, making its office an adversary to Johnson in name

---

[57] Prior familiarity supports the reliability of an eyewitness identification.  *See Commonwealth v. Ali*, 10 A.3d 282, 303 (Pa. 2010).

[58] Under the exhaustion requirement, "a state prisoner must exhaust available state remedies before presenting his claim to a federal habeas court."  *Davila v. Davis*, 582 U.S. 521, 527 (2017).  A claim is procedurally defaulted, and therefore not subject to federal habeas review, if it was denied in state court "based on an adequate and independent state procedural rule."  *Id.*

only. It also sought to evade judicial review of its own confession by waiving its defenses. In other words, rather than set Johnson's petition up for meaningful review, it tried to clear his pathway to habeas relief through the [s]ettlement [a]greement. Johnson's case is one in a striking pattern of state-court murder convictions that have been overturned in recent years using similar alleged stratagems. . . . When prosecutors couple a confession of error with waiver stratagems like this one, in the face of opposition from an *amicus* that also represents the state's interests (the Attorney General), courts have discretion to consider whether accepting the DA's tactics would undermine their core reviewing function.

*Johnson*, 144 F.4th at 187.

### iii. Lavar Brown

As discussed, the present case is actually the second one involving Brown in which the DAO has unreliably confessed error. Following his conviction for the Rite Aid murder, Brown was separately convicted of first-degree murder and sentenced to death for murdering a second victim, Crawford. Following the denial of his first PCRA petition, he appealed to this Court. In September of 2017, the DAO filed a lengthy brief opposing relief. Thereafter, however, following the commencement of DA Krasner's administration in January of 2018, the DAO did a complete about-face. In April 2018, the DAO filed a joint motion with Brown confessing error with respect to his claim that his trial counsel was ineffective for not developing and presenting mitigating evidence at the penalty phase. This Court invited the OAG to participate as *amicus* and file a brief. In the DAO's brief in support of its joint motion, it argued its sudden concession was not merely persuasive but binding on this Court. The DAO insisted that "when a district attorney makes a 'reasoned fact and policy-based decision not to defend a particular conviction or sentence,' this Court must immediately remand for imposition of the agreed-upon relief, as this Court may not 'second-guess legitimate exercises of prosecutorial discretion.'" *Brown*, 196 A.3d at 143, *quoting* DAO's Supplemental Brief at 3. The OAG countered that this Court cannot accept confessions of error by a prosecutor without conducting independent judicial merits review.

This Court rejected the DAO's position as to the binding nature of its concession, as well as its assessment of the merits of the conceded ineffectiveness issue. The Court held in no uncertain terms that "neither the parties, by agreement, nor this Court, absent a finding of legal error, have the power or ability to order that the jury's verdict be commuted to a life sentence without parole." *Id.* at 144. In other words, the Court declaimed, "a district attorney's concession of error is not a substitute for independent judicial review." *Id.* at 146. Moreover, the Court disagreed with the DAO's assessment of the merits of the conceded mitigation ineffectiveness issue, and instead "conclude[d] that the PCRA court did not err" in denying this claim. *Id.* at 161.

### iv. Derek Murchison

Derek Murchison was convicted of first-degree murder and sentenced to life imprisonment for the strangulation of Linda Willis. The evidence against him at trial included testimony demonstrating he was close to the victim's house at the time of the murder; he acknowledged he was coming from the victim's house and she had just put him out; he confessed the murder in detail to the mother of two of his children; he told another woman he had gotten into a fight, the man's girlfriend jumped in, and he hit her with a stick; he had a black eye, scratches on his face, and a busted lip around the time of the murder; and he twice attempted to escape after he was arrested. In addition to this testimonial evidence, the Commonwealth introduced DNA evidence from the crime scene, none of which implicated Murchison. Following direct appeal and one round of PCRA review, Murchison filed a second PCRA petition alleging the results of new DNA testing constituted after-discovered evidence entitling him to relief. Murchison sought a new trial, or, in the alternative, offered to plead *nolo contendere* to third-degree murder in exchange for a reduced sentence of 20 to 40 years' imprisonment. In response, on July 9, 2019, the DAO filed a short letter with the PCRA court advising that, "after thoroughly

reviewing the DNA testing results and the trial notes," it would agree to PCRA relief and accept Murchison's plea offer. *Commonwealth v. Murchison*, 328 A.3d 5, 12 (Pa. 2024), *quoting Commonwealth v. Murchison*, 294 A.3d 1251, 1258 (Pa. Super. 2023) (*en banc*). Hence, the DAO's pre-concession investigation was limited to reviewing the new DNA test results and the trial transcript. It did not consult with any DNA experts, seek any additional DNA or other forensic testing, or interview any of the multiple witnesses presented at trial. The PCRA court dismissed the petition, and the Superior Court *en banc* affirmed.

On appeal to this Court, the DAO continued to agree with Murchison that he was entitled to relief. On the other hand, the OAG, which we invited to participate as *amicus*, argued the new DNA evidence was not likely to compel a different jury verdict. This Court unanimously agreed with the OAG that the after-discovered DNA evidence did not demonstrate that a different outcome would be likely and accordingly affirmed the Superior Court's order.

### v. Dontez Perrin

Dontez Perrin was convicted of robbing a pizza delivery man. Lynwood Perry, who participated in the robbery, testified against him at trial. Perrin subsequently filed a post-sentence motion alleging that Curtis Brown, who was incarcerated with Perry, heard Perry state Perrin was not involved in the robbery. At an evidentiary hearing, Brown testified that Perry told him he lied about Perrin at trial. The trial court denied Perrin's post-sentence motion. The Superior Court, however, reversed and remanded for the determination of whether Brown's testimony was credible so as to justify a new trial. Because the original trial judge was no longer sitting, the Superior Court directed the trial court to hold a new evidentiary hearing so it would not have to rely on a cold record to make its credibility determination.

Following the remand, the DAO interviewed Brown and, based on this interview and the supposed scarcity of evidence supporting Perry's account, concluded that if Brown were to testify at a new evidentiary hearing, he "would do so credibly." *Commonwealth v. Perrin*, 291 A.3d 337, 341 (Pa. 2023) (emphasis and citation omitted). The DAO did not attempt to interview Perry. Thereafter, the DAO and Perrin filed a joint memorandum of law and stipulations of fact providing that if Brown were called to testify at another evidentiary hearing his testimony would be consistent with his testimony at the prior hearing and credible; there was no need for an evidentiary hearing to hear Brown's testimony a second time; and Perrin was entitled to a new trial. The trial court did not accept the stipulations, and after the parties repeatedly refused to participate in the evidentiary hearing ordered by the Superior Court, denied Perrin's motion.

On appeal to this Court, the DAO contended trial courts are required to accept all factual stipulations proposed by the parties. On the other hand, the OAG, which the Court appointed as *amicus*, insisted trial courts retain the discretion to decline to accept factual stipulations regarding ultimate, dispositive issues of fact. This Court sided with the OAG. The Court held "the parties' attempt to stipulate as to Brown's credibility intruded into the trial court's jurisdiction and prerogative" and, thus, the joint stipulations filed by the DAO and Perrin were "neither valid nor enforceable." *Perrin*, 291 A.3d at 346; *see also id.* ("Parties cannot require the court to accept any such stipulation as binding during post-verdict fact-finding.").

### vi. Javier Artache

Javier Artache shot a man in the head and was convicted of first-degree murder. He filed a petition for a writ of habeas corpus in federal court claiming his trial counsel was ineffective for not objecting to the trial court's consideration of his post-arrest silence at his bench trial. The district court denied the petition. On appeal, the DAO "confess[ed]

error" and "recommended that [the Third Circuit] grant the appeal." *Artache v. Superintendent SCI Forest*, No. 22-1500, 2023 WL 8468613 at *4 (3d Cir. 2023) (unpublished). "Because '[i]t is the uniform practice of [a federal court] to conduct its own examination of the record in all cases where the Federal Government or a State confesses that a conviction has been erroneously obtained,' [the Third Circuit] appointed [*a*]*micus* to present counterarguments." *Id.* (citation omitted). Based on these counterarguments, the Third Circuit affirmed the denial of habeas relief. In particular, the Third Circuit rejected an argument by the DAO in support of granting Artache relief as unsupported by the record. *See id.* at *5 ("[T]he Commonwealth did not cite to the trial record for this proposition. Nor could it have.").

### vii. Rasean Malone

Rasean Malone filed an unsuccessful federal habeas petition challenging his second-degree murder conviction. Thereafter, he filed two motions to amend the petition. "Although the [DAO] had fought him throughout the initial petition, it had a change of heart and consented to the motions. It's not clear why." *Malone v. Smith*, 2023 WL 2351694 at *2 (E.D. Pa. 2023). "Because our adversarial system works best when someone presents both sides, [the district court] solicited the Pennsylvania District Attorneys' Association [PDAA] to file an *amicus* brief if it had a view different from . . . Malone and his newfound friends at the [DAO]." *Id.* The PDAA did, in fact, have a different view, and "with the benefit" of its briefing, the district court denied Malone's motions. *Id.* at 2-3.[59]

---

[59] Malone appealed to the Third Circuit. While this federal appeal was pending, however, the DAO conceded PCRA relief in state court and entered into a negotiated guilty plea with Malone.

### viii. Isiah Mickeals

Isiah Mickeals shot and killed Jose Ortiz when Ortiz intervened to try to prevent Mickeals from robbing a woman. "Mickeals was unconditionally identified by an eyewitness multiple times, he matched the description of the person on the surveillance footage [depicting a man riding his bike away from the crime scene], and he voluntarily confessed to the murder." *Commonwealth v. Mickeals*, 335 A.3d 13, 25 (Pa. Super. 2025). Based on this evidence, Mickeals was convicted of second-degree murder and related offenses. Years later, he filed a second, untimely PCRA petition alleging a *Brady* violation. The DAO filed a response conceding the violation and asserting Mickeals was entitled to a new trial. At a scheduled evidentiary hearing on the petition, Mickeals insisted he was entitled to relief based on the agreement of the DAO. The PCRA court responded "that it need not accept any agreement between Mickeals and the DAO and that Mickeals had the burden to establish that his [p]etition was timely." *Id.* at 19. Nonetheless, both Mickeals and the DAO refused to present any evidence at the hearing.[60] Accordingly, the PCRA court dismissed the petition as untimely. On appeal, the Superior Court invited the OAG to participate as *amicus*, and it filed a brief in support of the PCRA court's order. The Superior Court concluded Mickeals's petition was untimely and therefore "the PCRA court lacked jurisdiction to consider the [p]etition and jurisdiction could not be conferred on the PCRA court through an agreement with the DAO." *Id.* at 25.

### ix. Salvatore Chimenti

In 1982, Salvatore Chimenti shot Andrew Tucker seven times, killing him. He was subsequently convicted of first-degree murder. Then, in 1984, Chimenti and the Commonwealth reached an agreement providing that if Chimenti cooperated in the

---

[60] The DAO did, however, "attempt to add to the factual record" on appeal, which request was denied because the DAO "'elected to present no evidence at the PCRA hearing when this evidence could have been entered into the record.'" *Id.* at 19 n.7, *quoting* Order, 3/26/25 (*per curiam*).

Commonwealth's investigation of his trial counsel, his conviction would be vacated and he would plead guilty to murder generally, with a certification that the degree of guilt would rise no higher than third degree. The trial court sentenced Chimenti to a mandatory term of life imprisonment. Chimenti and the Commonwealth filed a joint petition with the President Judge of the Superior Court to effectuate their agreement. The President Judge granted the petition and ordered the case remanded to the trial court "for special assignment to a judge who shall, on application of the parties vacate appellant's sentence and . . . accept [Chimenti's] negotiated guilty plea." *Commonwealth v. Chimenti*, 507 A.2d 79, 80 (Pa. 1986). This Court, however, assumed plenary jurisdiction and vacated the President Judge's order:

> This order reduced the prospective hearing judge to a "rubber stamp," empowered only to perform a ministerial function. Neither [the President Judge], nor the Superior Court at large, possessed such power. The order in question was also problematic on another score in that [the President Judge] effectively abrogated a jury verdict without any semblance of a record. We can in no way condone such an action[.]

*Id.* at 83.

Thereafter, on direct appeal, initial PCRA review, and habeas review, the Commonwealth opposed relief. However, on February 23, 2018, the DAO filed a letter in the trial court providing:

> The history of this case has revealed that [Chimenti's] good faith reliance on a plea agreement, combined with this office's ongoing interference in effectuating the terms of that agreement, has resulted in an inability to effectively litigate and prove a violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States.
>
> In order to remedy the constitutional violation recognized and agreed to by this office in 1984, we will no longer oppose the original plea agreement offered and entered into by The Honorable Edward Rendell when he was District Attorney. Accordingly, we agree [Chimenti's] conviction and sentence should be vacated, a new trial granted and, pursuant to the terms of the 1984 plea agreement, he shall then enter a plea to murder (not to rise higher than third degree) and [p]ossession of an [i]nstrument of [c]rime. In turn, the Commonwealth will recommend that your client be sentenced to

the maximum term of imprisonment legally allowed for those crimes at the time of the offense — 12.5 to 25 years.

*Commonwealth v. Chimenti*, 218 A.3d 963, 972 (Pa. Super. 2019), *quoting* DAO's Letter, 2/23/18. Three days later, Chimenti filed a serial PCRA petition, which he claimed was timely under the governmental interference exception to the PCRA's one-year filing deadline. *See* 42 Pa.C.S. §9545(b)(1)(ii). Specifically, he argued the Commonwealth interfered with his ability to effectively litigate his claims by opposing relief prior to the DAO's February 23, 2018 letter, in contravention of the 1984 post-verdict agreement. The DAO filed an answer advocating for relief. The PCRA court dismissed the petition as untimely.

The Superior Court affirmed. It held "[t]he Commonwealth did not, as [Chimenti] contends, renege on its plea bargain negotiations, but rather zealously sought to uphold the plea in the Pennsylvania Supreme Court." *Chimenti*, 218 A.3d at 975, *quoting Commonwealth v. Chimenti*, 524 A.2d 913, 919 n.2 (Pa. Super. 1987). Moreover, the Superior Court "reject[ed] [Chimenti's] claim of governmental interference that the Commonwealth should have abided by an alleged agreement which was voided by the Supreme Court of Pennsylvania." *Id.* The panel continued: "notwithstanding the fact the current District Attorney's Office 'agrees' its predecessors breached the agreement, and thus [Chimenti] is entitled to PCRA relief, we reject such an argument as it is beyond the power of the District Attorney. To adopt the position of the current District Attorney on the so-called plea agreement would allow the District Attorney to usurp the power of the judiciary, including that of our Supreme Court." *Id.* at 975-76. This Court denied allowance of appeal.[61]

---

[61] Thereafter, Chimenti filed yet another PCRA petition, and the DAO again conceded relief. On November 16, 2023, the PCRA court vacated his sentence. In addition, he pleaded guilty to third-degree murder, the court resentenced him, and he was immediately released from custody.

### x. Antonio Martinez

Antonio Martinez was convicted of first-degree murder and voluntary manslaughter for the shooting deaths of Hector and Luis Camacho. In 2019, he filed a serial petition for PCRA relief in state court. While that petition was still pending, he also filed a petition for habeas relief in federal court. In its response to the federal filing, the DAO agreed there had been *Brady* violations and that Martinez was entitled to relief. The DAO additionally advised the district court it was waiving all exhaustion and procedural default defenses because the district court was better equipped to address Martinez's claims in an expedient fashion, Martinez was represented by counsel in federal court but not in state court, the state court judge was not acquainted with the case, and the state courts were essentially closed due to the pandemic.

The DAO asserted Martinez's federal habeas petition necessitated immediate attention. Relying on these representations, the district court expended significant time and resources reviewing the merits of the petition and scheduled the matter for an evidentiary hearing. "In discussing the evidence to be presented at that hearing, [the court] asked counsel whether they had interviewed either the [trial prosecutor] or the assigned detectives regarding the withheld *Brady* material and learned that neither counsel had done so." *Martinez v. DelBalso*, 19-5606, ECF No. 52, Order, 12/1/20, at 4. The court, on the other hand, viewed the trial prosecutor's testimony at the hearing "as indispensable information that any responsible prosecutor and/or judge would want to carefully consider before agreeing to overturn a double homicide state court conviction." *Martinez v. DelBalso*, 2021 WL 510276 at *1 (E.D. Pa. Feb. 11, 2021). In addition to thoroughly reviewing the matter and scheduling an evidentiary hearing at which the trial prosecutor was to testify, the court also took the highly unusual step of granting bail to Martinez pending the resolution of his federal habeas petition. However, the court was

compelled to vacate this order two days later when the DAO informed the court that Martinez was wanted for homicide in Puerto Rico.[62]

On October 23, 2020, a little over two weeks before the scheduled evidentiary hearing in federal district court at which the trial prosecutor was poised to testify, the federal proceedings were mooted by developments in state court which took the federal court by complete surprise. "[U]nbeknownst" to the district court, but with the prior agreement of the DAO, the state PCRA court granted Martinez's PCRA petition, his judgment of sentence was vacated, the DAO dismissed the charges against him, and he was immediately released from prison. *Id.* at *1. Accordingly, that same day, the DAO and Martinez filed a stipulation of dismissal in federal court.

The district court concluded the DAO violated its duty of candor to the court by failing to advise it that Martinez's case was being fully and simultaneously litigated in state court:

> [W]hat occurred here is not . . . analogous to a civil or criminal matter that morphed from a trial to a settlement or plea agreement. Nor is it a lapse of "courtesy" on the part of the District Attorney. In the matter before me, lawyers from a very public office, held to the highest standard of candor to the court, either knowingly or through a lack of understanding of basic federal habeas principles, engaged in the clearly discouraged process of parallel state and federal post-conviction litigation and did so without advising the federal court that this was occurring. Last minute settlements, pleas, and amended pleadings are allowable by the law and are sometimes even encouraged. But ongoing, simultaneous state PCRA proceedings, in the midst of federal habeas litigation, is strongly disfavored. . . .
>
> Given the undeniable importance of state court exhaustion in habeas matters, and after affirmatively advising that it sought to litigate the claims raised in Petitioner's PCRA petition in federal, not state court, the District Attorney should have advised me well before October 23 that it was fully engaged in parallel state court litigation.

---

[62] Information was subsequently received from Puerto Rico that it had no "present intent to prosecute" Martinez. *Id.* at *1 n.3 (citation omitted).

*Id.* at *12; *see also id.* ("In short, a fair reading of the record reflects that state court litigation, which commenced at least as far back as March 26, 2019, began proceeding simultaneously with the federal court habeas case, and triggered counsel's duty of candor obligation, in July 2020, when the state court began issuing [o]rders and the CIU Supervisor contacted the state court judge seeking to avoid dismissal of the PCRA petition."); *id.* at *9 ("Having waived exhaustion and having provided specific reasons for doing [so], that were based upon the extraordinary needs of this particular case, candor required that the CIU Supervisor notify the federal court at once if and when, in her view, those extraordinary needs no longer existed."). Although the district court did not impose sanctions, it "admonish[ed]" the DAO in an opinion and directed that, "[g]oing forward, in habeas matters assigned to [its] docket in which the [DAO] chooses to affirmatively waive state court exhaustion, status reports will be required regarding any state court litigation." *Id.* at *13.

### xi. Dontia Patterson

Dontia Patterson shot and killed Antwine Jackson. A jury convicted him of first-degree murder, and he was sentenced to a mandatory term of life imprisonment. On February 16, 2018, the PCRA court vacated the judgment of sentence and ordered a new trial. Three months later, on May 15, 2018, the DAO filed a motion to enter *nolle prosequi* requesting dismissal of the charges against Patterson. The motion was signed by the then-Supervisor of the DAO's Homicide Unit. Among other things, the motion alleged Patterson was "probably innocent," criticized the case against him as "illogical" because he and the victim were "friends," and contended his conviction was "an egregious example of police and prosecutorial misconduct." N.T. *In re Bochetto*, 2/26/25, at 36-37, 112-13. The next day, the trial court granted the DAO's motion and *nolle prossed* the charges.

Subsequently, the trial prosecutor in Patterson's case testified in RTKL proceedings related to the case. She testified the DAO's *nolle prosequi* motion included numerous false statements, including that an eyewitness did not identify Patterson from a surveillance video as testified to at trial, the two eyewitnesses did not previously know Patterson, he and Jackson were friends, and Patterson was distraught following the killing. *See* N.T. *In re Bochetto*, 2/21/25, at 45-47, 57-60; *see also id.* at 60 ("We will be here for a long time if we go through all of the issues with this motion. I mean, it is like nobody read the file."); *id.* at 61 (describing motion as "load of baloney"). The former Supervisor of Homicide who signed the motion, thereby verifying it was true and correct, testified he did not know if there were false statements in the motion, he did "virtually nothing" to assure himself of the accuracy of the motion, he did not read it before he signed it, and he did not agree the trial prosecutor engaged in misconduct. *See* N.T. *In re Bochetto*, 2/26/25, 148-49, 158, 162, 174. He acknowledged it was a "reckless act" and a "mistake" for him to sign "something that [he] did not review[,]" and he "shouldn't have done it." *Id.* at 172, 176. The court presiding over the RTKL action concluded the DAO's dismissal motion in the Patterson case "most certainly" reflected "a distinct lack of candor and provision of salient information" to the court which granted it. N.T. *In re Bochetto*, 3/13/25, at 6. In addition, the court determined:

> the information that was provided [to the court] in the motion for *nol pros* blaming prior prosecutors had no good faith basis. And there were . . . factors that were recited that were blatantly wrong. Inculpatory information was omitted. And what was presented to [the court] defies all logical understanding. A prosecutor has a duty well and above a defendant's counsel. That duty extends to justice for everyone, including the defendant, the victims, families of the respective persons, the community at large. The responsibility of a prosecutor is reiterated within the Rules of . . . Professional Conduct. I invite everyone to read it again.

*Id.* at 6-7.[63]

*   *   *

These cases, and the present one, likely represent only a fraction of the DAO's problematic concessions since January of 2018. For the most part, the DAO's many concessions have not been subjected to any sort of adversarial testing. Hearing from both sides is generally the best means to expose problems and ensure a reliable and just outcome; this is the "very premise of our adversary system of criminal justice." *Cronic*, 466 U.S. at 655; *Herring*, 422 U.S. at 862. Also, uncontested concessions generally produce scant records, which can make it difficult or impossible for courts to assess their reliability. The incidence of court findings of unwarranted concessions and other improprieties would almost certainly be higher, perhaps significantly so, if more of the concessions had been tested by opposing advocacy. However, the courts tasked with adjudicating the numerous cases in which the DAO has conceded relief have generally lacked the vetting and truth-determining benefits of adversarial proceedings. Regardless, the problems evident in the present case and the others discussed above provide ample cause for concern.

To recap, in at least ten cases the DAO has been held by state and federal courts to have wrongly conceded relief where none was warranted under the law: this case, *Brown*, *Wharton*, *Johnson*, *Murchison*, *Perrin*, *Artache*, *Malone*, *Mickeals*, and

---

[63] Justice Donohue alleges "the [m]ajority simply accepts the OAG's summary of" these other problematic concession cases. Concurring and Dissenting Opinion at 7 n.5 (Donohue, J.). In fact, as is evident from the foregoing discussion of these matters, we have substantially relied on the opinions and judgments of the courts who presided over these cases, courts which Justice Donohue praises for having "effectively engaged in independent review[.]" *Id.* at 7. The judicial opinions upon which we rely, seven of which were published, confirm as a matter of law that the DAO unreliably conceded relief or otherwise committed misconduct in these cases.

*Chimenti*.[64]  In addition, the DAO has violated its duty of candor to the court in a number

of concession cases.  Here, the DAO filed joint stipulations of fact falsely claiming Brown's

July 22, 2003 police statement was the first in which Vann implicated Brown or Lyons,

and it also submitted pleadings repeating this same falsehood as well as several others.

In *Wharton*, the DAO lacked candor when it falsely claimed it had carefully reviewed the

facts and the law and misleadingly represented it had contacted the victims' family.  The

DAO in *Martinez* violated its duty of candor by failing to disclose to the federal court the

parallel post-conviction proceedings occurring simultaneously in state court.  And in

*Patterson*, the DAO's motion to dismiss the charges included information that was

blatantly wrong.

The DAO has also time and again withheld relevant evidence from the courts.

Presently, the DAO withheld the March 2003 memorandum.[65]  The DAO in *Wharton* did

not disclose Wharton's escape attempt or prison misconducts.  In *Johnson*, the DAO did

---

[64] Justice Wecht insists these cases "amply demonstrate[] that our criminal justice system is operating exactly as it should . . . and requires no intervention or recalibration." Dissenting Opinion at 20 (Wecht, J.).  Justice Donohue agrees.  *See* Concurring and Dissenting Opinion at 7 (Donohue, J.) ("[F]rom my reading, these examples demonstrate that these courts effectively engaged in independent review in conducting concession of error proceedings.").  This argument unreasonably assumes the courts are presently able to recognize each and every one of the DAO's unreliable concessions.  But this is almost certainly not the case.  Courts are substantially reliant on the arguments, representations, and record made by the parties.  They cannot go beyond the record, conduct their own investigations, contact fact witnesses, or retain their own experts.  Given these limitations, it seems to us all but inevitable that unreliable confessions of error go unidentified and relief is granted where it is not warranted.  The present case is illustrative.  But for this Court's extraordinary step of granting King's Bench jurisdiction, the unreliable concession here would never have been exposed.  A criminal justice system in which the courts are able to catch only a fraction of the DAO's questionable confessions of error is not one "operating exactly as it should."

[65] This fact alone disproves Justice Donohue's contention the existing "tools at a [PCRA] court's disposal" are adequate to "ensure the effective administration of justice." Concurring and Dissenting Opinion at 7 (Donohue, J.).

not inform the court that the eyewitnesses were previously acquainted with Johnson. In *Patterson*, the DAO omitted inculpatory information from its motion for a *nolle prosequi*.

In multiple cases, the DAO has failed to conduct a reasonable investigation before conceding. *Sub judice*, the DAO limited its investigation to the pleadings and its own records, declining to interview even one witness. In *Wharton*, notwithstanding its false claim of a careful review, the DAO did not even do simple checks of Wharton's criminal and prison records, which would have revealed his escape attempt and prison misconducts. In *Perrin*, the DAO did not attempt to interview the witness that the defense claimed had recanted. In *Murchison*, the DAO simply reviewed the new DNA test results and the trial transcript, and did not consult with any DNA experts, pursue any additional testing, or interview any witnesses.

Further, the DAO has repeatedly sought to avoid evidentiary hearings in cases where it has conceded. For instance, the DAO opposed an evidentiary hearing in this case. In *Wharton*, the DAO sought to forestall the evidentiary hearing ordered by the Third Circuit by filing its misleading concession notice on remand to the district court. In *Perrin*, following a remand by the Superior Court for an evidentiary hearing, the DAO filed joint stipulations insisting a hearing was unnecessary, and when the stipulations were rejected, refused to participate in the ordered hearing. The DAO in *Mickeals* refused to present any evidence at the evidentiary hearing ordered by the PCRA court. In *Martinez*, the DAO successfully preempted an evidentiary hearing in federal court by arranging, without the federal court's knowledge, to have relief granted in state court. The DAO's recurring reluctance to present evidence in open court casts serious doubt on the dependability of its concessions. The DAO's aversion to evidentiary hearings raises the question of why, if the defendant's entitlement to relief is truly so clear as to warrant concession, the DAO would not want the evidence supporting this result publicly aired.

To be clear, what is concerning about the DAO's concessions is not that it is conceding relief, or even that it is conceding relief in a great many cases. Although the list of DAO concessions is certainly long — not to mention disproportionately weighted to the most serious crimes — the "number alone" is not what draws concern. Dissenting Opinion at 16 n.55, 17 (Wecht, J.). Again, as a minister of justice and not simply an advocate, the DAO must concede relief when the facts and law call for it. *See* Pa.R.P.C. 3.8 exp. cmt. [1]. Rather, what concerns us is whether the DAO's concessions are reliable, that is, whether they are actually called for under the facts and the law. Because if a concession is not reliable — such as when it is made for purely personal, political, ideological, policy, or other non-legal reasons — there is a grave risk it will result in the erroneous grant of relief, which is precisely what happened in this case.

More unreliable concessions and erroneous grants of relief seem certain to follow. We are informed "more than 1,000 cases still await review" by the CIU. Professors' *Amici* Brief at 15. And this is on top of the thousands of cases handled by the DAO's Law Division, which also routinely concedes cases. *See* DAO's Brief at 67. The DAO does not acknowledge any problem or need to reform its practices. As it has in the past when its concessions have been called into question by state and federal courts alike, the DAO has simply "doubled down," *Wharton*, 95 F.4th at 150, insisting, despite considerable evidence and myriad court findings to the contrary, that there is nothing wrong. *See* DAO's Brief at 57 ("What is actually occurring is a painful but necessary course correction to ensure the office is complying with its prosecutorial duties[.]"); *id.* at 76 ("This case is what it looks like when the system works."). In reality, there have been serious problems with the DAO's concessions and its conduct, both in this case and a number of others,[66]

---

[66] Justice Donohue claims we have "equate[d] advancing arguments that are ultimately rejected [by a court] as misconduct by [the] DAO." Concurring and Dissenting Opinion at 7 n.6 (Donohue, J.). A fair reading of this opinion plainly demonstrates otherwise. As (continued…)

and the DAO's steadfast refusal to recognize as much contributes to the likelihood they will continue.[67]

### e. Remedial Measures

Having identified the serious problems posed by the DAO's aggressive and unreliable concession program, we turn to remedies. "[O]ur Court possesses broad authority to craft meaningful remedies when required." *League of Women Voters v. Commonwealth,* 178 A.3d 737, 822 (Pa. 2018), *citing, e.g.*, PA. CONST. art. V, §§1, 2, 10. Significantly, we do not believe existing procedures for vetting the DAO's concessions are adequate to ensure correct and just outcomes. The DAO argues that "[p]ursuant to rules already in effect, common pleas courts have the discretion to appoint *amici curiae* where they believe *amicus* participation would be helpful[.]" DAO's Brief at 74. True enough, but the role of *amicus* is quite limited, as the DAO itself acknowledges. *See id.* at 83. "[A]n *amicus curiae* is not a party[.]" *Shirley v. Pa. Legislative Reference Bureau*, 318 A.3d 832, 857 (Pa. 2024), *quoting Commonwealth v. Cotto*, 753 A.2d 217, 224 n.6 (Pa. 2000); *see United States v. Michigan*, 940 F.2d 143, 165 (6th Cir. 1991) (*amicus* "has never been recognized, elevated to, or accorded the full litigating status of a named party or a real party in interest"). Rather, the participation of *amicus* is generally confined

---

detailed at length above, the misconduct that concerns us is not that the DAO is "acting as an advocate by presenting arguments . . . to advance unresolved legal propositions[,]" *id.*, but that it is failing to conduct reasonable investigations before conceding cases, evading required evidentiary hearings, failing to show candor to courts, and withholding relevant information and evidence from courts.

[67] Throughout this opinion, we have elected to refer to "the DAO" generally when speaking of the conduct of its attorneys in the cases discussed. This was intentional. Although this Court is "responsible for the Rules of Professional Conduct that govern lawyers and attorney discipline[,]" *In re Bruno*, 101 A.3d at 665, *citing, e.g.*, PA. CONST. art. V, §10(c), we did not exercise King's Bench jurisdiction to determine in the first instance whether particular attorneys involved may have violated the Rules of Professional Conduct; such is the purview of the Pennsylvania Attorney Disciplinary Board. Our primary concern here is with the demonstrated pattern of misconduct by the DAO as an entity under the leadership of DA Krasner.

"to brief[ing] and argu[ing] as a friend of the court." *Id.* Moreover, *amicus* "cannot raise issues not set forth by the parties." *Banfield v. Cortes*, 110 A.3d 155, 172, n.14 (Pa. 2015); *see Commonwealth v. Tharp*, 754 A.2d 1251, 1253 n.5 (Pa. 2000) ("An *amicus curiae* is not a party and cannot raise issues that have not been raised or preserved by the parties."). Also, lacking party status, *amicus* has no right to appeal. *See* Pa.R.A.P. 501 (providing that "**any party** who is aggrieved by an appealable order . . . may appeal therefrom") (emphasis added); *In re Barnes Found.*, 871 A.2d 792, 794 (Pa. 2005) ("[T]he general rule is that only parties may appeal a decision.").

Given these constraints, *amicus* generally cannot conduct discovery, present its own evidence, challenge evidence adduced by the parties, raise new issues, participate in an evidentiary hearing, or seek appellate review. In other words, *amicus* is not sufficient to develop the fulsome record and engage in the robust adversarial testing crucial to a correct result. Take the PCRA proceedings in this case for instance. While Family Members sought to intervene to litigate the merits of Brown's PCRA petition, they were granted only *amici* status and were accordingly limited to briefing and arguing the case, with no access to the DAO's files. Despite their diligence in this circumscribed role, material evidence was nonetheless withheld from the court, the court accepted a false stipulation of fact, a required evidentiary hearing was not held, and relief was granted where none was warranted. It took the extraordinary step of this Court exercising its rarely invoked King's Bench jurisdiction for the multiple problems with the PCRA proceedings to be fully revealed, and for the court's erroneous award of a new trial to be undone. As the present case clearly exemplifies, when it comes to the DAO's problematic concession program, the availability of *amicus* participation is inadequate to safeguard against erroneous grants of relief; more is required.

Under our state constitution, this Court has "the power to prescribe general rules governing practice, procedure and the conduct of all courts . . . if such rules are consistent with th[e c]onstitution and neither abridge, enlarge nor modify the substantive rights of any litigant[.]" PA. CONST. art. V, §10(c). The Court generally exercises its constitutional rulemaking authority through the rules committee process. This process certainly has "much to recommend" it. *Commonwealth v. Bradley*, 261 A.3d 381, 407 (Pa. 2021) (Dougherty, J., concurring). As this author observed in *Bradley*:

> Members of the rules committees are selected by this Court for their good judgment and expertise. They generally have varied backgrounds and bring diverse viewpoints and perspectives to their work. The committees operate by consultation and consensus. They receive outside input through the public notice and comment process. They are empowered to empanel special subcommittees to focus on specific issues.

*Id.* However, referral to the appropriate rules committee(s) can be quite time consuming, and this Court has declined to follow this path where "we ought not to countenance any further delay." *Id.* at 405 (majority opinion); *see Commonwealth v. Holmes*, 79 A.3d 562, 586 (Pa. 2013) (Saylor, J., concurring) (endorsing "rulemaking" in "adjudicatory setting" "given the need for prompt clarification"); Pa.R.J.A. 103(a)(3) ("A proposed rule or amendment may be promulgated even though it has not been previously distributed [by the Rules Committee] and published [in the Pennsylvania Bulletin] . . . , where exigent circumstances require the immediate adoption of the proposal; or where the proposed amendment is of a typographical or perfunctory nature; or where in the discretion of the Supreme Court such action is otherwise required in the interests of justice or efficient administration."). So too here we believe the pressing concerns raised by the DAO's faulty concession program necessitate prompt action by this Court. *See In re Bruno*, 101 A.3d at 672 ("[T]he power of King's Bench allow[s] the Court to innovate a swift process and remedy appropriate to the exigencies of the event."). As we have previously, "we do so 'with an eye towards reasonable fairness and the orderly administration of justice,'"

and "subject to the possibility of future refinements, or the adoption of other alternatives through the rulemaking process." *Bradley*, 261 A.3d at 383 n.2, *quoting Holmes*, 79 A.3d at 586 (Saylor, J., concurring).

Pursuant to this Court's constitutional procedural rulemaking authority, we now hold that in any PCRA case in which the DAO concedes relief, the PCRA court, before ruling on the concession, shall afford the OAG notice and an opportunity to intervene. Importantly, if the OAG elects to intervene in the case, it will not "replace" or supersede the DAO; the DAO shall remain in the case. Dissenting Opinion at 3 (Wecht, J.). The OAG will merely become an additional, full party in the case providing its own perspective on the concession. The OAG may agree with the defendant and the DAO that relief is warranted, or it may not, but in either case its independent assessment and participation will foster reliable proceedings and correct results.[68]

Our holding applies only in Philadelphia County, but that is because that is where the problem is.[69] It is only in Philadelphia County that there has been a pronounced, documented pattern of highly problematic prosecutorial concessions. This Court has "often undertaken flexible measures deriving from our broad power at King's Bench" to render county-specific relief when warranted. *In re Bruno*, 101 A.3d at 671; *see id.* ("Perhaps the most notable examples of the flexibility necessary for this Court to ensure the integrity of the judiciary arose in our response to the revelation of criminal charges

---

[68] In addition to third-party participation, the OAG requests access to the full files of the DAO, mandatory evidentiary hearings before relief is granted based on claims of fact, and entitlement to appeal as of right. *See* OAG's Brief at 47-50. The OAG can request discovery and evidentiary hearings pursuant to the existing rules governing these procedures. *See* Pa.R.Crim.P. 902(E), 907, 908, and 909(B). As a full party, the OAG may appeal the PCRA court's decision as of right. *See* Pa.R.A.P. 501; *Barnes*, 871 A.2d at 794.

[69] Nevertheless, we fully endorse Justice Brobson's view that "PCRA courts throughout the Commonwealth will benefit from the lessons learned in this case when faced with similar circumstances." Concurring Opinion at 3 (Brobson, J.).

involving two trial judges in Luzerne County," where we ordered a review of "all Luzerne County juvenile court adjudications and dispositions that had been affected by [the judges'] criminal actions" so we could take "appropriate remedial actions to rectify the situation as fairly and swiftly as possible."). Moreover, the Court's broad rulemaking power encompasses the promulgation of rules applicable to a specific county. For instance, the rules in Chapter 10 of the Pennsylvania Rules of Criminal Procedure apply only to proceedings in Philadelphia County. *See* Pa.R.Crim.P. 1000(A) ("The rules in this chapter govern all proceedings in the Philadelphia Municipal Court, including summary cases; Municipal Court cases, as defined in Rule 1001(A); the filing of appeals from Municipal Court cases; the filing of petitions for writs of certiorari; and the preliminary proceedings in criminal cases charging felonies, Part A, and govern proceedings in summary traffic cases in Municipal Court Traffic Division, Part B.").

Today's ruling does not abridge, enlarge, or modify the substantive rights of any litigant in contravention of Article V, Section 10(c). A substantive right is "[a] right that can be protected or enforced by law; a right of substance rather than form." *Substantive Right*, Black's Law Dictionary (12th ed. 2024). In other words, "[s]ubstantive rights are rights established by law. The term 'substantive' does not mean rights that are 'important' or 'substantial,' but rather those that have been conferred by the Constitution, by statute, or by the common law." *Id.*, *quoting* 1 James W. Moore, Moore's Federal Practice §1.05[2][b], at 1-29 (3d ed. 2016). A procedural right, on the other hand, is "[a] right that derives from legal or administrative procedure; a right that helps in the protection or enforcement of a substantive right." *Procedural Right*, Black's Law Dictionary (12th ed. 2024). "Procedural rights include trial by jury, fair and impartial administration of justice, speedy arraignment and trial, reasonable bail, and representation by counsel." *Id.*; *see Commonwealth v. Morris*, 771 A.2d 721, 738 (Pa. 2001) ("As a general rule, substantive

law is that part of the law which creates, defines and regulates rights, while procedural laws are those that address methods by which rights are enforced."). "[T]he demarcation between procedur[al] and substantive rights" can be "shadowy and difficult to determine." *Laudenberger v. Port Auth. of Allegheny Cty.*, 436 A.2d 147, 150 (Pa. 1981).[70] Simply because the "performance" of a rule "will touch upon substantive rights" does "not mean that the rule is an inappropriate topic for Supreme Court rule-making." *Id.* at 155. "This Court should not be prevented from exercising its duty to resolve procedural questions merely because of a collateral effect on a substantive right." *Id.* "Most rules of procedure will eventually reverberate to the substantive rights and duties of those involved." *Id.* Ultimately, "[w]e must . . . seek to determine the purpose of the rule in order to properly characterize its nature" as substantive or procedural. *Id.* at 150.

Presently, the rights of the defendant and the DAO are not impacted whatsoever by notice to the OAG and the OAG's opportunity to intervene. Assuming the OAG takes advantage of its opportunity to intervene, the defendant stays in the case as a full party and can continue to advocate for relief using every lawful process and procedure. The same goes for the DAO. It is not "displace[d]." Dissenting Opinion at 24 (Wecht, J.). The DAO remains a full party along with the defendant, and these parties are joined by a third, the OAG, which is also headed by a prosecutor "duly elected" by "[t]he people of Philadelphia" (as well as those of the rest of the Commonwealth). *Id.* at 2, 24. The Attorney General, like the Philadelphia District Attorney, is also a "representative" "chose[n]" by the "Philadelphia electorate." *Id.* at 20. Likewise, today's decision does not "override" or "manage" the "discretion" of the DAO, "diminish[]" the DAO's "authority[,]" or

---

[70] In *Craig v. Magee Memorial Rehabilitation Center*, 515 A.2d 1350 (Pa. 1986), this Court suspended the mandatory provisions of the version of Pa.R.Civ.P. 238 (damages for delay in actions for bodily injury, death or property damage) upheld in *Laudenberger*. However, *Craig* specified: "We do **not** overrule the rationales of *Laudenberger*, for they have vitality of their own in the context of the ends sought." *Id.* at 1353 (emphasis added).

"interfere[] with [its] obligation to rectify the injustice of a conviction improperly obtained." *Id.* at 24, 39; Concurring and Dissenting Opinion at 21 (Donohue, J.). The DAO retains the same discretion and authority it has always had to litigate cases as it sees fit (within permissible ethical bounds).

Certainly, the OAG gains the right to intervene. But this is a procedural right, not a substantive one. Like trial by jury, fair and impartial administration of justice, speedy arraignment and trial, reasonable bail, or representation by counsel, intervention assists in the protection and enforcement of substantive rights. *See* 59 Am. Jur. 2d Parties §150 ("A statute or rule relating to intervention is purely procedural . . . and does not create substantive rights."). Indeed, this Court has promulgated numerous rules of procedure permitting intervention, none of which has ever been deemed to raise constitutional concerns. *See* Pa.R.C.P. 2327 (intervention in civil proceedings); Pa.R.J.C.P. 1133 (intervention in juvenile dependency cases); Pa.R.A.P. 1531 (intervention in petition for review proceedings); Pa.R.A.P. 3775 (intervention in proceedings against insurers). Of particular note, the Court has enacted procedural rules permitting intervention by the OAG. *See* Pa.R.C.P. 235 (in any civil proceeding "in which an Act of Assembly is alleged to be unconstitutional or a charitable bequest or trust is involved and the Commonwealth is not a party," OAG "may intervene as a party or may be heard without the necessity of intervention"); Pa.R.A.P. 521(b) (if constitutionality of statute is called into question on appeal and Commonwealth is not party, OAG "may be heard on the question of the constitutionality of the statute involved without formal intervention[,]" or if OAG "files a brief concerning the question the Commonwealth shall thereafter be deemed to be an intervening party in the matter").[71] The procedural rule we announce today fits

---

[71] Parenthetically, we observe the Criminal Procedural Rules Committee has published a proposal to adopt a new rule of criminal procedure providing for notice to the OAG, and the opportunity for the OAG to intervene, in the event of a criminal proceeding in which (continued…)

comfortably among these procedural rules governing intervention.[72]  In any event, any

effect on substantive rights is unintended and collateral.  The purpose of the rule is not to

diminish or augment the rights of any party but rather to promote reliable outcomes.[73]

___

an Act of Assembly is alleged to be unconstitutional.  *See* Criminal Procedural Rules Committee, Publication Report, Proposed Adoption of Pa.R.Crim.P. 579.1 (Apr. 12, 2025) (available at https://www.pacodeandbulletin.gov/Display/pabull?file=/secure/pabulletin/d ata/vol55/55-15/485.html) (last visited June 12, 2026).  The modest notice-and-opportunity-to-intervene procedure we adopt herein is of the same ilk.

[72] Permitting the OAG to intervene as a full party with "the ability to file pleadings, request discovery, participate in hearings, present evidence, and make substantive arguments" does not transform's today's constitutional procedural rule into an unconstitutional "substantive mandate."  Dissenting Opinion at 27, 39 (Wecht, J.).  Indeed, multiple existing procedural intervention rules constitutionally promulgated by this Court, including those specifically pertaining to the OAG, expressly permit full party status.  *See* Pa.R.A.P. 3775(c)(2) ("When the applicant's interest involves a discrete controversy relating to the administration of the insurer's business or estate, the Court may grant the applicant limited intervention to participate **as a party** in the discrete controversy.") (emphasis added); Pa.R.C.P. 235 ("The Attorney General may intervene **as a party** or may be heard without the necessity of intervention.") (emphasis added); Pa.R.A.P. 521(b) ("If the Attorney General files a brief concerning the question the Commonwealth shall thereafter be deemed to be **an intervening party** in the matter.") (emphasis added).

[73] Justice Donohue questions whether the involvement of the OAG will foster reliable results because "[a]fter [DA] Krasner was elected, many former prosecutors from [the] DAO relocated to the OAG[,]" and these attorneys have "a potential bias in favor of upholding convictions they procured[.]"  Concurring and Dissenting Opinion at 13-14 n.11 (Donohue, J.).  This Court has repeatedly invited the OAG to participate as *amicus curiae* in cases successfully prosecuted by a prior administration of the DAO in which the DAO under DA Krasner has subsequently conceded relief.  *See Commonwealth v. Murchison*, 315 A.3d 830 (Pa. 2024) (*per curiam*); *Perrin*, 291 A.3d at 342; *Brown*, 196 A.3d at 313; *see also Commonwealth v. Drummond*, 261 A.3d 1035 (Pa. 2021) (inviting OAG to participate as *amicus* where DAO conceded trial counsel was ineffective).  To be sure, there is a "distinction between participating as *amicus* and as a party."  Concurring and Dissenting Opinion at 13-14 n.11 (Donohue, J.).  But not when it comes to bias.  If, as Justice Donohue suggests, the OAG is so invested in upholding convictions procured by prior administrations of the DAO that it is incapable of providing "neutrality of perspective[,]" this prejudice would have surfaced in its role as *amicus* in the many cases where we have called upon its input.  *Id.*  Yet we have never noted any sort of partiality or bias on the part of the OAG in these matters.  To the contrary, we have praised the OAG's advocacy and, where appropriate, endorsed its positions.  *See Brown*, 196 A.3d at 145 ("As cogently explained by the Attorney General, the scope of prosecutorial (continued…)

The goal is fair and just PCRA proceedings. As such, today's decision does not exceed our constitutional rulemaking authority. *See Laudenberger*, 436 A.2d at 155 ("Clearly, Rule 238, when viewed from the perspective of its purpose and goal, contributes to the orderly and efficient administration of justice in Pennsylvania, and must stand.").

Our decision likewise does not contravene the CAA. On the contrary, Section 204 of the CAA squarely permits the OAG to intervene in PCRA cases. This section, titled "[l]egal advice and civil matters[,]" pertinently provides: "[t]he Attorney General shall represent the Commonwealth and all Commonwealth agencies and upon request, the Departments of Auditor General and State Treasury and the Public Utility Commission in any action brought by or against the Commonwealth or its agencies, and **may intervene in any other action**, **including** those involving charitable bequests and trusts or the constitutionality of any statute." 71 P.S. §732-204(c) (emphasis added). This provision grants broad authority to the OAG to intervene in civil matters. "The word 'any' is generally used in the sense of 'all' or 'every' and its meaning is most comprehensive." *In re Beleski's Estate*, 196 A.2d 850, 855 (Pa. 1964); *see also United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'") (internal quotations and citation omitted). Moreover, the word "action" is defined for purposes of the CAA to broadly

---

discretion changes as a criminal case proceeds, narrowing as the case nears completion."); *id.* at 194 (Dougherty, J., concurring) ("As the Attorney General cogently explains, a 'prosecutor is of course privileged to take a position on that claim; indeed, duty requires that he or she do so, in accordance with her good faith understanding of the applicable law. But the statute does not empower her to assume the role of the court, which is to decide.'") (quoting Attorney General's Brief at 10); *Perrin*, 291 A.3d at 346 (agreeing with OAG's position trial court was not required to accept parties' post-verdict stipulation to credibility of witness). There is no reason to believe the OAG will not provide the PCRA courts the same objective and helpful input it has consistently provided to this Court in DAO concession cases. Like Justice McCaffery, we have every confidence the OAG will perform its duties "with the honor, integrity, and perhaps most importantly, the impartiality required." Concurring Opinion at 19 n.19 (McCaffery, J.).

encompass "[a]ny action at law or in equity." 71 P.S. §732-102. The word "including" also indicates the statute's expansive scope. "[I]t is widely accepted that general expressions such as 'including,' . . . that precede a specific list of included items are to be considered as words of enlargement and not limitation." *Department of Environmental Protection v. Cumberland Coal Resources LP*, 102 A.3d 962, 976 (Pa. 2014); *see also Pennsylvania Human Relations Comm'n v. Alto-Reste Park Cemetery Ass'n*, 306 A.2d 881, 885 (Pa. 1973) ("The term 'include' is to be dealt with as a word of enlargement and not limitation[.]") (cleaned up). The expansive language of Section 204(c) permitting the OAG to intervene in any civil action readily subsumes the OAG's right to intervene in PCRA matters, which, as this Court has repeatedly recognized, are civil in nature. *See Commonwealth v. Haag*, 809 A.2d 271, 284 (Pa. 2002) ("The PCRA system is not part of the criminal proceeding itself, but is, in fact, civil in nature."); *Commonwealth v. Hill*, 16 A.3d 484, 495 n.14 (Pa. 2011) ("Technically, the PCRA is civil in nature."), *overruled on other grounds by Bradley*, 261 A.3d at 400; *see also Pennsylvania v. Finley*, 481 U.S. 551, 556-57 (1987) ("Postconviction relief is even further removed from the criminal trial than is discretionary direct review. It is not part of the criminal proceeding itself, and it is in fact considered to be civil in nature.").[74]

---

[74] Justice McCaffery agrees "the CAA provides the [OAG] the authority to intervene in any PCRA proceeding." Concurring Opinion at 13 (McCaffery, J.). Additionally, he submits "the CAA . . . expressly requires the [OAG] to represent the Commonwealth in PCRA proceedings." *Id.* In Justice McCaffery's view "the [OAG] not only has the right to intervene, but the obligation to represent the Commonwealth in PCRA proceedings." *Id.* at 24. He reasons that a PCRA petition is a civil action brought by a defendant against the Commonwealth, and "the CAA [via Section 204(c)] requires the [OAG] to represent the Commonwealth in any civil action brought against the Commonwealth." *Id.* at 15. Justice McCaffery forwards a textually rooted argument with logical force. However, the issue of whether the CAA requires the OAG to represent the Commonwealth in every PCRA case has not been raised by the parties or *amici*. Presently, the OAG seeks the opportunity to intervene as an additional party alongside the DAO, not to supersede the DAO as the sole representative of the Commonwealth. This Court has a "longstanding policy" against raising and deciding issues *sua sponte*. *In re Adoption of K.M.G.*, 240 (continued…)

Justice Donohue disagrees with our interpretation of Section 204(c) based on "the statutory construction doctrine of *ejusdem generis*[.]"  Concurring and Dissenting Opinion at 17 (Donohue, J.) (italics added).  Under this doctrine, "where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated."  *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 888 (Pa. 2020), *quoting Indep. Oil & Gas Ass'n of Pa. v. Bd. Of Assessment Appeals*, 814 A.2d 180, 184 (Pa. 2002).  "Where the opposite sequence is found, *i.e.*, specific words following general ones, . . . the doctrine is equally applicable, and restricts application of the general term to things that are similar to those enumerated."  *McClellan v. Health Maintenance Organization of Pennsylvania*, 686 A.2d 801, 806 (Pa. 1996) (opinion in support of affirmance); *see also Marcellus Shale Coalition v. Department of Environmental Protection*, 292 A.3d 921, 943 n.16 (Pa. 2023) (opinion announcing judgment of court) ("The doctrine also applies to situations where the generic words precede the list.").  "'[W]hile *ejusdem generis* is a useful tool of statutory construction,' it 'must yield in any instance in which its effect would be to confine the operation of a statute within narrower limits than those intended by the General Assembly when it was enacted.'"  *Corman v. Acting Secretary of Pennsylvania Dep't of Health*, 266 A.3d 452, 478 (Pa. 2021), *quoting DeVito*, 227 A.3d at 889.

Presently, Justice Donohue submits that, pursuant to the *ejusdem generis* doctrine, the specific examples enumerated in Section 204(c), *i.e.,* actions involving charitable bequests and trusts or the constitutionality of a statute, limit the application of the general phrase "any other action" to "those matters in which [the OAG's] interest has

A.3d 1218, 1234 (Pa. 2020) (cleaned up).  As such, we do not consider on our own motion the unraised question of whether the CAA mandates the OAG represent the Commonwealth in every PCRA proceeding.  We leave that issue for another day.

been explicitly recognized by statute." Concurring and Dissenting Opinion at 19. (Donohue, J.) (emphasis omitted). Had the General Assembly intended to simply cross-reference other statutory provisions, it would have done so. *See Commonwealth v. Wright*, 14 A.3d 798, 814 (Pa. 2011) ("[A]s a matter of statutory interpretation, although one is admonished to listen attentively to what a statute says[,] one must also listen attentively to what it does not say."), *quoting Kmonk–Sullivan v. State Farm Mut. Auto. Ins. Co.*, 788 A.2d 955, 962 (Pa. 2001). The "common thread" between the specifically enumerated examples in Section 204(c) is not an independent statutory interest, but rather a pronounced history of OAG involvement. *Cumberland Coal*, 102 A.3d at 976. The OAG has traditionally been heavily involved in charitable trust matters as well as cases implicating the constitutionality of statutes. *See In re Voegtly's Estate*, 151 A.2d 593, 594 (Pa. 1959) (noting "the necessity of the Attorney General's participation as an indispensable party in every proceeding which affects a charitable trust, whether the proceeding be one of invalidation, termination, administration or enforcement of such trust"); 71 P.S. §732-204(a)(3) ("It shall be the duty of the Attorney General to uphold and defend the constitutionality of all statutes so as to prevent their suspension or abrogation in the absence of a controlling decision by a court of competent jurisdiction."). PCRA proceedings fall into this same general class of matters in which the OAG has had a longstanding and active role. The OAG is routinely involved in PCRA litigation. *See* OAG's Brief at 1 ("The Office of Attorney General has a longstanding interest in the preservation of valid judgments of sentence and the proper treatment of post-conviction concessions. That interest has extended over many administrations and at least four

decades[.]"). Indeed, it is commonplace for the OAG to represent the Commonwealth in PCRA proceedings.[75]

In any event, the OAG has a statutorily recognized interest in PCRA matters. The Pennsylvania Constitution provides that the "Attorney General . . . shall be the chief law officer of the Commonwealth[.]" PA. CONST. art. IV, §4.1. Consistent therewith, the General Assembly has declared the Attorney General "the chief law enforcement officer of the Commonwealth[.]" 71 P.S. §732-206(a). Thus, the legislature has recognized the OAG's interest in criminal judgments and issues. Although PCRA proceedings are civil in nature, they nonetheless clearly implicate these subjects. *Ejusdem generis* confirms our reading of Section 204(c) to authorize the intervention of the OAG in PCRA cases.

Furthermore, we are not "violat[ing] the separation of powers." Dissenting Opinion at 21 (Wecht, J.); *see also* Concurring and Dissenting Opinion at 20 (Donohue, J.) ("This attempt to expand the duties beyond those established by the General Assembly violates the separation of powers[.]"). Today's decision does not "encroach[] upon the executive

---

[75] *See, e.g.*, *Commonwealth v. Taylor*, 283 A.3d 178, 181 (Pa. 2022) ("[T]he Pennsylvania Office of Attorney General . . . represented the Commonwealth in opposing Taylor's third PCRA petition."); *Commonwealth v. Brown*, 141 A.3d 491, 497 (Pa. Super. 2016) ("The attorney in the OAG's office who represented the Commonwealth with respect to Appellant's third PCRA petition was not involved in Appellant's original prosecution."); *Commonwealth v. Ahmad*, 2025 WL 2808637 at *1 (Pa. Super. 2025) (non-precedential decision) ("The Pennsylvania Attorney General represented the Commonwealth [in Ahmad's] PCRA [proceedings,] as Attorney Militello's law partner, [Attorney] Weisbrod, [ ] was the District Attorney-Elect at the time [Ahmad] filed his PCRA petition."), *quoting* PCRA court opinion; *Commonwealth v. Muhammed*, 2024 WL 4892509 at *1 n.1 (Pa. Super. 2024) (non-precedential decision) ("[T]he Office of the Attorney General represents the Commonwealth in these PCRA proceedings."); *Commonwealth v. Miller*, 2023 WL 7179446 at *1 (Pa. Super. 2023) (non-precedential decision) ("On April 4, 2022, having received no correspondence from Counsel, the PCRA court entered an Order providing the Commonwealth, represented by Deputy Attorney General Gregory J. Simatic, with 20 days to file its Motion to Dismiss the PCRA petition for untimeliness."); *Commonwealth v. Oglesby*, 2020 WL 7780108 at *3 (Pa. Super. 2020) (non-precedential decision) ("The Pennsylvania Office of the Attorney General represented the Commonwealth for the purposes of the instant PCRA."), *quoting* PCRA court opinion.

branch's discretionary decision-making authority[.]" Dissenting Opinion at 21 (Wecht, J.). With respect to the OAG, the Court is not coercing it to join PCRA cases against its wishes. The OAG has, of its own volition, requested this Court craft a mechanism whereby it be notified and given an opportunity to intervene in the DAO's concessions cases. While the Court invited the OAG to provide briefing and oral argument in this case, we never "solicited [the] remedy" of intervention. *Id.* at 26. Intervention was the OAG's idea. The Court is not imposing its will on the OAG; it is lawfully effectuating the discretionary will of the OAG. The OAG's discretion to intervene is not self-executing. *See id.* ("There is no need for this Court to 'effectuate' the discretion that the OAG already has, and that the OAG can 'effectuate' on its own."). Intervention must be court approved. *See* Pa.R.C.P. 2329. We are simply granting the OAG's discretionary request for notice and the opportunity to intervene, and there is nothing in the Pennsylvania Constitution, CAA, or elsewhere in our law barring us from doing so. Should the OAG subsequently determine, either under its current administration or another one, that it no longer wishes to be notified and afforded an opportunity to intervene in the DAO's concession cases, it is free to return to this Court and request a change of course.

Moreover, providing the OAG notice and an opportunity to intervene as a supplemental party does not in any way "override the discretion of . . . the DAO." Dissenting Opinion at 24 (Wecht, J.). As discussed, even assuming the OAG's joinder, the DAO will retain the identical discretion it always possessed to litigate the case however it deems appropriate. It may be that the OAG's involvement will impact the **court's** ultimate decision, but it will in no way infringe on the DAO's discretionary decision-making. And by no means are we invading "the lawmaking function of the legislative branch" or "manufactur[ing] an interest for the OAG that the General Assembly did not see fit to create." *Id.* at 21; Concurring and Dissenting Opinion at 20 (Donohue, J.).

Rather, as detailed above, we are faithfully applying the plain terms of Section 204(c) of the CAA, wherein the legislature expressly authorized the OAG to intervene in PCRA cases.

Lastly, our decision today is consistent with this Court's precedent. In *Commonwealth v. Carsia*, 517 A.2d 956 (Pa. 1986), the OAG filed criminal charges against an attorney related to his attempt to bribe two municipal policemen. However, none of the charges fit within Section 205(a) of the CAA, which specifies the types of cases the OAG has the power to prosecute.[76] Accordingly, this Court held the OAG

---

[76] Section 205(a) provides:

(a) Prosecutions.--The Attorney General shall have the power to prosecute in any county criminal court the following cases:

(1) Criminal charges against State officials or employees affecting the performance of their public duties or the maintenance of the public trust and criminal charges against persons attempting to influence such State officials or employees or benefit from such influence or attempt to influence.

(2) Criminal charges involving corrupt organizations as provided for in 18 Pa.C.S. § 911 (relating to corrupt organizations).

(3) Upon the request of a district attorney who lacks the resources to conduct an adequate investigation or the prosecution of the criminal case or matter or who represents that there is the potential for an actual or apparent conflict of interest on the part of the district attorney or his office.

(4) The Attorney General may petition the court having jurisdiction over any criminal proceeding to permit the Attorney General to supersede the district attorney in order to prosecute a criminal action or to institute criminal proceedings. Upon the filing of the petition, the president judge shall request the Supreme Court to assign a judge to hear the matter. The judge assigned shall hear the matter within 30 days after appointment and make a determination as to whether to allow supersession within 60 days after the hearing. The district attorney shall be given notice of the hearing and may appear and oppose the granting of the petition. Supersession shall be

(continued…)

lacked prosecutorial authority over the criminal charges and affirmed the dismissal of the information. In *Commonwealth v. Mulholland*, 702 A.2d 1027 (Pa. 1997), following the declaration of a mistrial, the trial court *sua sponte* ordered that if the defendants were retried, the District Attorney of Allegheny County would be removed and replaced with the OAG. None of the provisions of Section 205(a) permitting supersession by the OAG was implicated. Rather, the trial court rationalized the removal of the local district attorney by asserting a cloud of conflict of interest and the suspicion that the interests of justice were not being served. This Court reversed the replacement of the district attorney. The Court reasoned the assertion of a conflict of interest was unsupported by the record, and even

ordered if the Attorney General establishes by a preponderance of the evidence that the district attorney has failed or refused to prosecute and such failure or refusal constitutes abuse of discretion.

(5) When the president judge in the district having jurisdiction of any criminal proceeding has reason to believe that the case is a proper one for the intervention of the Commonwealth, he shall request the Attorney General to represent the Commonwealth in the proceeding and to investigate charges and prosecute the defendant. If the Attorney General agrees that the case is a proper one for intervention, he shall file a petition with the court and proceed as provided in paragraph (4). If the Attorney General determines that the case is not a proper case for intervention, he shall notify the president judge accordingly.

(6) Criminal charges investigated by and referred to him by a Commonwealth agency arising out of enforcement provisions of the statute charging the agency with a duty to enforce its provision.

(7) Indictments returned by an investigating grand jury obtained by the Attorney General.

(8) Criminal charges arising out of activities of the State Medicaid Fraud Control Unit as authorized by Article XIV (relating to fraud and abuse control), act of June 13, 1967 (P.L. 31, No. 21), known as the "Public Welfare Code," . . . and the Federal law known as the "Medicare-Medicaid Antifraud and Abuse Amendments."

71 P.S. §732-205(a) (footnote omitted).

if such a conflict did exist, the proper course of action would have been for the trial judge, through the president judge, to request the OAG's intervention in accordance with the statutory provisions of the CAA. Most recently, in *Commonwealth v. Mayfield*, 247 A.3d 1002 (Pa. 2021), the trial court removed the DAO and appointed a private attorney to serve as a special prosecutor and represent the Commonwealth in probation revocation proceedings. This Court held there was nothing in the CAA authorizing the trial court's action, and the court lacked inherent authority to summarily remove the DAO and appoint a special prosecutor. Consequently, the Court vacated the trial court's appointment order.

In contrast to these cases, the role of the OAG here is not to act in place of or replace the local prosecutor's office, nor is its involvement contrary to the CAA. We herein permit lawful supplemental participation by the OAG, not an unauthorized prosecution as in *Carsia*, or illegal supersession of the proper prosecuting authority as in *Mulholland* and *Mayfield*.

## V. Conclusion

The DAO insists its many concessions over the past eight years in mostly murder cases "simply demonstrate[] that the DAO has embraced its responsibility as a minister of justice[.]" DAO's Brief at 7. We endorse in the strongest possible terms a prosecutor's duty to minister justice. Lest there be any uncertainty on this score, we reiterate that a prosecutor is ethically obliged to concede relief on PCRA review when (but only when) the facts and law support it. We also emphasize that our decision is not intended to "counteract [the] policy choices" of the DAO. Concurring and Dissenting Opinion at 21 (Donohue, J.). DA Krasner remains free "to exercise his discretion on behalf of the Commonwealth in Philadelphia's criminal [and PCRA] cases." Dissenting Opinion at 24 (Wecht, J.). But the means for achieving those ends cannot transgress the bounds of the law, and what we have seen in this case and too many others is the opposite of justice.

Again and again, the DAO has made unreliable concessions unsupported by the facts and law. And when conceding relief, the DAO has repeatedly lacked candor to the court, misrepresented facts, failed to conduct adequate investigations, and inexplicably dodged necessary evidentiary hearings. This Court too has a "duty . . . to minister justice." *Commonwealth ex rel. Holly v. Ashe*, 82 A.2d 244, 248 (Pa. 1951) (internal quotation and citation omitted). Indeed, our "principal obligations are to conscientiously guard the fairness and probity of the judicial process and the dignity, integrity, and authority of the judicial system, all for the protection of the citizens of this Commonwealth." *In re Bruno*, 101 A.3d at 675. Our duty to safeguard justice compels us to order that in all PCRA cases in which the DAO concedes relief, the PCRA court shall afford the OAG notice and the opportunity to intervene before ruling on the concession.

The order of the PCRA court is reversed and the matter is remanded to that court for further proceedings consistent with this opinion.

Justices Mundy, Brobson and McCaffery join the opinion.

Justice Brobson files a concurring opinion in which Justice Mundy joins.

Justice McCaffery files a concurring opinion

Justice Donohue files a concurring and dissenting opinion in which Chief Justice Todd joins.

Justice Wecht files a dissenting opinion.